E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
ALI MOGHADDAS (Cal. Bar No. 305654)
Assistant United States Attorney
Major Frauds Section
      1100 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-6527/1786
      Facsimile: (213) 894-6269
      E-mail:   scott.paetty/ali.moghaddas@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>THOMAS VINCENT GIRARDI, and<br>CHRISTOPHER KAZUO KAMON,<br><br>          Defendants. | No. CR 23-00047-JLS-1<br><br>GOVERNMENT'S OPPOSITION TO<br>DEFENDANT THOMAS VINCENT GIRARDI'S<br>MOTION FOR ORDER FINDING<br>INCOMPETENCY; EXHIBITS 1-28<br><br>Hearing Date:  August 23, 2023<br>Hearing Time:  8:30 a.m.<br>Location:  Courtroom of the<br>Honorable Josephine L. Staton |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Scott Paetty and Ali

Moghaddas, hereby files its opposition to defendant Thomas Vincent

Girardi's motion for order finding incompetency.

//

//

//

This opposition is based upon the attached memorandum of points and authorities, the attached exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 2, 2023          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

    /s/
SCOTT PAETTY
ALI MOGHADDAS
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION....................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND..............................3

      A.    Relevant Facts...........................................3

            1.    GK's Financial Decline in 2019-2020................3

            2.    COVID-19 Pandemic and Lion Air Lawsuit............4

            3.    Divorce, Civil Contempt, Criminal Referral, and
                  Defendant's and GK's Involuntary Bankruptcy........6

            4.    Defendant's Brother Files for Conservatorship......8

      B.    ████████████████████████████████████████████....10

            1.    ███████████████████████████████........11

            2.    ██████████████████████████████████....13

            3.    ███████████████████████████████████████
                  ██████████████████████████████████....16

III.  LEGAL STANDARD................................................18

IV.   ARGUMENT......................................................20

      A.    Defendant Is Malingering and Exaggerating His Symptoms
            To Avoid a Possible Trial or Imprisonment...............20

            1.    Defendant's Public Interactions Before and After
                  His Conservatorship in January 2021 are
                  Inconsistent with His Claimed Symptoms and Show
                  Malingering......................................21

            2.    ████████████████████████████████████████...29

            3.    ██████████████████████████████████████....33

## <u>TABLE OF CONTENTS (CONTINUED)</u>

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

B.   Defendant Has the Present Ability to Understand the
     Proceedings Against Him and to Assist in His Defense.....36

C.                    Competent ████████████████████
     ████████████..........█████████████████.....39

D.   Commitment is Mandatory if Defendant is Found
     Incompetent...............................................43

V.   CONCLUSION....................................................43

### TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

United States v. Kasim,
 No. 07-CR-56-PPS-APR,2010 WL 339084 (D. Ind. Jan. 21, 2010) .. 41, 42

Arave v. Hoffman,
 522 U.S. 117 (2008) ............................................. 18

Drope v. Missouri,
 420 U.S. 162 (1975) ............................................. 19

Dusky v. United States,
 362 U.S. 402 (1960) ......................................... 18, 37

Hoffman v. Arave,
 455 F.3d 926 (9th Cir. 2006) ............................... 18, 36

Jones v. Covello,
 No. 13-CV-7792-JWH, 2021 WL 4222699 (C.D. Cal. May 6, 2021) . 31, 32,
  35, 36

Mata v. Johnson,
 210 F.3d 324 (5th Cir. 2000) ............................... 18, 28

Sherwood v. Neotti,
 No. ED 11-CV-1728-CJC, 2020 WL 2572459 (C.D. Cal. May 21, 2020) .. 31

Smith v. Armontrout,
 812 F.2d 1050 (8th Cir. 1987) ............................... 18, 28

United States v. Benson,
 No. 12-CR-00480-YGR-1, 2015 WL 1869476 (N.D. Cal. Apr. 22, 2015) . 41

United States v. Brown,
 147 F. Supp. 3d 312 (E.D. Pa. 2015) ......................... 41, 42

United States v. Buckingham,
 2020 WL 7238273 (N.D. Ala. Dec. 9, 2020) ....................... 42

United States v. DeCoteau,
 630 F.3d 1091 (8th Cir. 2011) .................................. 19

United States v. Frank,
 956 F.2d 872 (9th Cir. 1991) ................................... 19

United States v. Hoskie,
 950 F.2d 1388 (9th Cir. 1991) ............................... 18, 19

United States v. Lindley,
 774 F.2d 993 (9th Cir. 1985) ........................... 19, 23, 26

United States v. Mackovich,
 209 F.3d 1227 (10th Cir. 2000) ......................... 19, 28, 30

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

United States v. Patel,
    524 F. Supp. 2d 107 (D. Mass. 2007) ............................... 41

United States v. Timbana,
    222 F.3d 688 (9th Cir. 2000) ................................. 18, 28

United States v. Turner,
    644 F.3d 713 (8th Cir. 2011) .................................... 19

United States v. Vallone,
    698 F.3d 416 (7th Cir. 2012) .................................... 41

Vogt v. United States,
    88 F.3d 587 (8th Cir. 1996) ..................................... 19

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3

After decades of lying to clients and misappropriating millions

4

of dollars from Girardi Keese ("GK") trust accounts, defendant

5

Thomas Vincent Girardi's house of cards came crashing down at the

6

end of 2020 when he and others at GK were sued by several clients

7

alleging the theft of millions of dollars from their settlement

8

funds.  When news broke, other creditors, including additional

9

clients who had likewise not received their settlements, also filed

10

suit.  As the pressure mounted from these multiple civil lawsuits,

11

GK was forced into involuntary bankruptcy by mid-December 2020.

