# Exhibit A

CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CRAIG A. HARBAUGH (Bar. No. 194309)
(E-Mail: Craig_Harbaugh@fd.org)
GEORGINA WAKEFIELD (Bar. No. 282094)
(E-Mail: Georgina_Wakefield@fd.org)
J. ALEJANDRO BARRIENTOS (Bar. No. 346676)
(E-Mail: Alejandro_Barrientos@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
THOMAS VINCENT GIRARDI

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-cr-00047-JLS-1 |
| Plaintiff, | **UNDER SEAL DOCUMENT** |
| v. | **[*UNDER SEAL*]** |
| THOMAS VINCENT GIRARDI, | |
| Defendant. | |

CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CRAIG A. HARBAUGH (Bar. No. 194309)
(E-Mail: Craig_Harbaugh@fd.org)
GEORGINA WAKEFIELD (Bar. No. 282094)
(E-Mail: Georgina_Wakefield@fd.org)
J. ALEJANDRO BARRIENTOS (Bar. No. 346676)
(E-Mail: Alejandro_Barrientos@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
THOMAS VINCENT GIRARDI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-cr-00047-JLS-1 |
| Plaintiff, | **DEFENDANT'S MOTION FOR ORDER FINDING INCOMPETENCY** |
| v. | |
| THOMAS VINCENT GIRARDI, | **[*UNDER SEAL*]** |
| Defendant. | |

## **MOTION**

Thomas Vincent Girardi, by Deputy Federal Public Defenders Craig A. Harbaugh, Georgina Wakefield, and J. Alejandro Barrientos, moves for a hearing under 18 U.S.C. §§ 4241(c) and 4247(d) and a finding of incompetency under 18 U.S.C. §4241(d), but without an order of commitment, because Girardi suffers from an irreversible condition and is incapable of being restored.

//

//

1

1      This motion is based upon the attached memorandum of points and authorities,

2 exhibits, and such evidence that may be adduced at the hearing on this motion.

3                                     Respectfully submitted,

4                                     CUAUHTEMOC ORTEGA

5                                     Federal Public Defender

6

7 DATED: July 5, 2023           By *\_/s/ Craig A. Harbaugh\_*

8                                     CRAIG A. HARBAUGH

                                    GEORGINA WAKEFIELD

9                                     J. ALEJANDRO BARRIENTOS

10                                     Deputy Federal Public Defenders

                                    Attorneys for Thomas Vincent Girardi

2

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

I.     YEARS PRIOR TO ANY CRIMINAL INVESTIGATIONS, GIRARDI SUFFERED MULTIPLE ACCIDENTS THAT CALLED ATTENTION TO HIS ATROPHYING BRAIN AND COGNITIVE DECLINE. ............................... 2

    A.     Then-78-year-old Girardi was in a serious car accident that called attention to his atrophying brain and cognitive decline. .............................. 2

    B.     Then-79-year-old Girardi had a major fall and suffered further decline—noticed by his doctor, employees, and friends. ............................ 4

    ■ ████████████████████████████████████████████████ 7

II.    GIRARDI WAS PLACED UNDER CONSERVATORSHIP AND EVENTUALLY IN A LOCKED MEMORY WARD IN AN ASSISTED LIVING FACILITY. ................................................................................................. 10

    A.     On June 9, 2021, a state court judge found by clear and convincing evidence that then-82-year-old Girardi could not care for himself or his financial affairs. ........................................................................................ 10

    B.     Over his objection, Girardi was placed in an assisted living facility after suffering another fall. ............................................................................ 11

III.   THREE INDEPENDENT EXPERTS—A NEUROLOGIST, NEUROPSYCHOLOGIST, AND INDEPENDENT LEGAL EXPERT— CONFIRM THAT GIRARDI IS COGNITIVELY IMPAIRED AND NOT COMPETENT TO STAND TRIAL .................................................................... 17

    A.     Consistent with the numerous other professionals who have evaluated Girardi, Dr. Helena Chui—Chair of Neurology at USC Keck School of Medicine—concluded that Girardi suffers from dementia. ...................... 17

    B.     Dr. Stacey Wood, a neuropsychologist with expertise in geriatric neuropsychology, concluded Girardi has a Major Cognitive Disorder that renders him incompetent to stand trial. ................................................ 19

        1.     Neuropsychological Testing Provided Objective Measures of Girardi's Poor Episodic Memory and Executive Functioning ........ 19

            a.     Girardi's Memory Testing Showed an Inability to Learn and Apply New Information. .................................................. 20

            b.     Testing of Executive Function Showed Cognitive Inflexibility Impedes Girardi's Ability to Follow Complex Instructions. ........................................................................... 21

i

         c.     Girardi's Performance on Tests Designed to Ensure Full Effort Confirm Girardi's Deficiencies Did Not Result From a Lack of Effort................................................................22

         d.     Girardi's Performance on a Specific Competency Test Demonstrated His Lack of Insight and Memory Deficits Impeded His Ability to Assist With Counsel.......................22

    2.    Subsequent Interviews Over Multiple Days Further Confirmed Girard's Severe Memory Impairment................................................23

    3.    Dr. Wood Found That Girardi Suffered From a Major Neurocognitive Disorder Rendering Him Incompetent to Stand Trial.........................................................................................24

    4.    Dr. Wood's Opinion Is Consistent With Prior Experts Who Evaluated Girardi...............................................................25

  C.    Former and Current Counsel, as well as an Independent Legal Expert, Confirm Girardi's Inability to Understand or Assist in his Defense. ........26

    1.    Girardi Could Not Assist Former Counsel During Prior Legal Proceedings and Preindictment Stage................................................26

    2.    Girardi Is Presently Unable to Properly Assist Current Counsel with the Preparation of His Defense..................................................27

    3.    Independent Counsel Observed First-Hand Girardi's Inability to Assist with his Defense.......................................................28

LEGAL STANDARD.........................................................................................29

I.     DUE PROCESS PROHIBITS THE PROSECUTION OF AN INCOMPETENT DEFENDANT....................................................................29

II.    THE GOVERNMENT BEARS THE BURDEN OF PROVING GIRARDI'S COMPETENCY BY A PREPONDERANCE OF THE EVIDENCE. ................31

III.   THE DEFENDANT HAS A RIGHT TO FULL AND FAIR COMPETENCY HEARING. ...............................................................31

ARGUMENT....................................................................................................33

I.     DEMENTIA IS WELL-RECOGNIZED NEUROCOGNITIVE DISORDER IMPACTING COMPETENCY..........................................................33

II.    AS DIAGNOSED BY MULTIPLE NEUROLOGISTS AND AN EMERGENCY ROOM DOCTOR, GIRARDI SUFFERS FROM DEMENTIA .................................................................................37

III.   AS DETERMINED BY MULTIPLE MENTAL HEALTH PROFESSIONALS, GIRARDI'S DEMENTIA PREVENTS HIM FROM RATIONALLY ASSISTING WITH HIS DEFENSE .........................................41

ii

A.   Neuropsychological Testing Provided Objective Measures of Girardi's Poor Episodic Memory and Executive Functioning ................................. 41

C.   Dr. Wood Relied Upon Multiple Collateral Witnesses With Firsthand Knowledge of Girardi's Daily Functioning ................................. 43

IV.   DEFENSE COUNSEL AND LAY WITNESSES REINFORCE THE EXPERTS' FINDING OF INCOMPETENCE ................................... 43

V.   GIRARDI IS ENTITLED TO A FULL AND FAIR HEARING WHERE THE GOVERNMENT MUST ESTABLISH HIS COMPETENCY TO STAND TRIAL. ................................................................ 45

CONCLUSION ................................................................ 46

iii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*United States v. Azure,*
　279 F. Supp. 2d 1093 (D.N.D. 2003) ................................................................34, 35

*United States v. Benson,*
　No. 12-CR-00480-YGR-1, 2015 WL 1869476 (N.D. Cal. Apr. 22,
　2015) ...........................................................................................................................32

*United States v. Boigegrain,*
　155 F.3d 1181 (10th Cir.1998) ...................................................................................32

*United States v. Brown,*
　147 F.Supp.3d 312 (E.D. Pa. 2015) ...........................................................................34

*United States v. Buckingham,*
　2020 WL 7238273 (N.D. Ala. Dec. 9, 2020) .............................................................35

*Bundy v. Dugger,*
　675 F.Supp. 622 (M.D.Fla.1987) ...............................................................................32

*Cooper v. Oklahoma,*
　517 U.S. 348 (1996) ...............................................................................................29, 30

*United States v. David,*
　511 F.2d 355 (D.C. Cir. 1975) ...................................................................................32

*United States v. Dreyer,*
　705 F.3d 951 (9th Cir. 2013) .....................................................................................34

*Drope v. Missouri,*
　420 U.S. 162 (1975) .........................................................................................29, 30, 32

*United States v. Duhon,*
　104 F. Supp. 2d 663 (W.D. La. 2000) ........................................................................42

*Dusky v. United States,*
　362 U.S. 402 (1960) ....................................................................................................30

*United States v. Frank,*
　956 F.2d 872 (9th Cir. 1991) .....................................................................................31

iv

*United States v. Garza,*
    751 F.3d 1130 (9th Cir. 2014) ................................................................. 32

*United States v. Giffen,*
    2019 WL 2720216 (D. Or. May 28, 2019) ............................................... 30

*United States v. Gigante,*
    925 F. Supp. 967 (E.D.N.Y. 1996) ........................................................... 32

*United States v. Gillenwater,*
    717 F.3d 1070 (9th Cir. 2013) ................................................................. 31

*Hernandez v. Ylst,*
    930 F.2d 714 (9th Cir. 1991) ................................................................... 32

*United States v. Hoskie,*
    950 F.2d 1388 (9th Cir. 1991) ................................................................. 31

*Madison v. Alabama,*
    139 S. Ct. 718 (2019) ............................................................................... 34

United States v. Makris,
    535 F.2d 899 (5th Cir.1976) .................................................................... 32

*United States v. Mitchell,*
    706 F.Supp.2d 1148 (D.Utah 2010) ......................................................... 32

*United States v. Musto,*
    No. 10-338, 2014 WL 47351 (M.D. Pa. Jan. 7, 2014) ...................... 34, 38