12

Facing an avalanche of civil liability and potential criminal

13

exposure, defendant's response shifted from the facts of his alleged

14

wrongdoing to his purported diminished mental state.  Less than one

15

month after the bankruptcy proceedings were initiated, and criminal

16

and State Bar referrals were made by federal and state judges,

17

defendant's brother filed a petition in Los Angeles Superior Court

18

to have a conservator appointed, alleging that defendant could no

19

longer care for himself or his estate.  Without the benefit of any

20

adversarial testing, the petition was subsequently granted mere

21

months later.

22

Now, after being criminally indicted for his yearslong scheme,

23

defendant attempts to avoid being held to account for his conduct by

24

petitioning this Court to find him incompetent to stand trial.

25

However, despite defendant's asserted incompetence, evidence of his

26

normal routine immediately leading up to the demise of GK -- years

27

after defendant claims his purported mental competency issues began

28

-- demonstrates that his instant "symptoms" are exaggerated – an

1  artfully constructed self-serving portrait of a figure purportedly

2  so diminished as to be beyond the legal system's reach.  Indeed, in

3  the months leading up to defendant's conservatorship, he went to his

4  law firm nearly every day and worked on multiple cases, negotiated

5  loans to keep GK afloat, sat for multiple depositions and

6  interviews, and even moderated a panel discussion with other

7  attorneys sponsored by the Consumer Attorneys of California.  Only

8  after defendant's creditors started closing in, when an escape hatch

9  was needed most, was the issue of defendant's mental competency

10  first raised.

11  ███████████████████████████████████████████

12  ███████████████████████████████████████████████

13  ██████████████████████████████████████████

14  ████████████████████████████████████████████████

15  █████████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ███████████████████████████████████████████

18  █████████████████████████████████████

19  ███████████████████████████████████████████

20  ██████████████████████████████████████████████

21  ██████████████████████████    His purposeful manipulation of

22  these proceedings to avoid the consequences of a trial in this

23  matter directly demonstrate how cunning and capable he truly is.

24      Based on evidence contained in the expert reports filed by both

25  parties in this matter, and evidence and testimony adduced at the

26

27  ───────────────────

28  [1] ██████████████████████████████████████████████

forthcoming competency hearing, the government will show, by a preponderance of the evidence, that defendant is presently competent to stand trial.

**II.   FACTUAL AND PROCEDURAL BACKGROUND**

    **A.   Relevant Facts**

        1.   <u>GK's Financial Decline in 2019-2020</u>

Before its downfall, GK was one of the preeminent plaintiff's law firms in the country. With defendant at its helm, the firm secured numerous verdicts and settlements worth hundreds of millions of dollars. Defendant held out himself and the law firm he captained as successful and first-rate. In fact, defendant and others at GK were secretly stealing millions from client trust accounts and lying to clients thereafter to cover it up. While defendant's thefts of client settlement funds spanned decades, he was able to conceal his fraud and lull his client-victims through Ponzi—like payments from other money streaming into the firm. However, in 2019 and 2020, GK's bank accounts began to dry up as settlements substantially slowed. By March 2019, GK had less than $200,000 in one of its two operating accounts, and a negative balance in the other. Worse yet, clients who were not receiving funds from their settlements began to threaten defendant with lawsuits and/or reporting him to the State Bar. To hold them at bay, beginning in 2019 defendant began selling off his personal assets, including tens of millions of dollars in his investment accounts and his $10 million ownership stake in a local casino. (<u>See</u> Exhibits 1 and 2 attached hereto.)[2] But that was not enough to

---

    [2] "Exhibit" refers to exhibits attached to this opposition. "Ex." refers to exhibits attached to defendant's motion.

satisfy his creditors or prevent further legal action against
defendant and GK.

2. <u>COVID-19 Pandemic and Lion Air Lawsuit</u>

Once the COVID-19 pandemic shut down the courts and effectively
halted all litigation, including settlements, the spigot of incoming
cash was virtually shut off.  During the pandemic, defendant came
into the office every day and urged his staff to do the same.
Acutely aware of his mounting financial troubles, in a September
2020 memo, defendant told his staff:

> Unfortunately, the "working at home" is not working.  Our
> income has been reduced by 90%.  Therefore, you have to
> come back to work in the office. . . .
>
> We have to come back to the office and start settling all
> of the smaller cases (up to $200,000.00).  The larger cases
> will have to wait for the courts to reopen.

(Exhibit 3.)  The next month, defendant circulated another
memo, telling staff how "devastating" the pandemic was to the firm's
finances, reducing income from $45-55 million the previous year to
less than $3.5 million.  (Exhibit 4.)  "Obviously, this has been a
massively difficult time for me if you are going to continue to work
from home."  (<u>Id.</u>)  Nevertheless, defendant's problems continued to
mount.