*Florida v. Nixon,*
    543 U.S. 175 (2004) ................................................................................. 30

*Odle v. Woodford,*
    238 F.3d 1084 (9th Cir. 2001) ................................................................. 30

*United States v. Reese,*
    No. CR 18-39, 2018 WL 4854660 (E.D. Pa. Oct. 5, 2018) .................... 34

**Federal Statutes**

18 U.S.C. § 4247 ............................................................................... 31, 46

18 U.S.C. § 4241 ..................................................................................... 31

v

**State Statutes**

Cal. Prob. Code § 1454(a) .............................................................................11

Probate Code § 2356.5 ..................................................................................11

**Regulations**

*Mild Cognitive Impairment In Older Adults*. Curr Psychiatry Rep. 2012......................41

*Persons Living with Dementia in the Criminal Legal System*, ABA
    Commission on Law and Aging Final Report (May 2022).......................33

**Other Authorities**

Adonis Sfera et al., *Neurodegeneration Behind Bars: From Molecules to
    Jurisprudence* .........................................................................................33

American Bar Association ...............................................................................33

Anita Nitchingham, et al.. *Regional cerebral hypometabolism on 18F-
    FDG PET/CT scan in delirium is independent of acute illness and
    dementia*. 19 .............................................................................................10

*Anosognosia*. STATPEARLS (April 24, 2023), *available at*
    https://www.ncbi.nlm.nih.gov/books/NBK513361/...............................10

Bradford Dickerson & Howard Eichenbaum, *The Episodic Memory
    System: Neurocircuitry and Disorders*. 35 ...............................................1

Catherine Lewis et al., *A Study of Geriatric Forensic Evaluees: Who Are
    the Violent Elderly?* 34 ...........................................................................33

Davis C. Woodworth et al., *Dementia is associated with medial temporal
    atrophy even after accounting for neuropathologies* ...............................38

Desiree Murphy, *Erika Jayne's Estranged Husband Tom Girardi
    Disagrees With Conservatorship But Doesn't Object "Right Now,"* .......11

*What Is Dementia? Symptoms, Types, and Diagnosis*, National Institute on
    Aging, *available at* https://www.nia.nih ...............................................33

Meral A. Tubi et al., *White matter hyperintensities and their relationship
    to cognition: Effects of segmentation algorithm* .........................................3

vi

Naira Goukasian et al.. *Cognitive Correlates of Hippocampal Atrophy and Ventricular Enlargement in Adults with or without Mild Cognitive Impairment*. 13 ............................................................................................39

NUEROIMAGE at 1 (2020)............................................................................3, 4

Rachel M. Butler Pagnotti et al., *Cognitive and Clinical Characteristics of Patients With Limbic-Predominant Age-Related TDP-43 Encephalopathy*. 100 NEUROLOGY (May 2023)................................39, 40

Seth A. Gale et al.. *Dementia*. 131 AM. J. MED. 1161 (Oct. 2018) ...............................33

T.K. Khan, *Biomarkers in Alzheimer's Disease*.................................................18

Willa D. Brenowitz et al., *Hippocampal sclerosis of aging is a key Alzheimer's disease mimic: clinical-pathologic correlations and comparisons with both Alzheimer's disease and non-tauopathic frontotemporal lobar degeneration*. 39 ..................................................39

vii

## **MEMORANDUM OF POINTS AND AUTHORITIES**
### **INTRODUCTION**

Three neurologists, two neuropsychologists, one neuropsychiatrist, multiple lawyers, and a legion of friends, family, and caregivers all agree: Thomas V. Girardi suffers from dementia and is incompetent to properly assist in his defense.

For several years, Girardi's progressive cognitive decline was evident to those around him. Despite his best efforts to mask and compensate for his impairments, and emphatic denials that anything was wrong, there is overwhelming evidence that Girardi is cognitively impaired and incapable of caring for himself. His ability to learn and retain new information is practically nonexistent. The severe atrophy of Girardi's hippocampi, which is the epicenter of episodic memory,[1] places him in the bottom percentile expected for his age. And his judgment and ability for rational decision making is severely impaired. Girardi's frontal lobes, which manage executive functioning, also show significant volume loss.

The conclusion that Girardi is incompetent to stand trial is supported by reliable and independent sources, including neuropsychological testing data, brain imaging, and countless observations on numerous occasions in a variety of settings by several credible people. After presenting testimony and evidence from experts, other medical professionals, and lay witnesses, the defense will request that the Court issue an order finding Girardi incompetent.

---

[1] Episodic memory involves the ability to learn, store, and retrieve information about personal experiences that occur in daily life. These memories typically include information about the time and place of an event, as well as detailed information about the event itself. The ability to describe the details of a recent meeting, for example, depends heavily on intact episodic memory function. *See, e.g.*, Bradford Dickerson & Howard Eichenbaum, *The Episodic Memory System: Neurocircuitry and Disorders*. 35 NEUROPSYCHOPHARMACOLOGY 86 (2010)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT OF FACTS

I.   **YEARS PRIOR TO ANY CRIMINAL INVESTIGATIONS, GIRARDI SUFFERED MULTIPLE ACCIDENTS THAT CALLED ATTENTION TO HIS ATROPHYING BRAIN AND COGNITIVE DECLINE.**

A.   **Then-78-year-old Girardi was in a serious car accident that called attention to his atrophying brain and cognitive decline.**

While evidence of Girardi's cognitive decline precedes the 2017 automobile accident, brain scans and medical interventions following a 2017 car accident caused doctors to identify existing brain impairment.

Late on the night of July 30, 2017, Girardi lost control of his car and careened down a hillside. When he called his wife early the next morning, he was "confused and did not know where he was." (Ex. 1, p. 1.) He had lost consciousness and was rushed by ambulance to the emergency room at Huntington Hospital in Pasadena, California. (*Id.*)



Girardi had no memory of the accident. (Ex. 2, p. 1.)

---

[2] A CT scan is a diagnostic imaging exam that uses X-ray technology to produce images of the inside of the body.

[3] A cerebral infarction occurs as a result of disrupted blood flow to the brain due to problems with the blood vessels that supply it. A lack of adequate blood supply to brain cells deprives them of oxygen and vital nutrients which can cause parts of the brain to die off.

[4] The ventricles, or chambers within the brain that contain cerebrospinal fluid, are noticeably enlarged.  Sulci (plural of sulcus) are the grooves or furrows in the brain which are noticeably widened with volume loss.

[5] Magnetic resonance imaging is a non-invasive imaging technology that produces three dimensional detailed anatomical images.

2

1  ████████████████████████████████████████████

2  █████████████████████████████████████████████

3  ██████████████████████████████████████████

4  █████████████████████████ █████████████████████

5  ███████████████████████████████████████████

6  ████████████████████████████████████

7       Not only did doctors notice brain impairment, but friends and family also

8  noticed a decline in Girardi after the accident. Isabella Mancilla, Girardi's then-

9  housekeeper, noticed changes in Girardi's behavior. In the past, Girardi would

10 regularly bathe and change his clothing. After the accident, he could no longer

11 attend to his basic needs. Girardi would frequently wear the same socks for three or

12 four days. He would bring home used Styrofoam coffee cups home from work for

13 no apparent reason. (Ex. 41, p. 9)

14      Long-time friend Rick Kraemer similarly noticed that Girardi's "cognitive

15 acuity began to deteriorate noticeably." (Ex. 5, p.1.) Some of Kraemer's

16 observations include:

17      • Girardi repetitively called people to ask the same question he had

18         already asked many times;

19      • Girardi had trouble remembering recent places he had been or people

20         he had met;

21 //

22 //

23 //

24

25      [6] White matter hyperintensities (WMHs) are brain white matter lesions that are

26 hyperintense on fluid attenuated inversion recovery (FLAIR) magnetic resonance

27 imaging (MRI) scans. Larger WMH volumes have been associated with Alzheimer's

   disease and cognitive decline. *See* Meral A. Tubi et al., *White matter hyperintensities*

   *and their relationship to cognition: Effects of segmentation algorithm*, 206 J.

28 NUEROIMAGE at 1 (2020).

3

- Girardi constantly filled in his obvious memory gaps with stories inconsistent with reality.[7]

**B.     Then-79-year-old Girardi had a major fall and suffered further decline—noticed by his doctor, employees, and friends.**

███████████████  In February 2019, Girardi fell, striking his head and requiring stitches. At a follow-up visit ████████████████, Girardi's wife reported that Girardi had suffered two additional falls. ████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

*Kim Cory, Legal Assistant.* Beginning in 2019, Kim Cory, a legal assistant at Girardi Keese, noticed Girardi's worsening memory.  In September 2019, Girardi showed Cory a photograph of him and then-wife Erika Jayne together. To Cory's surprise, Girardi asked who the woman in the picture was, even though

---

[7] In subsequent years, Kraemer observed Girardi's decline accelerate. Even though the Girardi Keese law firm was permanently closed, Girardi continued to believe he was going to work every day. (*Id.*) And even though Kraemer frequently reminded Girardi that the law firm was no longer open, Girardi continued to ask his housekeeper and former driver to take him to the office. (*Id.*) He also told Kraemer that he had active cases.  But when asked about the cases, he was unable to articulate any relevant facts.  In Kraemer's view, Girardi was "rapidly losing his mental capacity to function." (*Id.*, at p. 2.)