By December 2020, after months of empty promises, co-counsel in
the Lion Air plane crash case, Edelson PC, publicly filed a civil
RICO lawsuit against defendant and others at GK.  The lawsuit, and
subsequent criminal indictment in the Northern District of Illinois,
alleges that in early 2020, GK successfully negotiated approximately
$11 million in settlements for the families of victims killed in the
Lion Air plane crash.  <u>Edelson PC v. Girardi et al.</u>, Case No. 20-CV-

4

7115 (N.D. Ill.), Dkt 1; <u>United States v. Girardi, et al.</u>, Case No. 23-CR-54 (N.D. Ill.), Dkt. 1.  As alleged in the lawsuit and indictment, after GK received the settlement funds directly into its trust account, defendant immediately began to misappropriate the money for improper purposes including paying firm expenses and AMEX charges and paying other clients whose monies had been previously misappropriated, including victims underlying the allegations in the instant criminal matter.  (<u>Id.</u> at 5.)

As further alleged, in order to lull the Lion Air victims and keep them from reporting defendant's misconduct, defendant made numerous false misrepresentations to buy himself more time.  For example, in May 2020 -- after GK had already received all of the settlement funds -- defendant authored a letter in which he falsely told a victim that Boeing had given him "special authorization to distribute 50%" and that the "balance will be done within 30 days." (Exhibit 5.)  A month later, in June 2020, defendant wrote to another Lion Air victim that "[t]here are some serious issues" and that he "need[s] two more weeks.  I will insist that, at least, we get the interest in two weeks if I cannot resolve it."  (Exhibit 6.)

Two days after the Lion Air victims and Edelson PC filed their lawsuit demanding disgorgement of all monies due and owing to the clients in the Lion Air matter, defendant called ████████ and left a voicemail stating: "I saw your fraudulent allegations here. This is really terrible.  I think we got clearance to send money out today.  Do you want to call me?"  (Exhibit 7.)  Weeks later, defendant left another voicemail for ██████ stating:  "I think there's been some miscommunication here.  I think that we weren't supposed to distribute until all the money was in so people would

get paid at the same time. . . . The money's in trust. . . . Th[ere] was some negligence here, it's obviously, since I'm the head of the firm, it's my fault.  Let's work everything out in a nice way, please."  (Exhibit 8.)

Defendant's lulling letters and lies to clients, and even other attorneys, were not unique to the Lion Air matter.  During this time period, defendant was fielding angry calls from dozens of clients and attorneys demanding their money.  For example, in July 2020, defendant wrote to Client 3 in this case, falsely claiming, among other things, that he was "trying desperately to get everything figured out" and that "[s]ince there's a Bankruptcy Trustee, we have to get an understanding of how much goes to the Trustee and how much goes to you."  (Exhibit 9.)  As defendant then knew, Client 3 was actually involved in bankruptcy proceedings and defendant and Client 3's bankruptcy trustee had already negotiated the apportionment of Client 3's settlement funds (Exhibit 10 at 18 signed by defendant), which the bankruptcy court had approved earlier that year (Exhibit 11).

3.   Divorce, Civil Contempt, Criminal Referral, and
     Defendant's and GK's Involuntary Bankruptcy

Despite defendant's attempts to raise additional money either through the sale of his personal assets or through additional loans, by December 2020, GK did not have enough money left in its operating account to pay back all of the money stolen from clients or borrowed from lenders.  Immediately following the Edelson lawsuit, the Honorable Thomas M. Durkin, the district court judge presiding over the Lion Air civil case, ordered a hearing.  In re: Lion Air Flight

JT 610 Crash, Case No. 18-CV-7686 (N.D. Ill.), Dkt. 843.[3]  At a
December 14, 2020, telephonic hearing, which defendant attended,
defendant's then-counsel, criminal defense attorney Evan Jenness,
told the court that she "advised him to decline" to answer the
Court's questions about the allegations.  (Dkt. 852 at 16.)  When
asked whether defendant had the ability to pay the approximately $2
million owed to the Lion Air victims, Ms. Jenness advised that
defendant "does not have the immediate ability to pay.  He's
involved in a divorce proceeding and he and the firm have
substantial outstanding legal obligations and debts."  (Id.)
Finally, when Judge Durkin asked why civil sanctions should not be
ordered against defendant, Ms. Jenness -- for the first time --
claimed that defendant was unable "to understand the nature of the
proceedings or to provide [her] with useful information."  (Id. at
23-24.)  At the end of the hearing, the court held defendant in
civil contempt and made a criminal referral to the U.S. Attorney's
Office. (Id. at 19; see also Dkt. 848.)

In addition to the criminal referral and civil contempt
proceedings, by December 10, 2020, defendant had also received a
letter from the California State Bar's Office of the Chief Trial
Counsel, informing him that he was under investigation.  Five days
later, Los Angeles Superior Court Judge Holly Fujie issued a
separate order to show cause why defendant "should not be reported
to the California State Bar for misconduct and violation of the

---

[3] This civil action is the underlying product liability/wrongful
death case based on the Lion Air crash that ultimately gave rise to
the dispute between Edelson PC and Tom Girardi over defendant's
misappropriation of funds related to that case. (See Edelson PC v.
Girardi et al., Case No. 20-CV-7115 (N.D. Ill.).)

Rules of Professional Conduct for withholding settlement funds" in another matter.  <u>Ruigomez et al. v. Girardi et al.</u>, LASC Case No. 19STCV22296 (Dec. 15, 2020 OSC).  By December 18, 2020, following the foregoing allegations of fraud and theft of client funds, certain creditors of GK commenced an involuntary petition for bankruptcy, which was subsequently granted.  <u>In re Girardi Keese</u>, Case No. 20-bk-21022 (C.D. Cal.), Dkt. 1.