4

Girardi having been married to Jayne for over a decade. (Ex 10, p. 1.) In a similar vein, Girardi would forget which cases he had settled and would ask for updates on closed cases. He would also dictate the same letter or declaration to Cory repeatedly for the same case, having no memory he had just done so. Even when he had "freshly" closed a case, he would almost immediately forget. (*Id.*) Girardi eventually stopped recognizing clients when they called, even when he was previously familiar with the client. Cory and others had to prepare Girardi before he took calls. Girardi would repeatedly ask Cory for the same files, sometimes "minutes" after he had just made the very same request. (*Id.*) He would ask Cory for the phone number for a particular person he knew but then return "a few minutes later," asking who the person was. (*Id.*) Even after his firm closed, Girardi would call Cory to ask for help with dictations and work. In January 2021, a month after the firm had effectively closed, Girard called Cory on a Friday and said, "I hope you are having a great day off. I will see you on Monday." (*Id.*)

***Richard Marmaro, Friend & Attorney.*** In March 2020, Richard Marmaro, then-partner at the law firm Skadden Arps, witnessed Girardi during a random encounter at the federal courthouse in a confused state. Marmaro and Girardi were long-time friends and had regularly seen each other at the Stanley Mosk courthouse for the Superior Court of Los Angeles. Marmaro was entering the federal building when a security officer stopped him and asked if he knew Girardi, who was also at the federal building. The officer stated, "The man appears lost. He's looking for a Department 32." (Ex. 11) Marmaro greeted Girardi, but Girardi appeared not to recognize him. After Marmaro identified himself, Girardi asked where Department 32 was located. Marmaro, who knew Department 32 referred only to the state courthouse, directed Girardi across the street. (*Id.*) Even though Marmaro knew Girardi had appeared countless times in the state courthouse,

5

Girardi seemed bewildered and still asked if the federal building was "State Court." (*Id.*)



***Isabella Mancilla, Housekeeper/Caregiver***. In 2021, Isabella Mancilla expanded her role from Girardi's housekeeper to his daytime caregiver. His inability to function on his own was evident. A year earlier, Girardi could make a small meal or sandwich. But by 2021, he was incapable of even completing that simple task. Girardi could stand and dress himself, but Mancilla had to remind him to do so. Mancilla also kept track of Girardi's medical appointments because he could not do so. Girardi could previously get around aided by his driver. By 2021, however, Mancilla had to accompany Girardi to ensure he arrived at his appointments and to prevent him from wandering off afterwards. Once, Mancilla transported Girardi for an ▓▓▓▓▓▓▓▓. While she was sitting in the waiting room, Girardi left the building through the back exit. Fortunately, Mancilla convinced him to provide his location and not to move until she arrived.

6

When she finally found him about fifteen minutes later, Girardi said that he was walking home.



7

Exhibit A - 017



8



9



## II.    GIRARDI WAS PLACED UNDER CONSERVATORSHIP AND EVENTUALLY IN A LOCKED MEMORY WARD IN AN ASSISTED LIVING FACILITY.

### A.    On June 9, 2021, a state court judge found by clear and convincing evidence that then-82-year-old Girardi could not care for himself or his financial affairs.

In 2021, due to Girardi's decline, Girardi's brother, Robert Girardi, DDS, initiated conservator proceedings in probate court. In support of temporary conservatorship, Dr. Nathan Lavid, a psychiatrist, submitted a declaration attesting to Girardi's incapacity. (Ex. 20, p. 1.) Dr. Lavid found Girardi could not attend the conservatorship hearing "for the foreseeable future" because of "dementia [that]

impairs his ability to understand the proceeding." (*Id.*) The State Bar of California and prior co-counsel to Girardi objected. But the probate court found their objections meritless. Robert Girardi was designated as temporary conservator for Thomas Girardi.

On June 9, 2021, after reviewing reports by a neutral investigator and Girardi's court-appointed counsel, the probate court conducted a hearing to determine if the conservatorship should become permanent. *See* Cal. Prob. Code § 1454(a) ("the court investigator shall be an officer or special appointee of the court with no personal or other beneficial interest in the proceeding."). No objections were filed, even though the court had invited objections to proceedings to make the conservatorship permanent. During the hearing, the court asked Girardi if he had any objection to a permanent conservatorship. Girardi responded, "not at this time," before adding, "I think that we should put together reasons why the conservatorship should be dissolved and then we'll address the court, but right now I have nothing to say to the court." Desiree Murphy, *Erika Jayne's Estranged Husband Tom Girardi Disagrees With Conservatorship But Doesn't Object "Right Now,"* KVUE (June 10, 2021).[16]

The probate court found by clear and convincing evidence that Girardi: (i) had "a Major Neurocognitive Disorder," (ii) was "unable properly to provide for his or her personal needs for physical health, food, clothing, or shelter," (iii) was "substantially unable to manage his or her financial resources or to resist fraud or undue influence," and (iv) had "dementia as defined in Probate Code section 2356.5." (Ex. 21, p. 1-4)

**B.      Over his objection, Girardi was placed in an assisted living facility after suffering another fall.**

*The Second Fall.* On July 31, 2021, Girardi was rushed to the emergency room at Huntington Hospital after falling and suffering a black eye and syncope (loss of consciousness). (Ex. 22, p. 1.) Girardi could not explain what happened and did not

---

[16] *Available at* https://www.kvue.com/article/entertainment/entertainment-tonight/erika-jaynes-estranged-husband-tom-girardi-disagrees-with-conservatorship-but-doesnt-object-right-now/603-3317824b-b76a-49af-b8a2-bd51764a354e.



1  know if he had fallen or bumped into something.

12

1 ███████████████████████████████████████

2 ██████████████████████████████████████████

3 ████████████████████████████████████

4 ██████████████████████████████████████

5 ██████ █████████

6      Despite his obvious impairment, Girardi expressed strong opposition to the

7 medical team's recommendation he enter an assisted living. He was very upset, saying

8 their recommendation was "shitty." (Ex. 26, p. 1.) Even after he was told that the

9 recommendation was for his own safety, Girardi objected and did not want to accept

10 the placement.[19] (*Id.*)

11      ███████████ Girardi's family, with assistance from the hospital social

12 worker, began a search for an assisted living facility with availability. After contacting

13 several facilities, the family identified ███████████████████ as a

14 placement. ████████████████████████████

15 ██████████████████████████████████████

16 ██████████████████████████████████████

17 ██████████████████████████████████████

18 ███████████████████████████████████████████

19 ██████████████████████████████████████

20 ██████████████████████████████████████

21 ███████████████████████████████████████████

24 ─────────────

25 █ ██████████████████████████████████████

26 [19] Girardi repeate███████ected to placement in an assisted living facility.  During
the intake interview at ████████ Girardi insisted he wanted to return home with his
27 caregiver Isabelle █████████████ time of discharge, Girardi told the nurse that he did
not want to go to █████████████ and wanted to go home.

13

1    ████████████ Girardi was discharged directly to ████████ on August 9,
2    2021. (Ex. 29.)
3    ████████████ conducted its own assessment of Girardi during intake. They
4    noted that Girardi had both "dementia" and "MCI." The service plan called for standby
5    assistance in and out of the shower, setting up toiletries, verbal cues for dressing and
6    grooming, cues for brushing teeth morning and night, prompts to eat meals, escorts
7    resident, and a note that Girardi was at for risk of falls.
8    ████████████ In June 2022, Girardi's family began the process of transferring
9    him to the ████████████████████████. On June 24, 2022, ████████
10   conducted a brief mental status interview, during which Girardi was only able to repeat
11   two of three words, required cueing to recall two of the three words, and could not
12   report the correct month or day of the week. (Ex. 30, p. 7.)
13   Girardi was transferred to a locked memory ward at ████████.
14   The Memory Care program is a secured area on the third floor where residents of
15   cannot wander off without supervision. The elevator will only stop on the third floor
16   with an employee code, and the elevator can only be summoned from the third floor if
17   an employee inputs the code.  During the intake process, ████ staff prepared an
18   assessment and service plan. The care manager went over Girardi's background, health,
19   abilities and interests to identify appropriate interventions. For personal activities,
20   Girardi noted that he "enjoy[ed] reviewing law cases and working on paperwork
21   outside or in the library." (Ex. 31, p. 4.) Girardi's daily routine included "work[ing] on
22   my 'law work and cases' by myself." (*Id.*) Girardi denied that he has a short attention
23   span or was forgetful despite being unable to recall the time or where he was. Girardi
24   noted "no history of falls," despite being hospitalized for a fall in 2021. (*Id.*, at p. 13.)
25   Girardi was "unable to remember [his] surroundings." (*Id.*, at p. 7.) Instead, Girardi
26   believed the assisted living was a "work retreat where [he] take[s] meetings and
27   work[s] on cases away from home." (*Id.*) Even though Girardi could not leave the
28

14

facility, he identified interests to be "golf" and "reviewing my law cases." (*Id.*, at p. 8.) In terms of activities, Girardi stated that he liked "to take time to myself in a library setting, to review my cases and work." (*Id.*, at p. 18.)

While at ███ the staff documented Girardi's decline. Despite being informed he is in an assisted living facility, Girardi "spends most of his time in his room napping or at his desk 'working on legal cases.'" (Ex. 32, p. 1.) "With encouragement, he occasionally joins for lunch/dinner in the dining room or out on the patio but prefers to sit alone to 'work' . . . ." (*Id.*) On some days, he will take his "paperwork" to lunch. (Ex. 33.)

Several occurrences highlight Girardi's complete lack of awareness at ███ In October 2022, Girardi was told that he would be getting a new roommate. Girardi responded that he didn't live here and that he would be gone later today. (Ex. 34.) Similarly, Girardi's forgetfulness was apparent when he tested positive for COVID on October 29, 2022. Girardi was subject to isolation protocol, which was explained to him. Throughout the isolation, however, he required "constant reminders" about the need to follow the restrictions. (Ex. 35) ("Resident continues on isolation precaution with constant reminders"; "Resident is on isolation precautions but needed constant reminders"; "Resident needed constant reminders that he's on isolation precautions.") Following his recovery, Girardi resorted to "attending to his paperwork per his usual routine. (Ex. 36) ("Resident was seen in the dining area, attending to his paperwork per his usual routine."; (Ex. 37) ("Resident was seen in the dining area after breakfast, attending to his paperwork per his usual routine.")

███ ███ the Program Coordinator for the memory ward at ███, has interacted with and observed Girardi since his arrival in June 2022. According to ███ throughout Girardi's time at ███ he has spent every day writing either on legal pads or loose paper. Girardi claims he is "working on his cases." (Ex. 38, p. 2.) The staff was instructed not to move his paperwork or cellphone of gets because

1    Girardi becomes very upset if he feels that his legal work has been disturbed. (*Id.*)

2    According to ███ Girardi is in a cycle where every day he mimics a lawyer

3    representing clients even though he is no longer an attorney and is living at ███

4    (*Id.*) Occasionally, Girardi will ask staff to call his car to take him to his law office.