                4.   <u>Defendant's Brother Files for Conservatorship</u>

In January 2021, weeks after allegations of defendant's criminal conduct were made public, defendant's brother filed a petition for conservatorship in the Los Angeles Superior Court. (Exhibit 12.)  In support of his request, Dr. Nathan Lavid, a psychiatrist retained by defendant's criminal defense lawyer, submitted a declaration claiming defendant "suffers Alzheimer's disease with late onset."  (Lavid at 4, <u>available at</u> Ex. 20 to Defendant's Motion.)  Despite requests by interested parties, including the State Bar, for an independent evaluation, the probate judge ordered a conservatorship over defendant's person and estate based on defendant's purported "major neurocognitive disorder" without any independent evaluation.  (<u>See</u> Ex. 21 to Defendant's Motion.)

In April 2021, Ms. Jenness asserted, in a letter to the U.S. Attorney's Office in the Northern District of Illinois, that her client ███████████████████████████████ an insufficient present ability to consult with defense counsel with a reasonable degree of rational understanding."  (Exhibit 13 at 1.) She further quoted Dr. Lavid's report, which claimed that defendant "has almost no short-term memory," and concluded that "[t]hus, he is

incapable of understanding his current legal situation[.]"  (Id. at

2.)  Additionally, according to Ms. Jenness, as of April 2021,

defendant still believed GK was operational, with 43 employees on

its payroll.  (Id. at 5.)  Ms. Jenness also claimed that defendant

had no memory of the December 2020 proceedings and, after being

reminded, "then completely forgets the conversation such that the

cycle begins afresh when he's next told about what occurred."  (Id.

at 3.)

Up through this time, defendant was still living by himself.

(Exhibit 12 at 6.)  Although defendant's brother claimed that

defendant "c[ould] not care for himself," (id.), defendant continued

living alone in his 10,000+ square foot Pasadena mansion for nearly

nine months, from November 2020, when his wife filed for divorce,

until August 9, 2021, when his home was listed "for sale as a part

of the ongoing bankruptcy proceedings."  (Exhibit 14 at 3.)  During

this time, defendant entertained guests, kept his home in order, and

even warded off an intruder.  Indeed, according to defendant's

longtime secretary, ███████, in approximately April 2021, during a

social visit at his home, defendant told ██████ and others about a

break-in that had occurred several months earlier in January 2021

and even showed ██████ the broken window.  (Exhibit 15 at 2.)  In

fact, notwithstanding defendant's claims of late onset dementia and

"almost no short-term memory," defendant's account of the burglary

was corroborated by authorities who confirmed signs of forced entry

through a broken window.[4]   ██████ further described a subsequent

_____

[4] Brandon Lowrey, Girardi Pasadena Mansion Burglarized, Police
Say, Law360, Feb. 3, 2021, available at
https://www.law360.com/articles/1351805/girardi-s-pasadena-mansion-
burglarized-police-say.

9

1   social visit to defendant's home months later, this time accompanied

2   by another group of former GK employees.  (Id.)  During this social

3   visit, defendant and his former employees enjoyed several bottles of

4   wine that defendant served them while they all had lunch.  (Id.)

5   Shortly after this, in August 2021, defendant moved into a senior

6   living facility.

     **B.  Medical Experts Determine that Defendant is Competent to
7          Stand Trial**

8

9   On February 3, 2023, prior to defendant's initial appearance in

10  this case, defendant filed for a determination of competency

11  pursuant to 18 U.S.C. § 4241(a), which the Honorable Karen L.

12  Stevenson, Chief Magistrate Judge, ordered.  (Dkt. 20.)  In

13  compliance with this Court's order regarding competency (Dkt. 54),

14  the parties each retained a neuropsychologist and a neurologist to

15  evaluate defendant and issue a report.  The court in the Northern

16  District of Illinois likewise ordered a competency determination to

17  be based on the expert evaluations and reports completed in this

18  case.  United States v. Girardi, et al., Case No. 23-CR-54 (N.D.

19  Ill.), Dkt. 47, 56.



20

21

22

23

24

25

26

27

28

1.    

⁷ In his filing related to the government's motion to exclude
defense expert Kate Corrigan, defendant criticized Dr. Goldstein for
not interviewing defense counsel regarding their interactions with
defendant.  (See Dkt. 74 at 8.)  However, those interactions





2.









**III. LEGAL STANDARD**

A defendant is competent to stand trial if "he understands the proceedings and is able to assist counsel in his defense." <u>Hoffman v. Arave</u>, 455 F.3d 926, 937 (9th Cir. 2006) (citing <u>Dusky v. United States</u>, 362 U.S. 402 (1960) (overruled on other grounds, <u>Arave v. Hoffman</u>, 522 U.S. 117 (2008). The burden is on the government to prove competence by a preponderance of the evidence. <u>United States v. Hoskie</u>, 950 F.2d 1388, 1392 (9th Cir 1991).