5    (*Id.*) The staff placates Girardi by assuring him that the car has been called and it's on

6    the way until Girardi eventually forgets about his request. (*Id.*)

7         Since his arrival, ███ has noticed a drastic decline in Girardi's selfcare.

8    (*Id.*, at p. 1.) He no longer changes his clothes regularly and often wears the same

9    clothes on multiple days. Even with prompting to change, Girardi will remove

10   dirty clothing from the hamper and wear them again. (*Id.*, at p. 2.) Girardi's

11   bathroom must be regularly cleaned since Girardi started using a towel to clean

12   himself after bowel movements. (*Id.*)

13        In recent months, staff have notice that Girardi's functioning has gotten

14   worse and has required greater care. ███ was interviewed by defense counsel on

15   April 20, 2023 and June 23, 2023. During the second interview, ███ confirmed

16   that Girardi now needs someone to stand outside the shower and provide him with

17   prompts, like reminders to use soap, and reminders to brush his teeth every

18   morning. (Ex. 39.)[20]

19   //

20   //

21   //

22   //

23

24

---

25       [20] ███ was also asked about Dr. Diana Goldstein's claim that ███ said,
     "[Girard███ yers told lawyers, ███ e not to speak to anyone if I wa███ d." (*Id.*;
26   *see also* ECF ███ 4, at 96.) Ms. ███ categorically denied the allegation. (Ex. 39.)
     Ms. ███ confirmed tha███ Dr. Goldstein that the "ED," referring to the
27   ███ Exec███ Director, told Ms. ███ to limit her conversations about Girardi.
     ███ s set forth below, this one of m███ asons the Court must hear directly from lay
28   witnesses during the competency hearing. (*Id.*)

                                        16

## III.   THREE INDEPENDENT EXPERTS—A NEUROLOGIST, NEUROPSYCHOLOGIST, AND INDEPENDENT LEGAL EXPERT— CONFIRM THAT GIRARDI IS COGNITIVELY IMPAIRED AND NOT COMPETENT TO STAND TRIAL.

### A.   Consistent with the numerous other professionals who have evaluated Girardi, Dr. Helena Chui—Chair of Neurology at USC Keck School of Medicine—concluded that Girardi suffers from dementia.

Dr. Helena Chui, Chair of Neurology at USC Keck School of Medicine, examined Girardi beginning in April 2021 and most recently in May of 2023. (Ex. 43) After reviewing Girardi's medical records, including prior brain scans, and ordering additional tests and conducting an evaluation, Dr. Chui offered her expert opinion in four areas: (1) Girardi's medical condition and its etiology, (2) severity of the condition, (3) progression, and (4) prognosis. Dr. Chui concluded that Girardi suffers from "dementia due to a progressive, irreversible neurodegenerative disorder." (*Id.*, at p. 6)

In 2021, Dr. Chui originally concluded that the likely cause of Girardi's dementia was Alzheimer's disease. That conclusion was based on severe impairment in episodic memory and evidence of severe and progressive atrophy of the hippocampus and anterior temporal lobe, hallmarks of Alzheimer's disease. (*Id.*) With the benefit of a recent amyloid PET scan, however, Dr. Chui ruled out Alzheimer's disease based on the absence of amyloid plaque.[21] (*Id.*, at p. 7) Instead, Dr. Chui concluded that the most likely etiological diagnosis is "hippocampal sclerosis of the elderly" or, using more

---

[21] "[N]eurodegenerative disorders are associated with the accumulation of misfolded protein, in disordered processes referred to proteinopathies.  Alzheimer disease is characterized by beta-amyloid plaques and phosphorylated neurofibrillary tangles."  ECF No. 60, at 115.

17

recent nomenclature, Limbic predominant Age-related TDP43 Encephalopathy (LATE).[22]

Dr. Chui concluded that the atrophy or volume loss of Girardi's hippocampi was "extreme." (*Id.*, at p. 4) Relying on quantification software (NeuroQuant) of the MRI imaging from 2021 and 2023, Dr. Chui placed Girardi's hippocampal atrophy in the bottom one percentile of patients his age. Dr. Chui explained how the extensive atrophy of the frontal lobes and hippocampi would affect Girardi. Because the hippocampi "are essential for encoding new episodic memories, . . . [a]trophy of the hippocampi are associated with impairments in learning and retaining new information." (*Id.*) Thus, Girardi's loss of short-term memory and perpetual repetition of the same stories from the past are explained by severe atrophy of his hippocampi.  His loss of insight, confabulation, repetitive behaviors (calling clients, writing notes) suggest a frontal lobe component to his memory disorder. (*Id.*)

Regarding severity, Dr. Chui scored Girardi as a 2-Moderate on the Clinical Dementia Rating (CDR) scale.[23] Dr. Chui concluded this based on her most recent examination of Girardi, recent neurological testing results, and information regarding Girardi's day-to-day functioning from his caregiver at ▉▉▉. Dr. Chui's CDR score was based upon her findings that Girardi "has severe impairment in memory, is disoriented to time and place, has significant impairment in problem solving and

---

[22] LATE is associated with TDP-43 cytoplasmic inclusions and usually pronounced hippocampal atrophy

[23] The Clinical Dementia Rating (CDR) is a global rating device that was first introduced in a prospective study of patients with mild "senile dementia of AD type" (SDAT) in 1982 (Hughes et al., 1982). New and revised CDR scoring rules were later introduced (Berg, 1988; Morris, 1993; Morris et al., 1997). CDR is estimated on the basis of a semistructured interview of the subject and the caregiver (informant) and on the clinical judgment of the clinician. CDR is calculated on the basis of testing six different cognitive and behavioral domains such as memory, orientation, judgment and problem solving, community affairs, home and hobbies performance, and personal care. The CDR is based on a scale of 0–3: no dementia (CDR = 0), questionable dementia (CDR = 0.5), MCI (CDR = 1), moderate cognitive impairment (CDR = 2), and severe cognitive impairment (CDR = 3).  T.K. Khan, *Biomarkers in Alzheimer's Disease*, Academic Press (2016),

18

judgment, he no longer drives by himself, and is unable to perform outside activities, perform simple home activities and hobbies [hard to evaluate and residential care facility where these needs are handled by staff] , and needs some help with dressing and toileting, [mostly for hygienic reasons]." (*Id*., at  pp. 8-9.)

Dr. Chui opined the progression of Girardi's dementia began before the car accident in 2017. However, the concussion accelerated the deterioration, "produc[ing] a step-wise cognitive decline upon what would otherwise be a slowly progressive course." (*Id*., at p. 9.)  Since that time, the dementia has remained on a slow progression from 2021 forward.

Finally, Dr. Chui offered a poor prognosis: "There is currently no disease-modifying treatment, therefore dementia will continue to worsen." (*Id*., at p. 10.) Similar to other neurocognitive disorder, LATE/hippocampal sclerosis, has a "slowly progressive decline, which often accelerates as the disease progresses." (*Id*., at p. 9.)

**B.** **Dr. Stacey Wood, a neuropsychologist with expertise in geriatric neuropsychology, concluded Girardi has a Major Cognitive Disorder that renders him incompetent to stand trial.**

In May 2023, Dr. Stacey Wood, a neuropsychologist who specializes in evaluating the elderly and has both clinical and forensic experience, examined Girardi. (Ex. 42.) Dr. Wood's evaluation included testing, multiple in-person meetings over a week-long period, review of records, and collateral interviews, including with Girardi's counsel.

**1.** **Neuropsychological Testing Provided Objective Measures of Girardi's Poor Episodic Memory and Executive Functioning**

Neuropsychological testing provided the clearest measure of Girardi's cognitive decline in two key areas: (a) memory and (b) executive functioning. (*Id*., at p. 12.)

//

//

19

### a.   Girardi's Memory Testing Showed an Inability to Learn and Apply New Information

Testing data showed Girardi's verbal memory is significantly impaired. He scored in the bottom one-fourth of people his age in immediate memory recall. His delayed recall was even worse, scoring in the "mildly impaired range." (*Id.*, at p. 12.) When performing the CVLT-3, a test to assess his ability to learn new information, Girardi "performed in the mildly to severely impaired range." (*Id.*) Girardi's recall ability over time went from bad (18th percentile) to worse (5th percentile) to the statistical bottom (1st percentile), when he could not recall even one word of a 5-word list. (*Id.*) Cuing only slightly improved his performance. Girardi scored slightly better on a recognition format test.  But because he had a high number of "false alarms," he was scored to be moderate impairment. (*Id.*) As Dr. Wood explained, "[t]hese results indicate that he had a poor ability to learn new words, even with repetition, and had difficulty discriminating between true items and foils." (*Id.*)

Girardi's visual memory was also impaired. When taking the Wechsler Memory Scales Visual Reproduction subtest, which requires the participant to draw figures, he scored in the borderline to low average range and dropped to the bottom percentile when asked to reproduce the figures after a significant delay. Girardi had similar results for visual memory using the Rey Figure Test: Girard's initial performance placed him in the "mild to moderately impaired range." (*Id.*) He could recall some details immediately after viewing the figure but "after a 20 min delay, he could not recall any details and scored in the severely impaired range (1st percentile)." (*Id.*, at pp. 18-19.) In Dr.Wood's opinion, "Girardi demonstrated a deficit in learning new information and retaining it across test modalities (verbal and visual)." (*Id.*, at p. 19.)

//
//
//

20

**b.**   **Testing of Executive Function Showed Cognitive Inflexibility Impedes Girardi's Ability to Follow Complex Instructions.**

"Executive functioning refers to the ability to plan, think flexibly, monitor one's behavior, and regulate emotion." (*Id*.) In testing abstract reasoning, Girardi was considered "average" or "37th percentile." (*Id*.) Girardi did about the same in his ability for error monitoring and response inhibition. (*Id.* at p. 19) His performance was low average for conditions of color naming (25th percentile), was average for word reading (37th percentile), and was average for color-word interference (37th percentile). (*Id*.) Where Girardi performed poorly, however, was in trying to follow two streams of information, placing him in the 16th percentile, which was "low average range." (*Id*.) Girardi also performed in the low average range on a task of cognitive flexibility that required him to track two streams of information (Trails B, 16th percentile). (*Id*.) When presented with a fourth condition, Girardi lacked the ability to understand. Even when the instructions were repeated and Girardi was given an opportunity to practice, he remained confused and had to stop.