The standard for the court to use in assessing competence is whether defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960). Mental deficiencies alone do not render an individual incompetent to stand trial. <u>Hoffman</u>, 455 F.3d at 938 ("The standard for competency to stand trial is lower than the standard for capacity to commit a crime."). In fact, the Ninth Circuit has upheld a district court's determination that a defendant was competent to stand trial despite suffering brain damage due to head trauma, borderline retardation, and dementia combined with partial paralysis. <u>See</u> <u>United States v. Timbana</u>, 222 F.3d 688, 701 (9th Cir. 2000). Other circuits have similarly held that evidence of mental disease, disorder, or defect does not, in and of itself, mean a defendant is incompetent. <u>Smith v. Armontrout</u>, 812 F.2d 1050, 1057 (8th Cir. 1987 (noting that it is possible that a defendant may have a mental disease, disorder, or defect, but may still be competent); <u>Mata v. Johnson</u>, 210 F.3d 324, 329 n.2 (5th Cir. 2000) (stating that presence or absence of mental illness or brain disorder is not dispositive);

18

1   United States v. Mackovich, 209 F.3d 1227, 1233 (10th Cir. 2000)

2   (noting that the Tenth Circuit Court of Appeals has long recognized

3   that a defendant is not necessarily incompetent simply because he

4   suffers from a mental disease or defect).  Thus, not every

5   manifestation of cognitive impairment demonstrates incompetency to

6   stand trial.  United States v. Turner, 644 F.3d 713, 725 (8th Cir.

7   2011).

8       Neither low intelligence nor mental deficiency compels a finding

9   of incompetency to stand trial.  Vogt v. United States, 88 F.3d 587,

10  591 (8th Cir. 1996); United States v. DeCoteau, 630 F.3d 1091, 1095-

11  96 (8th Cir. 2011) (finding defendant competent to stand trial

12  notwithstanding low IQ scores of 55 to 57 that placed defendant in

13  the "mild mental retardation range").  Although defense counsel's

14  observations are probative, the Court need not accept a lawyer's

15  representations concerning a client's competence.  Drope v. Missouri,

16  420 U.S. 162, 177 n.13 (1975).

17      A district court's finding that a defendant is competent to

18  stand trial is a question of fact which is reviewed for clear error.

19  United States v. Hoskie, 950 F.2d 1388, 1392 (9th Cir. 1991).

20  Evidence supporting a district court's finding of competence is

21  reviewed in the light most favorable to the government, United States

22  v. Frank, 956 F.2d 872, 874 (9th Cir. 1991), and the court has the

23  discretion to assign whatever weight it deems appropriate to the

24  findings of the experts produced by the parties, United States v.

25  Lindley, 774 F.2d 993, 993 (9th Cir. 1985).

26

27

28

1  **IV.   ARGUMENT**

2         Qualified experts have concluded that defendant is competent to

3  stand trial based on thorough evaluations.  Although defendant shows

4  ███████████████, his claims of legal incompetence are exaggerated and

5  fail in the face of concrete evidence of malingering and ████████████

6  ████████████████████████████████████████████████████████████

7         **A.   Defendant Is Malingering and Exaggerating His Symptoms To
             Avoid a Possible Trial or Imprisonment**

8

9         In the years leading up to December 2020, defendant juggled

10  hundreds of cases at GK, made numerous court appearances on complex

11  matters, negotiated millions in loans from litigation lenders, and,

12  most importantly, continued to successfully keep his ongoing

13  fraudulent scheme a secret from the public.  Defendant's experts

14  completely ignore the context in which defendant's purported ████████

15  arose -- that is, only after his legal problems and financial debts

16  were threatening to ruin him.  Their failure to address this

17  suspicious timing and the fact that legal incompetence conveniently

18  provides a way for defendant to evade accountability is a significant

19  flaw in their analysis.  Defendant's experts also ignore the

20  precipitous -- and, thus, incredible -- rate at which ████████████

21  ███████████████████████████████████ developed.  Defendant's public

22  interactions both at work and socially do not support his claimed

23  incompetency in 2020 or any steep decline resulting in incompetence

24  today.  To the contrary, ███████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  support the conclusion that defendant is exaggerating the effect of

27  any ████████████████████████████████

28

                                       20

1.   Defendant's Public Interactions Before and After His Conservatorship in January 2021 are Inconsistent with His Claimed Symptoms and Show Malingering

Defendant's motion repeatedly cites his 2017 accident as the impetus of his ▮▮▮▮▮▮▮▮▮▮.  However, in the years following 2017 and leading up to defendant's conservatorship in early 2021, defendant was acutely aware of his outstanding debts to both clients and creditors.  He continued to create excuses for delays, including through lulling letters and lulling payments that he directed his staff to send.

For example, as alleged in the indictment, defendant lulled Client 1 with nominal payments, including a $100,000 check in 2017, and letters containing calculated lies.  In a 2017 letter from defendant to Client 1, defendant claimed that "the only way we were able to settle this case was a commitment by me that I would make sure that the funds were used properly.  [Justice Panelli] indicated that he knew many young men who got a large amount of money and it ended up in a total disaster."  (Exhibit 20.)  Defendant's reference to retired California Justice Edward Panelli, who was in fact the mediator used in Client 1's case, was a common tactic he used to dissuade suspecting clients of any foul play.  Later, in 2018, defendant successfully negotiated a settlement of Client 3's lawsuit related to injuries caused by a defective medical device.  (Dkt. 1, Indictment at 11.)  Like many medical malpractice lawsuits, this case was complicated and involved sophisticated defense counsel, yet defendant effectively navigated complicated settlement discussions and successfully settled claims for 25 GK clients, including Client 3.  Indeed, as referenced supra Section II.A.2, that defendant was

21

able to invent a lie specific to Client 3, who was actually involved in a personal bankruptcy, demonstrates his mental acuity.