Tests designed to assess Girardi's strategy and problem-solving ability showed Girardi performed well with one critical deficiency: the inability to maintain a set of instructions and recall complex rules. For the DKEFS Tower test, Girardi's overall metric of achievement was in the average range. For tasks associated with reasoning, Girardi performed in the top 74th percentile, "the high average range." (*Id*.) For the specific measure dealing with rule violations, however, Girardi could not consistently apply the rules and scored in the lowest percentile. (*Id*.) Dr. Wood concluded that although "Girardi performed fairly well across tasks of executive functioning, . . . he evidenced difficulty maintaining a set of instructions and recalling complex rules." (*Id*.)

//

//

21

### c.    Girardi's Performance on Tests Designed to Ensure Full Effort Confirm Girardi's Deficiencies Did Not Result From a Lack of Effort

Dr. Wood employed performance validity measures to ensure the test results reflect Girardi's actual ability. All measures including both standard alone tests and embedded measures showed that Girardi adequately applied himself throughout the testing.  As summarized by Dr. Wood:

> Girardi was administered two standardized tasks to assess his level of motivation and effort (TOMM and Dot Counting). His scores on both of these measures are valid and are consistent with an individual with adequate motivation. Embedded measures also indicated good effort (Digit Span, CVLT-3 forced choice). In addition, Girardi performed in the average range on many measures that should not be impacted by temporal lobe brain changes (e.g., word reading). Overall, the tests results indicated adequate effort.

(*Id.*, at p. 16.)

### d.    Girardi's Performance on a Specific Competency Test Demonstrated His Lack of Insight and Memory Deficits Impeded His Ability to Assist With Counsel

Dr. Wood administered the Fitness Interview Test-Revised (FIT-R) which is an established structured interview for assessing a person's competence to stand trial. Dr. Wood found that Girardi demonstrated a strong factual understanding of court proceedings. However, she found he had almost no ability to "apply his knowledge to his own situation and to utilize it." (*Id.*, at p. 28.) For example, Girardi was unaware of his current charges and thought he was represented by a former colleague, rather than the Federal Public Defender. Girardi also had no appreciation of how his memory limitations would impact his case. He remained confident that he could testify noting that despite memory lapses, he needed only to "pause a bit" before answering the questions. (*Id.*, at p. 27.)  Girardi, despite having been a veteran trial lawyer, was "100%" convinced he would be acquitted with no thought of the inherent risks of proceeding to trial.  (*Id.*, at p. 25.) Dr.

22

1  Wood found that Girardi's "inability to recall and retain case specific information"
2  would impede his ability to assist counsel. (*Id*., at p. 28.)

3        **2.**    **Subsequent Interviews Over Multiple Days Further**
4               **Confirmed Girard's Severe Memory Impairment**

5        Besides testing, Dr. Wood conducted several interviews of Girardi to
6  evaluate his memory of case-specific matters. Despite providing Girardi with
7  relevant information, repeated reinforcement, and even when aided by notetaking,
8  Dr. Wood found that Girardi had almost no recall of the facts and total lack of
9  insight into his current circumstances.

10        After concluding the testing, Dr. Wood met with Girardi three additional
11  times. While Girardi could provide a few pieces of information about his case, he
12  could not provide any specific details. On the first day, May 20, 2023, Dr. Wood
13  attempted to assess Girardi's baseline knowledge of his circumstances. Girard was
14  unaware of his case ("What case?"), unaware of his disbarment (saying he was in
15  court "two weeks ago") and was unaware of any bankruptcy ("I also have a house
16  in the desert and own the law firm property"). (*Id*., at pp. 29-30.) Girardi insisted
17  he is "living" at his former home in Pasadena and was at the ███e memory ward
18  "just for meetings, near here." (*Id*., at p. 30.)

19        During the interview, Dr. Wood also discussed the indictment, covering the
20  allegations regarding all five clients. Girardi was given a pen and paper for
21  notetaking. When meeting with Girardi the following day, however, he summoned
22  almost no facts Dr. Wood had discussed. ("I know you said five of them, but I
23  don't recall any details.") (*Id*.)

24        Upon Dr. Wood's return a week later, Girardi had no recollection of who
25  Dr. Wood was, much less the facts. Girardi was not aware of any pending case
26  against him. When prompted with information regarding a pending indictment,
27  Girardi claimed he had a lawyer from his non-existent firm working on the case.

28

In Dr. Wood's opinion:

> [Girardi] had a poor ability to recall previous conversations . . . regarding some of the basic information related to his case found in the indictment. . . [A]fter about a week, even when he brought his notes, he did not recall anything substantive regarding the previous conversations with this examiner about the clients or cases involved, his current legal representation, or steps to take to assist.

(*Id*., at p. 32.)

### 3. Dr. Wood Found That Girardi Suffered From a Major Neurocognitive Disorder Rendering Him Incompetent to Stand Trial

Applying the diagnostic criteria from the DSM-5-TR, Dr. Wood diagnosed Girardi with "Major Neurocognitive Disorder – Not Specified." As Dr. Wood explained:

> Neuropsychological testing indicated mild to severe impairments in episodic memory for both visual and verbal material. Girardi also evidenced significant retrograde amnesia for recent aspects of his personal history. He was not oriented to place, aspects of time, or situation. Girardi had a tendency to confabulate and confuse events. Girardi needs assistance with financial management and medication management.

(*Id*., at p. 36.)

Regarding severity, Dr. Wood concluded that Girardi met the criteria for Major Neurocognitive Disorder-Mild. This is based upon "impaired IADLs (medication, finances, transportation, meal prep) with relatively intact ADLs (dressing, eating)." (*Id*.)

Dr. Wood concluded "with a reasonable degree of certainty that Girardi is not currently competent to proceed to trial." (*Id*., at p. 37) Dr. Wood acknowledged that "[w]hile he retains a good factual understanding of court proceedings, [Girardi] lacks the sufficient ability to consult with his attorney with a reasonable degree of rational understanding." (*Id*.) Dr. Wood explained precisely how Girardi's impairments would prevent him from assisting with his defense:

24

[I]t is Girardi's poor episodic memory, inability to learn new information, poor insight, and disorientation that impairs his ability to assist counsel. These impairments impact his ability to retain and evaluate the evidence against him and make sound decisions in light of the information. These impairments would also impair his ability to follow testimony of witnesses during a trial, even with notes. These impairments would even impair his decision to testify and impair his ability to testify accurately and relevantly.

(*Id.*)

Dr. Wood's conclusions were based not only on her direct observations but accounts from collateral witnesses and counsel. Specifically, Dr. Wood interviewed Girardi's housekeeper, Isabella Mancilla, reviewed an interview of Girardi's ███ care manager, ██████████ and interviewed Girardi's current counsel.[24]

### 4.   Dr. Wood's Opinion Is Consistent With Prior Experts Who Evaluated Girardi

Dr. Wood's findings follow prior assessments and an expected decline given Girardi's dementia diagnosis. ████████████████

████████████████████████████████

████████████████████████████

██████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████

█████████████

███████████████████████████████████

██████████████████████████████████

██████████████████████████████████

---

[24] Summarized statements of Mancilla, █████, and Girardi's counsel are included in other sections of the statement of r████d are not repeated here.

25

1 ████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 █████████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ██████████████████████████████████████████████████████

7 ██████████

**C.      Former and Current Counsel, as well as an Independent Legal Expert, Confirm Girardi's Inability to Understand or Assist in his Defense.**

Based upon interactions with Girardi, both former and undersigned counsel believe Girardi is unable assist properly in his own defense.

**1.      Girardi Could Not Assist Former Counsel During Prior Legal Proceedings and Preindictment Stage.**

In late 2020, Girardi faced several adverse legal actions. After learning of potential criminal charges, Girardi's brother, Robert Girardi, retained legal counsel, Evan Jenness to represent Girardi in contempt proceedings relating to the Lion Airlines case. Just a month after the proceedings, Girardi "recalled nothing or little about the proceedings themselves" and "nothing about the facts underlying those judgments." Jenness observed that Girardi had "no or little recollection of any recent events – places he has been even several days ago, people he has seen, or things he has been told." Despite having repeatedly met with her client, Girardi "appeared not to initially recognize [her] each of the times we have met in person." Jenness further observed that Girardi "does not recall, or inaccurately relates, recent past history." While Girardi had a better recollection of past events, "at times he confabulates to fill in obvious gaps in his recollection." Jenness reported that Girardi repeatedly asks the same questions, receives the same answer, and then

26

forgets that he had asked the question. Finally, despite have being informed that his law firm no longer exists, Girardi persists in the belief he has been to the office and his employees are still there.

## 2. Girardi Is Presently Unable to Properly Assist Current Counsel with the Preparation of His Defense.

Two years later, Girardi's cognitive functioning has appeared to decline, and his memory impairments and general cognitive dysfunction continue to impede his ability to assist counsel in defense of indictments on two federal cases. In February 2023, the Office of the Federal Public Defender was appointed to represent Girardi in the Central District of California. At Girardi's initial appearance, the court granted the defense's application for an order to conduct a competency determination. Soon after, counsel began the process of regularly meeting with Girardi to discuss the allegations and discovery underlying the indictment. Counsel experienced many of the same problems that Jenness described in 2021. Specifically, "the client had no recall meeting to meeting and sometimes no recall from earlier in a meeting." Despite meeting with Girardi multiple times, including successive days, Girardi had no recollection of who they were. Further, despite counsel repeatedly informing Girardi of his situation—disbarment, firm dissolution, and involuntary bankruptcy—Girardi "repeatedly informed counsel of his understanding that he owned a house in Pasadena and had other assets." Following a thorough review of the indictment, including the underlying documents relating to the different victims, Girardi was unable to retain any information beyond a general understanding that the case involved allegations that the firm failed to settle clients. Even after repeated discussion of the simplest allegation involving "Client 2" and the underlying records, Girardi could not retain the information, sometimes even during the same interview. "[T]he next day he had no recollection of the specifics of the indictment." Girardi denied having been

27

ever shown the charging document at the next meeting. Although counsel tried to help him compensate for his memory impairment by directing him to take notes, this proved futile. And despite repetition and having his notes available, Girardi was "unable to keep up" and "would get confused in the details." When counsel discussed the course of investigation, Girardi defaulted to saying he would talk to a particular employee at the firm—even after having been told that the firm no longer exists. In sum, "despite attempting to prep him and assist him by compensating for his memory deficits, they were unable to make progress, because he was unable to recall previous conversations and his current personal circumstances, including the status of Girardi Keese, current resources, and current allegations." (Ex. 42, at p. 33.) Additionally, counsel, aware of Girardi's lack of insight, recognize that it will have deleterious impact on decisions made exclusively by the client including whether to proceed to trial or plead guilty, the objective of his defense, and whether to exercise the right to testify or remain silent.