Then in 2020, defendant was also attempting to assuage the Lion Air victims and co-counsel, who were growing exceedingly suspicious that their settlement funds had been stolen. In multiple letters, defendant continued to lie about delays in payments, notwithstanding GK's full receipt of the settlement funds, by inventing detailed false excuses. (See, e.g., Exhibit 5 ("We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%. I feel fairly confident the balance will be done within 30 days."); Exhibit 6 ("There are some serious issues. I have been back east four times to get everything resolved. I think I need two more weeks. I will insist that, at least, we get the interest . . .").) Again, defendant's ability to juggle the dozens of angry clients who were calling him on a near daily basis, and to build upon the previous lies he had told them no less, demonstrates how high-functioning defendant was. (See, e.g., Exhibit 16 (voicemail from defendant in August 2020 falsely claiming that a payment was delayed by court closure), Exhibit 17 (voicemail from defendant in November 2020 falsely claiming that a payment was delayed by a purported tax issue), Exhibit 18 (letter from defendant in October 2020 re: same).)

Defendant's capabilities during this time period are also confirmed by witness accounts, including people who had frequent interactions with him. For example, ███████████, a longtime business partner of defendant who loaned defendant and GK millions of dollars, stated that over the course of their relationship, he never had any odd interactions or suspicions, where he thought defendant

was cognitively impaired.  (Exhibit 21 at 4.)  Rather, he has always

found defendant to be "very sharp and cunning."  (Id.)  ████████

also interacted with defendant immediately after his 2017 accident,

even getting lunch with him while he was still in a wheelchair

recovering from his leg injury.  (Id.)  Again, neither then nor at

subsequent meetings after the accident did defendant show any signs

of mental impairment.  (Id.; see also Exhibit 19 (voicemail from

defendant in March 2020 requesting additional funding from another

litigation lender.)  Moreover, attorneys and staff at GK, including

████████ who worked closely with defendant until December 2020,

denied ever having concerns about defendant being mentally impaired.[10]

(Goldstein at 62.)  █████ never observed him experience confusion,

difficulty in tracking conversations, or losing his train of thought.

(Id.)  And while she stated that defendant occasionally needed a

reminder regarding certain case details, she did not find that to be

remarkable given how many cases he oversaw.  (Id.)  Additionally,

defendant's longtime secretary, ████████ who also worked closely

with defendant until GK closed, confirmed that defendant oversaw

hundreds of cases and that despite occasional forgetfulness,

defendant still handled his busy schedule, and she never questioned

his mental fitness as a lawyer or the head of the firm.[11]  (See id.)

---

[10] ██████████ worked as a paralegal in the United States
Attorney's Office from January 2011 to March 2015.  She has had no
interaction with the agents or prosecutors on this matter other than
in interviews conducted pursuant to this investigation.

[11] ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

23

The foregoing is corroborated by video footage of defendant himself, including footage from 2019 and 2020, ███████████ ████████████████████████████   For example, in behind-the-scenes footage of defendant in October 2019, defendant is seen regaling his ex-wife and her friends with stories of his trials and his encounters with celebrities.  (Exhibit 22.)  Other stories defendant cogently told and topics he cogently discussed during this one-hour video include:

- His thoughts about challenges women have faced and statistics of women in his graduating law school class (starting at 2:00 and again at 12:10);

- His appointment to the Library of Congress and interactions with Senator Harry Reid (starting at 8:55);

- His experiences as a trial lawyer (starting at 15:00 and again at 27:10);

- His interactions with John Wayne (starting at 22:40);

- Stories about Sammy Davis Jr., Frank Sinatra, and Don Rickles (starting at 42:30); and

- Upcoming plans for a settlement conference and Las Vegas trip (starting at 47:15).

Defendant's stable cognitive functioning and comprehension continued into late 2020, when defendant sat for two depositions related to Client 1's settlement funds.  During the depositions, one of which was videotaped, defendant clearly tracked his testimony, making accurate reference to inquiries and responses from previous points in the examination.  (See Exhibits 23 and 24; Goldstein at 54-55.)  The following month, defendant also participated in a one-hour interview on a podcast where he described various trial strategies in

1    detail, (Exhibit 25), and in November 2020, just two months before

2    defendant's petition for conservatorship, defendant moderated a 90-

3    minute virtual panel with prominent plaintiff lawyers discussing

4    various aspects of trials, (Exhibit 26).  Again, during these

5    conversations he tracked the questions and topics without difficulty,

6    making relevant comments and references to past points of the

7    discussion.  He even made jokes and told his favorite trial stories.

8        During the entirety of this period, defendant was also living

9    alone in his 10,000+ square foot estate without any need for

10   assistance with his activities of daily living, e.g., using the

11   bathroom, showering, eating, or dressing.  However, notwithstanding

12   defendant's completely independent lifestyle, and continued

13   management of the legal and financial affairs of GK, immediately

14   following the bombshell allegations of defendant's theft, the

15   criminal referral, and the involuntary bankruptcy proceedings, in

16   December 2020, defendant's criminal defense attorney claimed that he

17   was incompetent and had no appreciation for the state of his affairs.