### 3. Independent Counsel Observed First-Hand Girardi's Inability to Assist with his Defense.

Katherine Corrigan has been a member of the California bar for almost 36 years. She is a former prosecutor and a member of Corrigan Welbourn & Stokke, APLC. Her firm's practice is limited to criminal defense, and she has extensive experience representing individuals facing criminal prosecution in state and federal court, including for fraud offenses. She has received several awards and accolades for her accomplishments, including the 2018 Life-Time Achievement Award, the Judge Alicemarie H. Stotler Award, which was bestowed upon her by the Federal Bar Association of Orange County in recognition of Ms. Corrigan's excellence in federal practice and contributions to the legal community and the Central District of California.

28

Corrigan sat observed four meetings between Girardi and his counsel. (Ex. 44.) Those meetings are described in over twelve pages of single-spaced text in the notice. (*Id*. at p. 4-12.) Based on Ms. Corrigan's observations, her review of discovery specific to alleged victims, and her training and experience as a practicing attorney for almost 36 years, it is Ms. Corrigan's opinion that Girardi appears unable to properly assist in his defense. (*Id*. at p. 16-17.) Ms. Corrigan explains,

> Girardi appear to struggle to retain basic information regarding his case, no matter how many times his attorneys discussed the allegations and evidence with him. In addition, . . . Girardi appeared not to be oriented to the status of his present circumstances, including the fact that his firm was no longer in operation, that he was no longer a licensed attorney, that he resided in the memory unit at an assisted living home rather than his house in Pasadena, and that he was represented by appointed counsel, even though his counsel repeatedly reminded him of these facts. Girardi's forgetfulness occurred across each meeting and also sometimes occurred within the same meeting. Whatever information Girardi appeared to have absorbed during the course of each meeting, he appeared to have no recollection at the following meeting, even the ones that occurred just twenty-four hours later. Girardi's apparent inability to retain or recall basic information about his case would prevent him from assisting with his defense at every stage of his case.

## LEGAL STANDARD

### I. DUE PROCESS PROHIBITS THE PROSECUTION OF AN INCOMPETENT DEFENDANT.

The Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Medina v. California*, 505 U.S. 437, 453 (1992)); *Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). In *Cooper*, the Court explained:

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

29

*Id.* (quoting *Riggins v. Nevada*, 504 U.S. 127, 139-140 (1992) (Kennedy, J., concurring)).

For a defendant, "the consequences of an erroneous determination of competence are dire. Because he lacks the ability to communicate effectively with counsel, he may be unable to exercise other 'rights deemed essential to a fair trial.'" *Id.* at 364 (quoting *Riggins*, 504 U.S. at 139 (Kennedy, J., concurring)).  The defendant must also be able to make rational decisions, including "whether to plead guilty, waive trial by jury, testify on his own behalf, or take an appeal." *Florida v. Nixon*, 543 U.S. 175, 187-88 (2004) (internal quotation marks omitted).

Given that the consequences of an erroneous competency determination are grave, the Supreme Court has held that a district court cannot find a defendant competent merely because he or she "[is] oriented to time and place and [has] some recollection of events." *Dusky v. United States*, 362 U.S. 402, 402 (1960). A simple understanding of the superficial facts of the legal proceedings is not adequate to meet the standard of possessing a rational and factual understanding of the proceedings against a defendant—a defendant must have some ability to draw rational conclusions. *United States v. Giffen*, 2019 WL 2720216, at *2 (D. Or. May 28, 2019), *report and recommendation adopted*, 2019 WL 2718485 (D. Or. June 28, 2019), *aff'd*, 839 F. App'x 168 (9th Cir. 2021). Competence requires more than the ability to passively observe: "it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001).  The "test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." *Id.*

//

//

30

Exhibit A - 040

## II. THE GOVERNMENT BEARS THE BURDEN OF PROVING GIRARDI'S COMPETENCY BY A PREPONDERANCE OF THE EVIDENCE.

The government "has the burden of demonstrating by a preponderance of the evidence that the defendant is competent to stand trial." *United States v. Frank*, 956 F.2d 872, 875 (9th Cir. 1991); *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991). A defendant is incompetent to stand trial if either: (1) they are unable to understand the consequences of the proceedings, or (2) they are unable to assist properly in their defense. 18 U.S.C. § 4241(d). Thus, if the government fails to prove by a preponderance of the evidence that the defendant *both* understands the consequences of the proceedings *and* is able to assist properly in his or her defense, the court must find the defendant incompetent. *See id*.

## III. THE DEFENDANT HAS A RIGHT TO FULL AND FAIR COMPETENCY HEARING.

Section 4241 sets forth the procedures to determine the competency of a defendant in federal court, from a motion to a psychological examination, to a report, to a hearing. Once the court concludes that "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent," a competency hearing is required. 18 U.S.C. § 4241(a) ("The court shall grant the motion, or shall order such a hearing on its own motion"); § 4241(c) ("The hearing shall be conducted pursuant to the provisions of section 4247(d)."). The defendant has a statutory right to a robust hearing. *United States v. Gillenwater*, 717 F.3d 1070, 1077 (9th Cir. 2013) ("Congress recognized that such procedural safeguards were, at a minimum, desirable, if not constitutionally mandated."). The law mandates that "the person whose mental condition is the subject of the hearing . . . shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses . . . and to confront and cross-examine witnesses . . . ." 18 U.S.C.

31

§ 4247(d). Competency hearings equal a competency trial, often over multiple days with the expert and lay witnesses testifying.

In making the competency determination, a district court should consider a variety of information. *See Drope v. Missouri*, 420 U.S. 162, 180 (1975). "Relevant evidence falls into three broad categories: medical history, the defendant's behavior in and out of court, and defense counsel's statements about the defendant's competency." *United States v. Garza*, 751 F.3d 1130, 1134 (9th Cir. 2014); (citing *United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008)). However, because the "applicable criteria measure one's ability to consult *with his lawyer* and to understand the course of *legal* proceedings," defense "counsel's first-hand evaluation of a defendant's ability to consult on his case and to understand the charges and proceedings against him may be as valuable as an expert psychiatric opinion on his competency." *United States v. David*, 511 F.2d 355, 360 (D.C. Cir. 1975) (emphasis in original); *see also Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991) (though not determinative, "a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings.").

Courts also routinely consider the testimony of lay witnesses. *United States v. Benson*, No. 12-CR-00480-YGR-1, 2015 WL 1869476, at *2 (N.D. Cal. Apr. 22, 2015); *Bundy v. Dugger*, 675 F.Supp. 622, 634 (M.D.Fla.1987) ("[T]he Court may rely on, in addition to expert testimony, lay witness testimony." *United States v. Mitchell*, 706 F.Supp.2d 1148, 1151 (D.Utah 2010) ("Lay witness testimony is especially important where the evidence indicates a defendant may be malingering or manipulating the system."); *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir.1998); *United States v. Makris*, 535 F.2d 899, 905 (5th Cir.1976); *see also United States v. Gigante*, 925 F. Supp. 967, 976 (E.D.N.Y. 1996) (relying on lay witness testimony in concluding that defendant's "actions and decisions were wholly inconsistent with the behavior observed by the doctors").

32

**ARGUMENT**

**I.     DEMENTIA IS WELL-RECOGNIZED NEUROCOGNITIVE DISORDER IMPACTING COMPETENCY.**

"Dementia is the loss of cognitive functioning — thinking, remembering, and reasoning — to such an extent that it interferes with a person's daily life and activities."[25] Dementia is marked by symptoms such as "difficulties with memory, language, problem-solving and other cognitive skills." "[It] is best characterized as a syndrome rather than as one particular disease."[26] The are numerous pathologies that contribute to dementia, including Alzheimer's Disease (AD), hippocampal sclerosis, Lewy bodies, cerebral amyloid angiopathy and atherosclerosis. One or more pathologies may be co-occurring and contributing to the dementia simultaneously. But the end result is the same: significant cognitive decline.

Dementia, just as any other mental disease, can render a defendant incompetent to stand trial. Studies demonstrate that for Alzheimer's disease (the most common form of dementia), between 30% and 50% of criminal defendants older than 60 were incompetent. Catherine Lewis et al., *A Study of Geriatric Forensic Evaluees: Who Are the Violent Elderly?* 34 J. AM. ACAD PSYCHIATRY LAW 324 (2006); Adonis Sfera et al., *Neurodegeneration Behind Bars: From Molecules to Jurisprudence*. FRONT PSYCHIATRY (Aug. 27 2014). Recognizing this risk to dementia patients, the American Bar Association states that "a diagnosis of dementia should call into question an individual's competency to stand trial and criminal liability, as dementia may impair one's ability to provide informed consent for their legal defense strategy and understand court proceedings." *Persons Living with Dementia in the Criminal Legal System*, ABA Commission on Law and Aging Final Report (May 2022).

---

[25] *What Is Dementia? Symptoms, Types, and Diagnosis*, National Institute on Aging, *available* at https://www.nia.nih. gov/health/what-is-dementia.

[26] Seth A. Gale et al.. *Dementia*. 131 AM. J. MED. 1161 (Oct. 2018).