18   Defense-led evaluations followed and mere months later, by March

19   2021, defendant's retained expert concluded that defendant had

20   "almost no short-term memory."  Nevertheless, the very next month, in

21   April 2021, during a social visit from defendant's former secretary,

22   defendant provided a detailed account of a break-in that occurred

23   months earlier.  Indeed, the record is replete with examples of

24   defendant's ability to access his short-term memory when he thinks

25   evaluators are not paying attention. ████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████

28   ████████████████████████████████████████████████████████

1    ████████████████████████████    In fact, his wife was traveling to

2    Spain as part of her role on her reality TV series.  This clearly

3    demonstrated defendant's ability to refer back to prior

4    conversations and ability to access such short-term memories.

5    ████████████████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████████████

8    ████████████████████████████████████████

9    █████████████████████████████████

10   ████████████████████████████████████████

11   ████████████████████████████████████████

12   ██████████████████████████████████

13   ████████████████████████████████████████

14   ███████████████████████████████████

15   ████████████████████████████████████████

16   ███████████████████████████████████

17   ███████████████████████████████████

18   █████████████████████████████████

19   ██████████████████████████████████

20   ████████████████████████████████████████

21       Defendant's ability to retain information, including the

22   allegations against him, is also clearly demonstrated in his December

23   2020 and January 2021 voicemails to ████████.  During this time,

24   defendant's criminal defense attorney claimed that he had no

25   appreciation for the nature of the proceedings, yet two days after

26   the civil lawsuit was filed, defendant called ██████ stating that he

27   "saw [the] fraudulent allegations."  (Exhibit 7.)  A few weeks later

28   he left another voicemail acknowledging his liability, stating that

26

there "was some negligence here, it's obviously, since I'm the head of the firm, it's my fault." (Exhibit 8.)  These voicemails make clear that defendant's short-term memory, and his general appreciation of outstanding legal matters, are intact.

Meanwhile, defendant's criminal defense attorney engaged medical experts to evaluate his competency.  The defense's experts deemed him mentally incompetent although they reached this conclusion without the benefit of defendant's full medical records or, any consideration of the chronology of events leading up to the closure of GK.  Instead, they simply took defendant at his word, did not conduct any performance validity testing, and did not question the veracity of his claimed symptoms at all.  Their failure to consider malingering, via validity tests, and to consider the relevant chronology casts doubts on their conclusions.  Indeed, the scale and speed at which defendant's purported cognitive decline occurred from late 2020 to early 2021 is a radical departure from the normal trajectory of any progressive neurological disease, be it MCI or dementia.

Simply put, there is no plausible basis upon which to assert that defendant's mental condition deteriorated that fast.

The explanation for defendant's claimed extraordinary decline from late 2020 to now is clear: defendant is exaggerating the extent of any mental decline he may be actually experiencing as an octogenarian.  And, as discussed <u>infra</u> Section IV.C., regardless of defendant's precise diagnosis, he has sufficient mental acuity to be found competent to stand trial.  This conclusion comports with precedent, both in this circuit and others, that a mental impairment alone does not equal incompetence.  <u>See e.g.</u>, <u>Timbana</u>, 222 F.3d at 701 (defendant competent to stand trial despite suffering brain damage, borderline retardation, partial paralysis, and dementia); <u>Smith</u>, 812 F.2d at 1057 (a defendant may have a mental disease, disorder, or defect, but may still be competent); <u>Mata</u>, 210 F.3d at 329 n.2 (presence or absence of mental illness or brain disorder is not dispositive in determining competence); <u>Mackovich</u>, 209 F.3d 1227 at 1233 (a defendant is not necessarily incompetent simply because he suffers from a mental disease or defect).

While defendant may argue that his conduct described above took place in late 2020 and early 2021 and his cognitive abilities have since radically declined, ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████



Additionally, the overwhelming documentary and testimonial evidence from 2017 to the present makes clear that defendant was able to adequately function for years before his claimed incompetency despite his ▮▮▮▮▮▮.  Indeed, as demonstrated above, from at least 2017 defendant was coherent and capable, if not high-functioning, and continued to manage and conduct GK business until the conservatorship proceedings (which, given their timing, are suspect in any case).  For defendant to have become so impaired by 2021 or even now as to be legally incompetent would require an unusually precipitous decline in mental functions -- so unusual that it is not plausible.

2.

29





1
2
3
4
5
6
7
8
9
10                                          Indeed, Dr. Lavid's
11 prior opinions have been called into question by several courts
12 evaluating the reliability of his findings.  See, e.g., Sherwood v.
13 Neotti, No. ED 11-CV-1728-CJC, 2020 WL 2572459, at *3 (C.D. Cal. May
14 21, 2020), aff'd, No. 20-55636, 2021 WL 4948930 (9th Cir. Oct. 25,
15 2021) (faulting Dr. Lavid's opinion of incompetence and noting his
16 opinion of incompetence was "at odds with the [direct] evidence");
17 Jones v. Covello, No. 13-CV-7792-JWH, 2021 WL 4222699, at *11, 20
18 (C.D. Cal. May 6, 2021) (criticizing Dr. Lavid's opinions, including
19 his opinion that defendant was not malingering despite reports of
20 malingering in the record).
21
22
23
24
25
26
27
28





3.