33

Numerous courts, including the United States Supreme Court, have also recognized that dementia can render a defendant incompetent by preventing the defendant from forming a rational understanding. *See, e.g.*, *Madison v. Alabama*, 139 S. Ct. 718, 728 (2019) (holding that dementia, "which has compromised the person's cognitive functions," can cause "the prisoner's inability to rationally understand his punishment" rendering him incompetent for execution); *United States v. Dreyer*, 705 F.3d 951, 965 (9th Cir. 2013) (finding the district court committed plain error by failing to hold a competency hearing *sua sponte* based upon expert reports that the defendant suffered from dementia); *United States v. Reese*, No. CR 18-39, 2018 WL 4854660, at *4 (E.D. Pa. Oct. 5, 2018) (concluding that based upon the defendant's dementia, he is "unable to assist properly in his defense due to his mental condition" and is "incompetent to stand trial."); *United States v. Musto*, No. 10-338, 2014 WL 47351, at *6 (M.D. Pa. Jan. 7, 2014) (finding defendant incompetent to stand trial based upon a psychiatric diagnosis of "Mild Cognitive Impairment"); *United States v. Azure*, 279 F. Supp. 2d 1093, 1096 (D.N.D. 2003) (finding defendant incompetent based upon dementia).

Two cases addressing dementia and competency are instructive here. In *United States v. Brown*, the defendant had been charged with a wire fraud scheme stealing six million dollars. 147 F.Supp.3d 312 (E.D. Pa. 2015). After having been found competent by psychiatrists at a federal correctional facility, the defendant was evaluated by outside professionals. Neuropsychological testing revealed that the defendant had difficulties in delayed recall, working memory executive function and visuospatial function." *Id.* at 316. Doctors concluded that she suffered from "dementia of the Alzheimer's Disease type." *Id.* Neuroimaging demonstrated that the defendant's hippocampal volume placed her in the 15th percentile (low average range) and also showed "minimal white matter disease," which is "reflective of chronic microvascular ischemia." Moreover, "neuropsychological evaluation revealed prominent impairment

34

in episodic memory and confrontation naming and executive functioning was also fairly consistently impaired." A defense-retained forensic psychiatrist agreed with the diagnosis of AD dementia and found the defendant incompetent to stand trial. Specifically, the psychiatrist noted that the defendant "is incapable of planning legal strategy, providing meaningful and accurate testimony, and/or assisting in cross-examination of witnesses." The government retained a forensic psychiatrist who also concluded that the defendant was incompetent because in part "her memory deficits cause her to be unable to maintain a *rational* and factual understanding of the proceedings against her." *Id.* at 323 (emphasis added). A court-appointed psychiatrist, however, reached a different conclusion. Although the psychiatrist found that the defendant "may have a Mild Neurocognitive Disorder, her presentation . . . did not remotely suggest incompetence to stand trial." *Id.* at 318.

The district court agreed with the conclusions that the defendant was incompetent. The court acknowledged that the defendant factually understood her case. *Id.* at 326 ("It seems clear that Defendant understands the general nature of the charges against her, the roles of the participants in the criminal justice system, the purpose and nature of a plea and the difference between a plea and a trial. Defendant also has a basic understanding of her constitutional rights."). But the court found that the defendant could not assist her counsel by "direct[ing] her attorneys as to her wishes, consider[ing] her attorney's advice, and rationally evaluat[ing] possible courses of action." *Id.* Based upon review of the evidence, the district court concluded that based upon the defendant's dementia, she "does not presently have the adequate memory or executive functioning skills to assist her counsel in a meaningful way." *Id.*

In *United States v. Buckingham,* the defendant, a former physician, had been charged with running "a pill mill" five years earlier. 2020 WL 7238273 (N.D. Ala. Dec. 9, 2020). A forensic neuropsychologist concluded that Buckingham suffered from the "major cognitive disorder" dementia. *Id.* Although his "his immediate memory and

35

abstraction remain intact," his attention, expressive language, visual skills, delayed memory and executive function" were all impaired.  The neuropsychologist concluded that the dementia left the defendant unable to assist counsel with his defense: "[his]severe memory loss, particularly after an intervening time period, and [his] impairments in divided attention and mental flexibility, . . . would render him unable to hold information in consciousness and be able to rationally make decisions regarding such information."

A forensic psychiatrist concurred in the opinion that Buckingham's "cognitive impairments likewise interfered with his ability to assist properly in his defense":

> Without foundational knowledge about his charges, [Defendant] would be unable to follow testimony for contradictions and errors, bring relevant information to his attorney's attention, testify and be cross-examined, understand instructions and advice, and make rational and informed decisions about the handling of his case.

The Government opposed, arguing that defendant's behavior, including his high education and intellect, rendered him competent. The magistrate judge who issued the report and recommendation of incompetency, aptly noted despite Buckingham's background, his present dementia rendered him incapable of assisting counsel:

> There is no question that the defendant is able to recall the general medical practices, procedures, and terms that he employed during the relevant period . . That ability appears to be a consequence of decades of medical experience. While such an ability is helpful in the preparation of his defense, the difficulty resides in his inability to recall specific events, facts, and relevant evidence from the charged period and make a rational connection between those events, to the extent he can even recall them, and the charged conduct.

The district court adopted the magistrate judge's conclusion. Although finding that the defendant had a general understanding of the nature of the proceedings, the court found that he was unable to assist counsel:

> [H]is mental condition renders him unable to recall events, assist in evaluating the veracity of the claims against him, and rationally undertake the decisions he must make to plead guilty or proceed to trial, which include the decision to enter a guilty plea, waive his rights, and whether to testify on his own behalf.

36

The district court cited not only Buckingham's inability to make consequential decisions about his case, but his inability to meaningful participate in his trial. As the district court explained, if the defendant was unable to discuss his case during his evaluations, he certainly would not be able to do so in the heat of trial ("consist of multiple days of both sides presenting evidence, cross-examining witnesses, and offering arguments to the jury.").

## II.   AS DIAGNOSED BY MULTIPLE NEUROLOGISTS AND AN EMERGENCY ROOM DOCTOR, GIRARDI SUFFERS FROM DEMENTIA

Multiple neurologists in different contexts and at different times have concluded that Girardi suffers from dementia. ███████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████ Each neurologist reached their opinion only after conducting a neurological examination, including a test of cognitive functioning, reviewing brain imaging, and consulting collateral witnesses.

//

//

//

//

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

37

1    First, Girardi's scores on the two standard cognitive screening tests, the MoCA[28]

2    and the MMSE,[29] consistently placed Girardi in the cognitive impairment range:

| Date | Physician | Test | Score |
|------|-----------|------|-------|
| ███████ | ███████ | ████ | ███ |
| ███████ | █████████ | ████ | ███ |
| ███████ | █████ | █████ | ███ |
| ██████ | █████ | █████ | ███ |
| Apr. 13, 2023 | Dr. Chui | MoCA | 18/30 |

10    Other administrations of these cognitive tests produced similar results. ██

11    ████████████████████████████████████████████████████████████████

12    ██████████████████████████.[30] Courts have found incompetency in cases

13    involving defendants who scored higher on the MoCA than Girardi has since 2021. *See,*

14    *e.g.*, *United States v. Musto*, No. 3:10-CR-338, 2014 WL 47351, at *5 (M.D. Pa. Jan. 7,

15    2014) ("On the MoCA, Mr. Musto received a score of 23/30 . . . .").

16    Second, neuroimaging objectively confirmed a finding of dementia. Brain scans

17    spanning a four-year period show increasing cerebral volume loss, most significantly

18    hippocampal atrophy.  Researchers have found "strong associations for dementia with

19    volumes of the hippocampus. . ." Davis C. Woodworth et al., *Dementia is associated*

20    *with medial temporal atrophy even after accounting for neuropathologies*, 4 Brain

21    //

22    //

23

24    ───────────────

25    [28] The Montreal Cognitive Assessment (MoCA) is a screening test assessing global cognitive function that assesses memory, visuospatial ability, executive function, attention, concentration, working memory and orientation.

26    [29] Mini-Mental State Examination (MMSE) is a well-validated and widely used assessment of global cognitive function.

27    [30] Dr. Wood also administered the MoCA on May 23, 2023 and Girardi scored a 17/30.

28

38

1  COMMUNICATIONS 2 (2022). The only condition where the neuropathology showed an

2  association stronger than dementia generally was hippocampal sclerosis.[31]

3        While Girardi's neurologists did not definitively identify the neuropathology or

4  cause of cognitive decline, none wavered in their conclusion he suffered from

5  dementia.  It's not surprising the neurologists initially thought Girardi suffered from

6  Alzheimer's disease (AD). AD mimics the neurological profile for LATE TDP,[32]

7  especially hippocampal sclerosis.[33] Misdiagnosis of AD is not uncommon—studies

8  show it happens in about 20 percent of cases. Rachel M. Butler Pagnotti et al.,

9  *Cognitive and Clinical Characteristics of Patients With Limbic-Predominant Age-*

10 *Related TDP-43 Encephalopathy*. 100 NEUROLOGY (May 2023) ("Autopsy data further

11 suggest that a significant proportion, up to 20%, of patients with clinically diagnosed

12 AD were actually misdiagnosed based on neurologic examination and neuroimaging,

13 and patients' cognitive decline was likely more attributable to LATE-NC."). Although

14 the impetus for Girardi's brain scans in 2017 was to ascertain the extent of trauma

15 resulting from the car accident, physicians discovered significant volume loss. Girardi

16 was found to have substantial hippocampal atrophy, which has a strong association to

17 cognitive impairment.

18       Six years after the car accident, additional neuroimaging and testing was done on

19 Girardi. That imaging confirmed even more atrophy of Girardi's hippocampus. With

20 the benefit of this additional neuroimaging, including an Amyloid PET scan and

---

[31] Naira Goukasian et al.. *Cognitive Correlates of Hippocampal Atrophy and Ventricular Enlargement in Adults with or without Mild Cognitive Impairment*. 13 DEMENT. GERIATR. COGN. DIS. EXTRA. 281 (Aug. 2019).

[32] Peter T. Nelson et al.. *Limbic-predominant age-related TDP-43 encephalopathy (LATE): consensus working group report*. BRAIN (June 2019) ("LATE is among the common age-related diseases that can mimic the amnestic presentation of Alzheimer's disease.")

[33] Willa D. Brenowitz et al., *Hippocampal sclerosis of aging is a key Alzheimer's disease mimic: clinical-pathologic correlations and comparisons with both Alzheimer's disease and non-tauopathic frontotemporal lobar degeneration*. 39 J. ALZHEIMERS DIS. 691 (2014).