**B.   Defendant Has the Present Ability to Understand the Proceedings Against Him and to Assist in His Defense**

Defendant has the present ability to understand the proceedings against him and aid in his defense. ███████████████████

While the government does not dispute that defendant, an 84-year-old man, ████████████████████████ that alone does not meet the standard for legal incompetency.  Rather, a defendant need only be able to understand the proceedings against him and to assist in his defense in order to be found competent to stand trial.  Hoffman, 455 F.3d at 927.  And while defendant has attempted to obscure his true abilities, his unprompted responses to the evaluators and other inadvertent tells demonstrate his "reasonable degree of rational understanding," including his factual

36

understanding of the proceedings against him.  <u>Dusky</u>, 362 U.S. at

402.







C.        t is Competent



In light of the evidence of malingering, defendant's █████████
impairment is less significant than the impairments, including
Alzheimer's and dementia, that numerous courts have recognized do not
prevent a defendant from possessing a rational and factual
understanding of the proceedings against them and having the ability
to consult with counsel with a reasonable degree of rational
understanding.  See, e.g., United States v. Brockman, No. 21-CR-9,
ECF 263, (S.D. Tex. filed May 23, 2022) (finding an 80-year old

defendant with Parkinson's disease and cognitive impairment to be competent due to malingering); United States v. Dreyer, No. 08-41-VAP, ECF 279 (C.D. Cal. filed Apr. 19, 2014) (finding a defendant with a brain hemorrhage and previous dementia diagnosis competent); United States v. Kight, No. 16-99-AT-LTW, ECF 118 (N.D. Ga. filed Feb. 2, 2018) (same); United States v. Bradley, No. 05-CR-59-JRH-CLR, ECF 349 (S.D. Ga. filed Jan. 24, 2006) (defendant with dementia and memory issues found competent); United States v. Benson, No. 12-CR-00480-YGR-1, 2015 WL 1869476 (N.D. Cal. Apr. 22, 2015) (defendant with alleged dementia and evidence of malingering found competent); United States v. Patel, 524 F. Supp. 2d 107 (D. Mass. 2007) (defendant with memory issues, alleged dementia, and evidence of malingering found competent); United States v. Chun, No. 17-CR-204510-VAR-MKM, ECF 87 (E.D. Mich. filed Dec. 6, 2019) (finding a malingering defendant with MCI competent); United States v. Kasim, No. 07-CR-56-PPS-APR, 2010 WL 339084 (D. Ind. Jan. 21, 2010) (finding a likely malingering defendant competent after previous order found defendant incompetent with dementia); see also United States v. Vallone, 698 F.3d 416, 508-511 (7th Cir. 2012) (finding defendant with Alzheimer's and dementia competent).

Defendant cites two cases in support of his argument for a finding of incompetency.  (Mot. at 34-37.)  These cases present different facts and procedural postures than are present here and are not persuasive.  In United States v. Brown, 147 F. Supp. 3d 312, 325 (E.D. Pa. 2015), there was no dispute that the defendant had dementia due to Alzheimer's.  Experts retained by both the government and defense agreed that defendant was not competent.  Id. at 326.  Moreover, the government further agreed that the defendant would not

41

1    be competent to stand trial in the future.  Id.  And, notably, the

2    issue was brought before the court via an unopposed motion by the

3    government to dismiss the superseding indictment in that case.  Id.

4    Such is not the case here where, as discussed above, competency is

5    disputed, and the evidence strongly suggests defendant is

6    malingering.

7         The same is true of United States v. Buckingham, 2020 WL 7238273

8    (N.D. Ala. Dec. 9, 2020), where the only two experts who evaluated

9    Buckingham both agreed that he suffered from dementia that rendered

10   him incompetent.  Id. at *2-3.  And, unlike the instant facts, the

11   court in both Brown and Buckingham agreed that the defendants were

12   not malingering.  United States v. Brown, 147 F. Supp. 3d 312, 325

13   (E.D. Pa. 2015) ("During the course of Defendant's extensive testing,

14   malingering measures and embedded measures sensitive to malingering

15   did not support the conclusion that Defendant is feigning her memory

16   impairment."); United States v. Buckingham, No. 2:18-CR-376-RDP-SGC-

17   2, 2020 WL 7238273, at *2 (N.D. Ala. Dec. 9, 2020) ("Defendant's

18   cognitive deficiencies were not the result of malingering or any

19   other disorder.").

20        Thus, regardless of whether defendant has ██████████████████

21   ████████████████  based on the evidence before this Court, defendant's

22   true capabilities reveal that he has a rational and factual

23   understanding of the charges he faces and the relevant proceedings to

24   come, and is able to consult meaningfully and rationally with his

25   counsel if he so chooses.  ████████████████  His feigned denial of

26   his current legal and financial troubles is willful and deliberate.

27   This Court should find him competent.

28

### D.   Commitment is Mandatory if Defendant is Found Incompetent

Notwithstanding defendant's request to forego commitment if he is found incompetent, pursuant to 18 U.S.C. § 4241(d), commitment is mandatory.  "If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General."  § 4241(d).  The Attorney General shall hospitalize the defendant for treatment in a suitable facility for such a reasonable time, not to exceed four months, as is necessary to determine whether there is substantial probability that in the foreseeable future, he will attain the capacity to permit the proceedings to go forward.  Id.

**V.   CONCLUSION**

For the reasons set forth above, after conducting the competency hearing and upon review of the evidence, the United States requests the Court find that defendant competent to stand trial.