39

genetic testing, Dr. Chui was able to rule out AD and opine that the most likely cause of Girardi's dementia was hippocampal sclerosis or LATE.

Third, all neurologists had the benefit of Girardi's caregivers to offer accounts of his daily functioning. In 2021, his daughter described Girardi's decline. Although she had been estranged from her father for more than a decade, she saw his significant decline in memory and ability to do even the most basic daily activities. In 2023, Girardi's care manager at ███ noted her observations of Girardi's further decline, including his inability to adequately clean himself after defecating. Her account is corroborated by ███ chronological notes documenting Girardi's limited functioning and lack of awareness, including his persistent belief he is running his defunct law firm from his secured memory ward.

Fourth, although each neurologist obtained a medical history from Girardi, few gave weight to Girardi's own assessment of his cognitive state. Rather than exaggerate his memory impairment, Girardi downplayed his cognitive decline, insisting he was "better than ever." Even when confronted with the neurological findings, Girardi denied having any impairment. Far from "partially malingering"—i.e., exaggerating his symptoms, Girardi was unaware of his impairment because of his lack of insight or attempting to mask his obvious dementia.

Finally, even the Government's own neuropsychologist, Dr. Diana Goldstein, conceded that Girardi suffered from Mild Cognitive Impairment, saying that back in 2020, "I do think it likely that Girardi met the diagnostic criteria for a Mild Cognitive Disorder (specifically, Mild Cognitive Impairment)" (ECF No. 64, at 69).[34] Her conclusion is based on records from late 2020—nearly three years ago. *Id.* Significantly, MCI is considered "the intermediate stage between the cognitive changes

---

[34] The defense expert only recently received and is still reviewing the raw data from the Government's neuropsychologist, Dr. Diana Goldstein. Moreover, the defense has not received the anticipated report from the Government's neurologist, Dr. Ryan Darby. Accordingly, the defense will wait to address their reports in its reply.

40

of normal aging and dementia. . . MCI is important because it constitutes a high-risk group for dementia." Yonas E. Geda, *Mild Cognitive Impairment In Older Adults*. Curr Psychiatry Rep. 2012 Aug;14(4):320-7.

## III. AS DETERMINED BY MULTIPLE MENTAL HEALTH PROFESSIONALS, GIRARDI'S DEMENTIA PREVENTS HIM FROM RATIONALLY ASSISTING WITH HIS DEFENSE

Three mental professionals independently confirm that Girardi has severe deficits in cognition that will prevent him with assisting counsel in his defense. Girardi has a rudimentary factual understanding of the proceedings and his case. But his dementia prevents him from forming a rational understanding and prevents him from properly assisting counsel in his defense. Because of his severe memory loss and executive functioning decline, Girardi cannot rationally evaluate his case, assist counsel in the investigation of his case and in the presentation of his defense.

Both defense experts who assessed Girardi's competency relied upon neuropsychological testing, client examinations, and collateral witness interviews, including defense counsel and lay witnesses.

### A. Neuropsychological Testing Provided Objective Measures of Girardi's Poor Episodic Memory and Executive Functioning

In light of Girardi's significant hippocampal and temporal lobe atrophy, one would expect significant impairment in episodic memory and executive functioning. Neuropsychologist testing from Dr. Wood and Dr. Budding bear this out.

Dr. Wood conducted extensive testing of Girardi which confirm significant impairment in memory and executive functioning. Besides conducting substantive testing, Dr. Wood conducted performance validity testing to ensure Girardi was performing with sufficient effort.

█████████████████████████████████

████████████████████████████████████



1

2

3

4

5

6

7

8

9

10    As Dr. Wood's

11   explained, "Girardi's performance over time reflects a similar pattern of strengths and

12   weaknesses with mostly stable performances, although mild erosions were noted on the

13   WAIS-IV [IQ test]."

14       **B.     Both Dr. Wood and the Neuropsychiatrist Dr. Lavid Relied Upon**

15             **Statements from Girardi's Counsel As Part of the Competency**

16             **Assessment**

17       Competency is ultimately a legal determination, not a medical one. It is critical

18   for mental health professionals to obtain information from all collateral sources. Most

19   important, experts rendering an opinion should interview defense counsel who is best

20   suited to assess the defendant's ability to assist them with the defense. *See United*

21   *States v. Duhon*, 104 F. Supp. 2d 663, 669 (W.D. La. 2000) ("one of the most evident

22

23

24

25

26

27

28                                            42

issues is whether the assessing professional, usually a psychiatrist or a psychologist, really knows what would normally go into the defense of the case").

As part of their competency evaluations, both Drs. Wood and Lavid obtained statements from Girardi's defense attorneys. In 2021, Dr. Lavid obtained a detailed statement from Girardi's then-counsel Evan Jenness. In 2023, Dr. Wood interviewed current counsel to provide their observations as to Girardi's present ability to assist counsel. As Dr. Wood noted, "his attorneys expressed that, despite attempting to prep him and assist him by compensating for his memory deficits, they were unable to make progress, because he was unable to recall previous conversations and his current personal circumstances, including the st███ of Girardi Keese, current resources, and current allegations."

### C. Dr. Wood Relied Upon Multiple Collateral Witnesses With Firsthand Knowledge of Girardi's Daily Functioning

Besides counsel, Dr. Wood relied upon third party witnesses in the best position to assess Girardi's daily functioning over a lengthy period. Most prominently, Dr. Wood obtained statements from Girardi's long-term caregivers from 2021 until the present, his housekeeper-turned-caregiver, Mancilla, and his ███ care manager, ███ Mancilla recounted Girardi's initial decline while ███ elucidated Girardi's further decline and status. Both accounts confirm Dr. Wood's opinion.

## IV. DEFENSE COUNSEL AND LAY WITNESSES REINFORCE THE EXPERTS' FINDING OF INCOMPETENCE

Multiple defense counsel spanning multiple years reach the same conclusion: Girardi cannot assist in his defense. Both current and former counsel relied upon numerous client interactions to conclude that Girardi is incapable of participating in his own defense. Prior counsel, Evan Jenness, met with Girardi over a multi-year period. Defense counsel have met with Girardi numerous times over lengthy meetings.

43

Despite differences in time and circumstances, a clear and consistent pattern of Girardi's impairments emerges. First, despite in-depth and repetitive discussions, Girardi cannot retain basic information about his case other than rudimentary facts such as the number of complainants identified in the indictment. Second, despite explanation and discussion of Girardi's present circumstances, Girardi cannot maintain awareness of his status, including that he has been disbarred, that his firm is no longer in existence, that clients continue to insist they have not been paid, and that he lacks the present financial ability to pay such clients. And, occasionally, he cannot remember that he's been charged with a crime. Even when Girardi has prepared notes during the course of the meeting, he has no ability to recall what was discussed.

No amount of repetition or reinforcement can serve as a substitute for basic retention of case information. Even if it was theoretically possible for defense counsel to engage Girardi around the clock, insufficient information would be retained the following meeting. While it is impractical for any defense counsel to repeat the identical information at each client meeting, it is impossible to do so in Girardi's case, where he is accused of a highly complex scheme involving multiple individuals over multiple years.

In sum, Girardi is not competent to rationally assist in his defense. His profound memory loss and executive functioning impairment, caused by his dementia, precludes him from retaining critical information and using that information to determine the direction of his case or participate in his ultimate trial. The overwhelming evidence from multiple sources—expert witnesses, medical professionals, lay witnesses and defense counsel—confirms that Girardi cannot be forced to proceed. Because the Government will not be able to meet its ultimate burden, the defense respectfully requests that, following a full hearing, the Court enter an order of incompetency.

//

//

44

**V.    GIRARDI IS ENTITLED TO A FULL AND FAIR HEARING WHERE THE GOVERNMENT MUST ESTABLISH HIS COMPETENCY TO STAND TRIAL.**

As discussed above, the Government bears the burden of proving Girardi's competency, rather than defense proving his incompetence. If the Government contests the findings of the experts presented, as expected, the defense has the right to call the witnesses necessary to establish Girardi is incompetent to proceed. This may require the defense to present, besides the expert witnesses and lay witnesses mentioned, other medical professionals and lay witnesses who have observed his cognitive dysfunction first-hand over-time and whose observations support various experts' opinions. Whether and how the government contests the findings of the defense experts and other witnesses will largely dictate the number of witnesses called to testify.[37]

//
//
//
//
//

---

[37] As discussed above, the defense has not seen Dr. Darby's report and does not know what opinion, if any, he has reached regarding Girardi's dementia.

45

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, the defense respectfully requests the Court conduct a full competency hearing under 18 U.S.C. 4247(d). The burden is on the prosecution to prove Girardi is competent to stand trial. Evidence presented will establish that Girardi is not presently competent to stand trial because he cannot properly assist in defense of his case. It will also establish that his condition is progressive-it will not improve and will only decline and any attempt to commit him for restoration would be futile.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: July 5, 2023            By  */s/ Craig A. Harbaugh*

CRAIG A. HARBAUGH
GEORGINA WAKEFIELD
J. ALEJANDRO BARRIENTOS
Deputy Federal Public Defenders
Attorneys for Thomas Vincent Girardi

46

**PROOF OF SERVICE**

I, **Christelle Solinap**, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **EX PARTE APPLICATION FOR DETERMINATION OF COMPETENCY PURSUANT TO 18 U.S.C. 4241(a) [UNDER SEAL]** on the following individual(s) by:

| [ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [ ] Faxing same via facsimile machine addressed as follows: |
|---|---|---|---|

[X] Via e-mail:

**Ali Moghaddas**
**Assistant United States Attorney**
**scott.paetty@usdoj.gov**
**312 N. Spring Street, 12th Floor**
**Los Angeles, California 90012**

**Scott Paetty**
**Assistant United States Attorney**
**ali.moghaddas@usdoj.gov**
**312 N. Spring Street, 11th Floor**
**Los Angeles, California 90012**

This proof of service is executed at Los Angeles, California, on **July 5, 2023**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*/s/ Christelle Solinap        .*
**LEGAL ASSISTANT**

47