# Exhibit B

CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CRAIG A. HARBAUGH (Bar. No. 194309)
(E-Mail: Craig_Harbaugh@fd.org)
GEORGINA WAKEFIELD (Bar. No. 282094)
(E-Mail: georgina_wakefield@fd.org)
J. ALEJANDRO BARRIENTOS (Bar No. 346676)
(E-Mail: Alejandro_Barrientos@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
THOMAS VINCENT GIRARDI

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-cr-00047-JLS-1 |
| Plaintiff, | *UNDER SEAL* **DOCUMENT** |
| v. | [*UNDER SEAL*] |
| THOMAS VINCENT GIRARDI, | |
| Defendant. | |

1

1 | CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
2 | CRAIG A. HARBAUGH (Bar. No. 194309)
(E-Mail: Craig_Harbaugh@fd.org)
3 | GEORGINA WAKEFIELD (Bar. No. 282094)
(E-Mail: georgina_wakefield@fd.org)
4 | J. ALEJANDRO BARRIENTOS
(E-Mail: alejandro_barrientos@fd.org)
5 | Deputy Federal Public Defenders
321 East 2nd Street
6 | Los Angeles, California 90012-4202
Telephone: (213) 894-2854
7 | Facsimile: (213) 894-0081

8 | Attorneys for Defendant
THOMAS VINCENT GIRARDI
9 |

10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA**

13 | **WESTERN DIVISION**

14 |

15 | UNITED STATES OF AMERICA,        Case No. 2:23-cr-00047-JLS-1

16 |            Plaintiff,           **REPLY IN SUPPORT OF MOTION
                                     FOR ORDER OF INCOMPETENCY**
17 |       v.
                                     *[UNDER SEAL]*
18 | THOMAS VINCENT GIRARDI,

19 |            Defendant.

20 |

21 |                                     Respectfully submitted,

22 |
                                        CUAUHTEMOC ORTEGA
23 |                                     Federal Public Defender

24 |

25 | DATED: August 9, 2023       By */s/ Craig A. Harbaugh*

26 |                                 CRAIG A. HARBAUGH
                                     GEORGINA WAKEFIELD
27 |                                 J. ALEJANDRO BARRIENTOS
                                     Deputy Federal Public Defenders
28 |                                 Attorneys for THOMAS VINCENT GIRARDI

# **TABLE OF CONTENTS**

Page(s)

INTRODUCTION ................................................................................................ 2

ARGUMENT ....................................................................................................... 6

I.     THE GOVERNMENT EXPERTS ARE UNQUALIFIED TO OPINE ON
       MR. GIRARDI'S COGNITIVE DECLINE AND COMPETENCY .................... 6

       A.     By His Own Admission, Dr. Darby Is Unqualified to Render an Expert
              Opinion Regarding Competency ..................................................... 6

       B.     Dr. Goldstein Relied on an Unqualified Technician to Perform
              Neuropsychological Testing and is Herself Unqualified to Evaluate
              Elderly Subjects ........................................................................... 8

              1.     Emily Graupman Was Not Qualified to Administer
                     Neuropsychological Tests to a Geriatric Subject. ................. 8

              2.     Dr. Goldstein Lacks the Expertise in Geropsychology and
                     Cannot Render an Opinion on an 84-Year-Old Defendant's
                     Competency. .......................................................... 10

II.    THE GOVERNMENTS EXPERTS' MALINGERING CONCLUSIONS
       DEVIATE FROM THE CRITERIA FOR MALINGERED
       NEUROPSYCHOLOGICAL DYSFUNCTION ............................................. 12

       A.     Criterion A: While the Pending Criminal Charges Qualify As An
              External Incentive, Mr. Girardi's Decline Predates the Filing of
              Charges ...................................................................................... 13

       B.     Criterion B: There Was No Invalid Presentation Indicative of Feigning
              or Exaggeration ........................................................................... 14

              1.     Criterion B, Sub-criterion 1: Mr. Girardi's Performance Validity
                     Tests, including those administered by the government experts,
                     do not suggest malingering. ........................................... 14

                     a.     Performance Validity Tests Must Have a Specificity Rate
                            of at Least 90 Percent ......................................... 15

                     b.     Mr. Girardi Did Not Fail the TOMM ....................... 18

                     c.     Mr. Girardi Did Not Fail the WMT ......................... 20

                     d.     Mr. Girardi Either Passed the Reliable Digit Span-
                            Revised or It Was Invalid ..................................... 21

                            (1)    Mr. Girardi Ultimately Passed the RDS-R ......... 21

                            (2)    Mr. Girardi's Initial Failure Resulted From
                                   "Hearing Difficulty" And "Not Poor Effort" ..... 22

                            (3)    In Any Case, the RDS-R Has Not Been Adequately
                                   Validated In Clinical Studies ....................... 22

ii

## <u>TABLE OF CONTENTS</u>

Page(s)

          (4)     Dr. Goldstein Tries to Minimize Mr. Girardi's Passing Score of a Nearly Identical Test, the Reliable Digit Span ....................................................... 23

     e.    Even If Girardi's Score on the CVLT-II Long Form Qualifies As a Failure, His Concomitant Hearing Difficulty and Corresponding Passing Score on the CVLT-II Short Form Undermines the Reliability of the Result ........................................................................ 23

     f.    Contrary to Dr. Goldstein's Contention, Mr. Girardi Never Scored Below Chance and His Single PVT Failure Does Not Satisfy Criterion B................................ 24

     g.    Contrary to Dr. Goldstein's "Mixed" Classification, Girardi Passed the Rey 15 Item (RFIT) ................................. 25

     h.    Dr. Goldstein's Use of the Word Choice Test, Which Has No Cutoffs for Mr. Girardi's Age, Much Less His Cognitive Impairment, Further Exposes the Unreliability of Her Examination ...................................................... 26

     i.    Because Mr. Girardi failed, at most, one out of fourteen PVTs, such tests cannot support a finding of malingering.... 27

   2.   Criterion B, Sub-criterion 2: The Purported Compelling Inconsistencies Identified By Dr. Goldstein and Dr. Darby Are Neither Compelling Nor Inconsistent............................................ 29

   3.   Criterion B, Sub-criterion 3: Though Dr. Goldstein Fails to Acknowledge Its Significance, Mr. Girardi Passed Her Symptom Validity Test.................................................................... 34

 C.   Criterion C: Rather than Marked Discrepancies, There Are Marked Consistencies Between Mr. Girardi's Examination Results and His Presentation in the Real World ........................................................ 35

   1.   Evidentiary Category 1: Contrary to the Government's Position, Independent Records Confirm Mr. Girardi's Progression from MCI in Late 2020 to Moderate Dementia Today ........................... 36

     a.    The Government Experts Improperly Disregard the Medical Records Consistent with Moderate Dementia......... 36

     b.    Dr. Darby Fails to Address, Much Less Dispute, Numerous Studies Showing a Strong Correlation Between Hippocampal Atrophy and Dementia.................................... 37

     c.    Dr. Goldstein's Attack on the Sophisticated Software Used to Quantify Brain Atrophy Is Both Baseless And Beyond Her Expertise........................................................... 39

   2.   Evidentiary Category 2: The Government's cited Video and Audio Recordings of Mr. Girardi in 2019-2020 Are Consistent

iii

## **TABLE OF CONTENTS**

Page(s)

With His Then-Mild Cognitive Impairment And Do Not Suggest
Malingering Today ........................................................................41

3.    Evidentiary Category 3: As Documented By Numerous
Collateral Witnesses, Mr. Girardi's Cognitive Decline Is
Consistent With the Natural Progression of Dementia...................42

D.    Criterion D: The Government Experts Cannot Reasonably Rule Out
Moderate Dementia, Which Precludes a Malingering Determination.......48

CONCLUSION.............................................................................51

iv

## **INTRODUCTION**

In its opposition, the Government insists that Mr. Girardi does not have moderate dementia and is feigning his cognitive impairment.  To meet its burden, the Government ignores all of the prior medical and mental health professionals who have diagnosed Mr. Girardi with dementia and instead proffers the opinions of their go-to out-of-state experts, Drs. Ryan Darby and Diana Goldstein.[1]  But neither opinion satisfies the Government's burden for two independent reasons.

*First*, Dr. Darby and Dr. Goldstein are unqualified.  Dr. Darby is a neurologist, not a neuropsychiatrist and not a neuropsychologist.  As such, Dr. Darby is not competent to render an opinion on competency.  In fact, Darby *admitted under oath* that he lacks the expertise to render a competency determination.  In that brief span, Dr. Darby did not and could have obtained the requisite training, education, and experience.  He lacked the necessary expertise then and he lacks it now.

Dr. Goldstein, though a neuropsychologist, lacks the expertise to conduct a forensic evaluation of an older adult.  As a threshold matter, Dr. Goldstein's technician, Emily Graupman, is not qualified to administer tests to a geriatric patient.  The Government offers no evidence that Ms. Graupman is qualified[2] and everything about the way she administered the testing shows she's not.  Ms. Graupman administered tests that should never be given to older adults, failed to apply the appropriate scoring cutoffs for adults with suspected dementia, ignored concerns about Mr. Girardi's documented hearing and vision loss, and forced him to endure marathon testing sessions without any regard for fatigue.  Although Dr. Goldstein rests her opinion extensively on Ms. Graupman's testing, Dr. Goldstein was absent for the testing and has no idea whether the tests were properly administered.  Without an explanation from

---

[1] Neither expert is based or even licensed to practice in California.

[2] The defense specifically requested Ms. Graupman's curriculum vitae but the government refused.

2

Ms. Graupman, Dr. Goldstein can neither rely upon the testing results nor vouch for their reliability.

Separately, Dr. Goldstein lacks the necessary qualification in forensic geropsychology.  In contrast to Dr. Wood who is a board-certified geropsychologist, Dr. Goldstein has minimal, if any experience, dealing with this unique population other than apparently a single court proceeding.  While Dr. Goldstein may have developed a niche practice for labeling malingers (often without scientific support), she lacks the requisite qualification to evaluate a geriatric patient.

*Second*, even if the Government can somehow bolster their qualifications, their opinions regarding malingering lack scientific reliability and must be rejected.  As recognized by the scientific community (and even Dr. Goldstein), the standard for determining malingering is the Malingering Neuropsychological Dysfunction (MND) which has four criteria:  (a) external incentive (b) invalid presentation (c) marked discrepancies and (d) inability to rule out other conditions including moderate dementia.  Although Dr. Goldstein pays lip service to the MND,[3] she fails to reliably apply its criteria.

Mr. Girardi had no invalid presentation.  Contrary to Dr. Goldstein's opinion, Mr. Girardi did not fail two or more tests for malingering or Performance Validity Measures (PVTs).  Because Dr. Goldstein was confronted with credible (indeed overwhelming) evidence of the probability of Mr. Girardi having dementia, she was required to administer PVTs appropriate for dementia patients and apply the dementia cutoff scores.  Had Dr. Goldstein followed protocol, she would have discovered that Mr. Girardi only failed one test.  While a single PVT failure is never sufficient, Mr. Girardi's passing of the nearly identical test casts doubt on his failure.

Further, Dr. Goldstein's claim that Mr. Girardi had compelling inconsistencies between his self-report and his presentation lacks support.  Just some of examples that

---

[3] Dr. Darby does not even mention the MND.

1   Dr. Goldstein relies upon, such as the failure to immediate recall his third wife or his
2   supposed recognition of people when he didn't, hardly qualify as inconsistencies, much
3   less compelling ones.  Finally, Mr. Girardi passed the MMPI-2 the only Symptom
4   Validity Test.  Despite the Government aggressively litigating Dr. Goldstein's ability to
5   administer this test, both fail to note the results demonstrate the *absence* of
6   malingering.
7        Dr. Goldstein was also wrong to conclude that Mr. Girardi had any
8   discrepancies, certainly not marked discrepancies, between his presentation within the
9   examination and without.  The medical records demonstrate a slow and steady decline
10  from mild cognitive impairment to dementia.  Despite their best efforts, Drs. Darby and
11  Goldstein fail to undermine the compelling neuroimages beginning in 2017.  While not
12  dispositive, the overwhelming medical research demonstrates a strong association
13  between severe brain atrophy like Mr. Girardi's and the profound loss of episodic
14  memory and executive functioning one would expect.
15       Ignoring the objective medical evidence, Dr. Goldstein and the government
16  proffer outdated videos and voicemails from Mr. Girardi as somehow proof that he is
17  feigning his impairment now.  But even if Mr. Girardi's presentation three years ago
18  were somehow relevant to his functioning today, a closer examination reveals just the
19  opposite. Throughout the multiple video presentations, Mr. Girardi demonstrates that,
20  far from being a wordsmith expected of a seasoned attorney, he struggles to remember
21  and use basic vocabulary. Rather than an eloquent trial lawyer, Mr. Girardi repeatedly
22  repeats himself without any awareness he has done so.  And Mr. Girardi's multiple
23  voicemails demonstrate a similar pattern, showing repetitive calling and repetitive
24  statements without any cognizance he had just made the call.
25       Dr. Goldstein also carefully curates collateral informant reports to support her
26  unsupported malingering opinion.  In disregard for MND protocol, Dr. Goldstein either
27  focuses on selective accounts from years earlier or gives significant weight to clearly
28  biased witnesses, including the alleged victims of Mr. Girardi's crimes.  Worse still,

4

1   Dr. Goldstein mischaracterizes and misreports the account from the most

2   knowledgeable and credible witness regarding Mr. Girardi's functioning, his memory

3   ward care manager, ███████ Munoz.  As documented in Dr. Goldstein's own

4   interview but absent from her report, Munoz confirms from her vast experience in

5   caring for dementia patients that Mr. Girardi, who has been under her care for more

6   than a year, does in fact have dementia.

7          Finally, in light of credible collateral accounts and objective medical evidence,

8   Dr. Darby's and Dr. Goldstein's refusal to rule out moderate dementia is unreliable.

9   Their opinions that Mr. Girardi has either "MCI" or "mild dementia," is based upon

10  speculation not science.   To accept their theory that Mr. Girardi is somehow

11  exaggerating requires him to have engaged in a sophisticated ruse (despite his cognitive

12  impairment), that has gone unnoticed by every single medical professional and

13  caregiver over years.  It requires a belief Mr. Girardi is so calculating that he feigned

14  wandering aimlessly out of a medical clinic, feigned falling multiple times requiring

15  hospital care, and now feigns not caring for himself, including losing bowel control and

16  staying in soiled bedding and clothing. Mr. Girardi's production is so extravagant, we

17  are told to believe, that every single day, he sits with stacks of legal pads and paper and

18  pretends to be working on active cases --- never once breaking character.

19         The Court should reject such blatant disregard for not only science but the truth.

20  The overwhelming evidence demonstrates Mr. Girardi has moderate dementia and is

21  not malingering.  His cognitive impairment precludes him from adequately assisting

22  counsel and participating in his defense at trial.  Following a full hearing on the matter,

23  the defense will ask the Court to issue a finding of incompetency.

24

25

26

27

28

5

## ARGUMENT

### I.  THE GOVERNMENT EXPERTS ARE UNQUALIFIED TO OPINE ON MR. GIRARDI'S COGNITIVE DECLINE AND COMPETENCY

#### A.  By His Own Admission, Dr. Darby Is Unqualified to Render an Expert Opinion Regarding Competency

Just a year and a half ago, in November of 2021, Dr. Ryan Darby, the government's neurologist, repeatedly testified before a federal court that he was not qualified to offer opinions about a criminal defendant's competency to stand trial:

> Q. So Dr. Darby, let me ask you, do you -- qualified as an expert in this case -- are you expert on competency-related law?
>
> A. No, so *that's not something that I have expertise in*. And so, I will counsel patients about things like driving, financial decision-making, but *I don't have expertise in competency to stand trial*.
>
> Q. What about specific legal burdens of proof?
>
> A. *No, that's not something that I have background or expertise in*.
> . . .
> Q. Do you feel like you have an accurate sense to understand, based on your experience, the type of assistance that an accused defendant has to provide to counsel?
>
> A. *No*, *I have a general understanding of that, but not a specific understanding.*

Ex. 45, pp. 75-80 (emphasis added). Dr. Darby later confirmed that at the time of this November 2021 testimony, "[he] had never evaluated someone for competency to stand trial." Ex. 46, pp. 47-48.

Now, a year and a half later, Dr. Darby purports to have "expertise in forensic neurology" and to offer expert opinions on the important questions of whether Mr. Girardi can "understand the nature and consequences of the proceedings against him" and "assist his counsel in his defense" under 18 U.S.C. § 4241. It is unclear what knowledge, skill, experience, training, or education that Dr. Darby has gained over the past 18 months. *See* F.R.E. 702.  Just a few weeks ago, he testified in a different case

6

that there "is no forensic training in neurology." Ex. 46, p. 47. And his publication list does not identify any work on competency determinations in criminal cases or malingering.  Nor has the defense been able to identify any training or experience related to malingering—an issue that is inextricably tied to Dr. Darby's purported expert opinion on competency.  According to Dr. Darby, his only 'expertise' in evaluating competency is from his involvement in a single case where he did "not offer" his lack of qualifications to the court before being allowed to offer his opinion. Ex. 46, p. 51.  One case does not an expert make.

Because Dr. Darby is not a neuropsychologist or neuropsychiatrist, and lacks adequate experience or training in forensics, the Court should reject his competency and malingering opinions, just as other courts have rejected the opinions of neurologists who step outside of their professional lanes. *See, e.g.*, *Mackesy v. Massachusetts Bay Transp. Auth.*, 76 Mass. App. Ct. 1114, 922 N.E.2d 179 (2010) (upholding exclusion of neurologist's malingering opinion where the trial court reasoned, "Dr. D'Alton is a neurologist, not a psychiatrist. As a result, he was not permitted to use the words 'malingering or conversion,' which are associated with psychiatric diagnoses."); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825 (7th Cir. 2010) (upholding exclusion of neurologist's opinions about multiple sclerosis in part because "he had very limited experience with MS patients."); *Watkins v. Schriver*, 52 F.3d 769, 771 (8th Cir. 1995) ("Watkins fails to adequately explain how Dr. Knox's expertise as a neurologist enables him to testify that the injury was more consistent with being thrown into a wall than with a stumble into the corner."); *Burton v. Danek Med., Inc.*, No. CIV.A. 95-5565, 1999 WL 118020, at *3 (E.D. Pa. Mar. 1, 1999) (excluding neurologist's opinion about spinal surgery because he lacked expertise on the issue); *see also United States v. Redlightning*, 624 F.3d 1090, 1115 (9th Cir. 2010) (upholding exclusion opinion of neuropsychologist on medical issues and limiting them to questions of mental health).

**B.**     **Dr. Goldstein Relied on an Unqualified Technician to Perform Neuropsychological Testing and is Herself Unqualified to Evaluate Elderly Subjects**

**1.**     **Emily Graupman Was Not Qualified to Administer Neuropsychological Tests to a Geriatric Subject.**

In contrast to all other experts who examined Mr. Girardi (Drs. Budding, Chui, Wood, and even Dr. Darby), Dr. Diana Goldstein, the government's neuropsychologist, did not perform any of her own neuropsychological testing. She instead delegated that task to her technician, Emily Graupman, who administered the tests outside of Dr. Goldstein's presence.

The Government must establish Ms. Graupman's qualifications to administer such tests because it is unquestionably expert opinion. *See* F.R.E. 702. There are minimum qualifications required to administer a battery of neuropsychological tests.[4] And the Government makes no attempt to establish Ms. Graupman's training or experience. To the contrary, it refused to produce Ms. Graupman's CV to the defense when requested. The Government's failure to demonstrate Ms. Graupman's qualifications is fatal to Dr. Goldstein's competency and malingering opinions. Because

---

[4] The National Academy of Neuropsychology and other professional neuropsychological organizations have issued standards regarding the minimum education, training and supervision of psychological technicians. Puente AE, Adams R, Barr WB, Bush SS; NAN Policy and Planning Committee; Ruff RM, Barth JT, Broshek D, Koffler SP, Reynolds C, Silver CH, Tröster AI; National Academy of Neuropsychology. *The use, education, training and supervision of neuropsychological test technicians (psychometrists) in clinical practice. Official statement of the National Academy of Neuropsychology*. Arch Clin Neuropsychol. 2006 Dec;21(8):837-9. doi: 10.1016/j.acn.2006.08.011. PMID: 17195315 ("Training and supervision of a technician should include but not be limited to ethics, neuropsychology, psychopathology, and test administration and scoring."); Division 40 Task Force on Education Accreditation Credentialing. (1991). *Recommendations for the education and training of nondoctoral personnel in clinical neuropsychology*. The Clinical Neuropsychologist, 3, 23–24 (developed recommendations for the education, training and supervision of non-doctoral personnel to be used in this capacity).

8

1   Ms. Graupman's testing is expert opinion, the Government cannot proffer

2   Dr. Goldstein's opinion without first establishing reliability of the underlying testing

3   performed by Ms. Graupman. And because Dr. Goldstein was not present when the

4   tests were administered, she cannot testify regarding whether the tests were

5   administered properly, whether Mr. Girardi heard and understood the instructions, or

6   whether and to what extent any other issues arose during the testing.  "[I]t is

7   insufficient for an expert to simply rely on or parrot another expert's report prepared

8   solely for litigation." *Crescenta Valley Water Dist. v. Exxon Mobile Corp*., No. CV 07-

9   2630-JST (ANX), 2013 WL 12120533, at *2 n.4 (C.D. Cal. Mar. 14, 2013).

10          Moreover, the cornerstone of Dr. Goldstein's malingering determination are

11   based on Ms. Graupman's test results. Ms. Graupman, for example, administered all of

12   the Performance Validity Tests that Dr. Goldstein uses to support her malingering

13   opinions. If Ms. Graupman's administration of those tests was unreliable,

14   Dr. Goldstein's opinion is also unreliable.

15          Finally, the defense intends to examine Ms. Graupman at the competency

16   hearing. Mr. Girardi has a statutory right to cross-examine witnesses against him,

17   which necessarily includes Ms. Graupman. Questioning Dr. Goldstein about what

18   Ms. Graupman did and whether the tests were administered properly, when

19   Dr. Goldstein has no first-hand knowledge, will not suffice. If the Government

20   contends the testing was properly administered and valid, the defense should have an

21   opportunity to demonstrate otherwise through the individual who administered the

22   testing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) (holding that a

23   defendant's "ability to subpoena the analysts ... is no substitute for the right of

24   confrontation"); *cf. Williams v. Illinois*, 567 U.S. 50, 58–59 (2012) (plurality) ("those

25   who participated in the testing may always be subpoenaed by the defense and

26   questioned at trial").

27

28

**2.    Dr. Goldstein Lacks the Expertise in Geropsychology and Cannot Render an Opinion on an 84-Year-Old Defendant's Competency.**

Dr. Goldstein lacks the requisite education, training, and experience to conduct competency evaluations for the unique population of elderly adults, like 84-year-old Mr. Girardi.

"Geropsychology is a specialty in professional psychology that applies the knowledge and methods of psychology to understanding and helping older persons."[5] Dr. Goldstein's curriculum vitae does not indicate that she has any specialized knowledge, training, or experience in geropsychology. While Dr. Goldstein may be qualified in forensic neuropsychology, that alone does establish the requisite expertise to evaluate the unique population of elderly adults, especially an individual who is 84 years old. Since 2010, the American Psychological Association recognized geropsychology as specialty with its own established training models, practice competencies, and practice guidelines.

Research examining the efficacy of certain neuropsychological tests in older adult populations, including Performance Validity Tests (PVTs) used by Dr. Goldstein, is limited. "Older adults have been largely excluded from validity testing."[6]  This is especially true for adults with known or suspected dementia due to generally lowered specificity rates in this population.  Moreover, as a result of a number of secondary factors such as fatigue, medication, disinterest, "older individuals may not perform at optimal levels despite not intentionally trying to produce suboptimal performance." Exhibit 47, p. 28. For this reason, a neuropsychologist without the necessary expertise

[5] American Psychological Association, *Geropsychology*, https://www.apa.org/ed/ graduate/ specialize/geropsychology#:~:text=Geropsychology%20is%20a%20 specialty%20in,maximum%20potential%20during%20later%20life.

[6] Exhibit 47, p. 28 Miller, J. B., & Axelrod, B. N. (2018). *Performance validity assessment: Disentangling dementia from the disinterested and disingenuous*. In S. S. Bush & A. L. Heck (Eds.), Forensic geropsychology: Practice essentials, p. 28. Washington, DC: American Psychological Association.

cannot simply review literature in order to prepare to conduct an evaluation of an older adult. Without the regular and continuous experience working with a geriatric population, a neuropsychologist is simply unaware of the unique challenges that are presented with this population.

Much of Dr. Goldstein's examination, as well as Ms. Graupman's tests, reflect a basic lack of expertise in evaluating older adults. One glaring example is Dr. Goldstein's decision (or perhaps Ms. Graupman's decision) to administer the Word Choice Test, a PVT used to asses malingering. As Dr. Goldstein acknowledges, the test has no norms for adults over the age of 69 years old. This means Dr. Goldstein either knew the test was inappropriate for Mr. Girardi and had Ms. Graupman give it anyway, or discovered after the fact that she had no way to score it. Either way, Dr. Goldstein's haphazard approach to an elderly subject exposes a profound lack of understanding in evaluating geriatric individuals.[7] Unless the Government can establish Dr. Goldstein's expertise with this unique population, the Court should reject her opinions.

By contrast, Dr. Stacey Wood, the defense's neuropsychologist, has been board certified in geropsychology by the American Board of Professional Psychology since 2019. Prior to sitting for a formal board examination, Dr. Wood completed a number of requirements, including extensive education (two doctoral/post-doctoral level course or 100 hours of formal continuing education courses), training (2,000 hours of full-time supervised training), and experience (at least one year devoted to full-time service of older adults).[8]

---

[7] As set forth below, the Word Choice Test has established cutoff scores for individuals with dementia and Mr. Girardi clearly passed.

[8] APA, Geropsychology, Specialty Specific Requirements. https://abpp.org/application-information/learn-about-specialty-boards/geropsychology/specialty-specific/.

11

## II.   THE GOVERNMENTS EXPERTS' MALINGERING CONCLUSIONS DEVIATE FROM THE CRITERIA FOR MALINGERED NEUROPSYCHOLOGICAL DYSFUNCTION

Lack of qualifications aside, their opinions are scientifically unsound. First, the experts unreliably applied the scientific standards to conclude that Mr. Girardi is malingering. Second, the government experts failed to reliably apply the scientific standards and opined that Mr Girardi does not suffer from moderate dementia.

The criteria for Malingered Neuropsychological Dysfunction (MND) are the governing standard within the psychological community for making malingering determinations.[9] The standards have been endorsed by the American Academy of Clinical Neuropsychology.[10]   Indeed, Dr. Goldstein recognizes that the MND criteria apply to her determination.[11] MND criteria were developed to address malingering of neurocognitive, somatic, or psychiatric symptoms. To find MND, the examiner must be presented with "clear and compelling evidence" of four criteria:

> (A)   Presence of an External Incentive;
>
> (B)   Invalid Presentation of Examination Indicative of Feigning or Exaggeration;

---

[9] Exhibit 48.  Sherman E, Slick D, Iverson G. Multidimensional malingering criteria for neuropsychological assessment: A 20-year update of the Malingered Neuropsychological Dysfunction criteria. Archives of clinical neuropsychology. 2020; 35: 735-764 ("Sherman").

[10] Exhibit 49.  Sweet JJ, Heilbronner RL, Morgan JE, Larrabee GJ, Rohling ML, Boone KB, Kirkwood MW, Schroeder RW, Suhr JA; Conference Participants; *American Academy of Clinical Neuropsychology (AACN) 2021 consensus statement on validity assessment: Update of the 2009 AACN consensus conference statement on neuropsychological assessment of effort, response bias, and malingering.* Clin Neuropsychol. 2021 Aug;35(6):1053-1106. doi: 10.1080/13854046.2021.1896036. Epub 2021 Apr 6. PMID: 33823750 (endorsing the MND criteria with minor exceptions) ("AACN 2021 Consensus").

[11] Revealing his lack of adequate qualifications, Dr. Darby fails to identify what, if any, criteria he used to assess Mr. Girardi's purported malingering.

12

(C)   Marked Discrepancies; and

(D)   Behavior Meeting Criterion B Are Not Fully Accounted for by
Another Developmental, Medical, or Psychiatric Condition.

Sherman, 740-742.

### A.   Criterion A: While the Pending Criminal Charges Qualify As An External Incentive, Mr. Girardi's Decline Predates the Filing of Charges

Presence of an external incentive is "[a] clearly identifiable and substantial external incentive for feigning or exaggeration of deficits or symptoms is present at the time of examination" which includes "avoidance of an undesirable outcome such as those related to criminal proceedings (e.g., avoiding being deemed competent to stand trial or avoiding criminal sentencing)," Sherman, p. 739. There is no dispute that Mr. Girardi, who has been charged with a crime, would have an incentive to feign or exaggerate a cognitive impairment to avoid prosecution.[12]

The Government, along with its experts, acts as if the presence of an external incentive is the only relevant question in a malingering analysis. *See* Gov. Opp., at 20 ("Their failure to address this suspicious timing and the fact that legal incompetence conveniently provides a way for defendant to evade accountability is a significant flaw in their analysis."). This amounts to mere bluster. The presence of an external incentive is only the starting point in the analysis—it is never independently sufficient to establish malingering. In any case, objective evidence, much of which predates Mr. Girardi's legal woes, demonstrates that he is not malingering.

---

[12] Significantly, rather than endorsing his cognitive impairment, Mr. Girardi has opposed any efforts to find he has cognitive impairments.  He opposed his involuntary conservatorship, opposed his placement in a elder care facility, and denied any cognitive impairments to all medical and mental health professionals.

13

**B.    Criterion B: There Was No Invalid Presentation Indicative of Feigning or Exaggeration**

Under Criterion B, the MND identifies three specific circumstances that qualify for invalid neurocognitive presentation: (1) Invalid Scores on Performance Validity Tests; (2) One or more compelling inconsistencies pertaining to cognitive deficits or symptoms are observed or documented during the evaluation; or (3) Psychometric evidence of exaggerated cognitive symptoms on Symptom Validity Tests (SVTs).[13] Sherman, p. 740.

**1.    Criterion B, Sub-criterion 1: Mr. Girardi's Performance Validity Tests, including those administered by the government experts, do not suggest malingering.**

Dr. Goldstein's finding of "partial malingering" is based upon her erroneous conclusion that Mr. Girardi failed multiple PVTs.  Goldstein, p. 65.  According to Dr. Goldstein, "Mr. Girardi failed or was unable to fully pass all aspects/trials of the majority of measures administered throughout testing, obtaining scores significantly below recommended clinical cutoff scores, and in two instances performing just above the chance range." *Id.* at 43. Her opinion lacks scientific reliability and is just plain wrong.

Disregarding professional standards, Dr. Goldstein failed to apply the appropriate cutoff scores for evaluating persons with impaired memories, like Mr. Girardi. Had she applied the correct benchmarks, she would have been forced to conclude that Mr. Girardi failed, at most, a single PVT. But even that result is called into question because Mr. Girardi passed the nearly identical version of the same test. In any event, because Mr. Girardi scored above chance (Dr. Goldstein is wrong to claim otherwise), this single PVT is insufficient to support a malingering opinion.

_____

[13] The MND identifies separate criteria for Invalid Somatic Symptom Presentation and Invalid Psychiatric Presentation.

14

1    Ignoring such nuances renders Dr. Goldstein's malingering opinion invalid.

2    Indeed, in a prior matter, a court rejected her attempts to gloss over similar testing

3    limitations. *See Kasim*, 2008 WL 4822291, at *20 ("[T]ests depicted poor effort . . .

4    but such performance was expected for a patient with a cognitive impairment. (See Fact

5    90) These corresponding opinions are accepted as outweighing the opinion of

6    Dr. Goldstein . . . .").

7    And when considering all PVTs tests administered across all experts, Mr. Girardi

8    passed (or at least did not fail) the vast majority of PVTs.

9        **a.    Performance Validity Tests Must Have a Specificity Rate of**

10       **at Least 90 Percent**

11   PVTs, historically referred to as "effort tests," are used by clinical

12   neuropsychologists to detect invalid cognitive performance. PVTs are designed to

13   identify test performance that is "indicative of exaggeration of cognitive problems to an

14   extent that cannot be attributable to a bona fide cognitive . . . condition." Sherman, p.

15   745. But it is not enough to merely point to low scores on PVTs to establish invalid

16   cognitive test performance. Instead, the PVT results must satisfy a number of

17   requirements.

18   *First*, the PVT must have a low false-positive rate, *i.e.*, they must have adequate

19   specificity. Sherman, p. 740. As with all screening tests, PVTs are susceptible to false

20   positives, meaning that the test result may be positive for the condition (*i.e.*,

21   malingering) but in reality the result is attributable to something else (*i.e,.* genuine

22   cognitive impairment). The more specific a test is, the less susceptible the result is to a

23   false positive.[14] The consensus within the psychological community is the administered

24

25       [14] Sensitivity is the ability of a test to correctly identify an examinee with invalid

26   performance. Specificity is the ability of a test to correctly identify people without the

27   disease. True positive means the person has the condition (i.e. malingering) and the test

28   is positive. False positive means the person does not have malingering and the test is

     positive.

15

PVT must have a specificity rate of 90% (or conversely, a false positive rate of 10% or less).   Ex. 49, p. 1069[15]

*Second*, PVTs must have cutoffs that have been validated in clinical studies. Ex. 48, Sherman, p. 746. "PVTs used for the high-stakes determination of malingering should be validated in clinical groups (e.g. real world population), and their validation evidence should not be restricted only to simulation studies (e.g. healthy volunteers or clinical volunteers instructed to feign or exaggerate deficits). Ex. 48, Sherman, p 748.[16]

*Third*, there must be invalid cognitive test performance on two or more PVTs. It is common for an examinee to fail one PVT test. Indeed, up to 25% of examinees fail.[17]   "[F]ailure on a single PVT is not unusual in non-malingering examinees when multiple PVTs are administered."[18]

*Fourth*, unique issues are presented when applying PVTs to older populations. Most research for validating PVTs intentionally exclude older adults, especially individuals "with known with known or suspected dementia due to generally lowered

---

[15]*See* AACN 2021 Consensus Statement, p. 1069 ("It is preferable that clinicians attempt to select PVTs with the highest sensitivity to invalid test performance, while maintaining acceptable specificity, which is commonly set at 90%.")

[16] The PVTs given must also avoid redundancy because highly correlative PVTS do "not contribute to providing additional evidence of invalid responding." While not fully defined, PVTs are considered redundant where they "PVTs that tap the same item pool or consist of derived scores from the same items would not be considered independent."

[17] McWhirter L, Ritchie CW, Stone J, et al Performance validity test failure in clinical populations—a systematic review Journal of Neurology, Neurosurgery & Psychiatry 2020;91:945-952.  https://jnnp.bmj.com/content/91/9/945.

[18] The MND makes clear not even the failure of a PVT with a 100% specificity rate would be sufficient to meet the Criterion B. ("although a score with 100% specificity in known clinical groups would indeed provide strong evidence of exaggeration and invalid test results, a single score in this range would be insufficient for meeting the PVT failure criterion in the model."). The MND would allow for a single PVT failure in making the malingering determination but only if the "score indicates significantly below-chance performance."

16

specificity rates in this population."[19] Accordingly, it is imperative that the PVTs have been validated for a dementia population. "[T]he specificity rates for the majority of PVTs are unacceptably low when using traditional cutoffs, particularly in moderate to severe cases of dementia."[20] Thus, the PVT must be validated for a dementia population and provide a cutoff score with a 90% specificity. If not, the PVT cannot be used to establish an invalid presentation under the MND.

Given the unique issues presented with older adults, "[t]he first recommended step in . . . is examining for the likelihood of dementia before testing occurs."[21] "If the information points toward a dementia process, the likelihood of a true dementia increases and the likelihood of outright feigning decreases."[22] This assessment is critical for not only "determin[ing] a priori which PVT cutoffs should be utilized" but also identifying the most appropriate PVTs to give. In making "the prior (or pretest) probability of dementia," the psychologist must consider a number of factors: demographics (e.g., older age), medical history (e.g., multiple cerebrovascular risk factors) and previous exam findings (e.g., neuroimaging findings of advanced localized atrophy or genetic testing revealing two APOE4 alleles).[23]

---

[19] Exhibit 50, Bortnik, K. E., & Dean, A. C. (2021). Performance validity testing in patients with dementia. In K. B. Boone (Ed.), Assessment of feigned cognitive impairment: A neuropsychological perspective, p. 481. The Guilford Press.

[20] Exhibit 50, Bortnik, p. 482.

[21] Exhibit 47, Miller & Axelrod, p. 35 ("[O]ne critical point of consideration is the prior probability of whether or not a patient may have a neurodegenerative disease, which would be established as early as feasible.").

[22] Exhibit 51, Schroeder, R. W., & Martin, P. K. (Eds.). (2022), p. 257

[23] Additional factors include (i) reported symptom onset and progression (e.g., gradual onset with gradually progressive course); (ii) convergence of reported symptoms to syndrome stereotypes, (iii) functioning in activities of daily living per medical records and collateral reports, (iv) neurological family history (v) convergence of reported symptoms to syndrome stereotypes (.e.g., consistent rapid forgetting of recent events for Alzheimer's dementia) (vi) functioning in daily activities per medical

17

1    In this case, Dr. Goldstein failed to reliably apply this well-accepted

2 methodology resulting in a flawed examination. In approaching the examination,

3 Dr. Goldstein disregarded or discounted all prior medical opinions that Mr. Girardi was

4 suffering from dementia. Given the overwhelming evidence—cognitive testing,

5 neuroimaging, collateral witnesses, medical professional diagnoses—Dr. Goldstein was

6 confronted with at least the probability (if not certainty) that Mr. Girardi was suffering

7 from dementia. Dr. Goldstein should have adjusted her evaluation accordingly,

8 informing both the tests that she administered and the appropriate cutoffs to be applied.

9    As a direct result of her flawed approach, Dr. Goldstein obtained results that are

10 equally flawed. Dr. Goldstein claimed that Mr. Girardi failed four PVTs: (1) Test of

11 Memory Malingering (TOMM); (2) Word Memory Test (WMT); (3) California Verbal

12 Learning Test (CVLT-II) (Long Form); and (4) Reliable Digit Span Revised.

13 Dr. Goldstein is wrong.

14            **b.    Mr. Girardi Did Not Fail the TOMM**

15    Dr. Goldstein claims that Mr. Girardi failed the Test of Memory Malingering

16 (TOMM). Not true. Had Dr. Goldstein applied the correct norms for dementia

17 populations, she would have to acknowledge that Mr. Girardi passed that performance

18 validity measure.

19    Dr. Goldstein scored Mr. Girardi's TOMM results were as follows: Trial 1:

20 39/50; Trial 2: 42/50; Retention Trial (10-minute delay): 44/50. Goldstein, p. 43.

21 While these may be invalid (suspected malingering) at traditional, non-dementia

22 cutoffs, "the TOMM should not be interpreted at traditional cutoffs in patients with

23

24

25 _____

26 records and collateral reports (e.g. spouse has assumed control of finances, medication
and driving) (vii) neurological family history (e.g., first-degree relative with dementia

27 at similar age of onset); and (viii) behavior signs of dementia observed during clinical
interview (e.g. repeating oneself without awareness and unable to recall recent medical

28 visits).  Exhibit 51, p. 257.

18

dementia. . . ." Exhibit 51, p. 262.[24] Numerous studies further confirm that the standard cutoffs for the TOMM are inappropriate for a malingering determination involving suspected dementia. The standard non-dementia cutoff of <40 for Trial 1 results in a specificity of only 64 to 67%, well below the 90% requirement. Accordingly, the recommended cutoff for Trial 1 for dementia individuals is <30. For Trial 2, the traditional cutoff of <45 results in an intolerably low 24% specificity for dementia patients.  Exhibit 51, p. 262.[25] The only way to maintain a 90% specificity  for dementia patients in Trial 2 is to lower the cutoff to <32.[26] Applying the standard cutoff score for the Retention Trial to dementia patients is just as bad, resulting in a unacceptable specificity range of 29% to 68%. The only way to achieve the requisite 90% specificity for dementia patients is to lower the cutoff to between 30 to 35. Thus, when Mr. Girardi's TOMM scores are normed to the dementia cut scores, he passed all three:[27]

---

[24] The two exceptions are when the individual has Huntington's disease or the individual had an MMSE score of 24 or higher. Both times Mr. Girardi took the MMSE he scored below the 24 threshold. Thus, for individuals like Mr. Girardi with a sub 24 score, the specificity drops to an unacceptable 69% specificity.

[25] In a recent systematic review and meta-analysis of the TOMM, Martin and colleagues (2020b) found that the standard cutoff of <45 on Trial 2 resulted in a weighted mean specificity rate of 70% and the same cutoff for the Retention trial resulted in a weighted mean specificity rate of 65%, both below the 90% specificity requirement.

[26] Fernandes S, Ferreira I, Querido L, Daugherty JC. To adjust or not to adjust: Cut-off scores in performance validity testing in Portuguese older adults with dementia. Front Psychol. 2022 Aug 11;13:989432. doi: 10.3389/fpsyg.2022.989432. PMID: 36033073; PMCID: PMC9406512

[27] Even if Dr. Goldstein was unfamiliar with the numerous studies requiring the TOMM to be adjusted for dementia patients, she should've at least followed the cutoff scores identified in the TOMM manual which establish a standard deviation for all three tests. When applying the norms from the TOMM manual to Mr. Girardi's scores, he again passes all three:

19

| TOMM test | Dementia Cutoff Score | Mr. Girardi's Score |
|---|---|---|
| Trial 1 | <30 | 39 |
| Trial 2 | <32 | 42 |
| Retention Trial | 30-35 | 44 |

### c.   Mr. Girardi Did Not Fail the WMT

The Word Memory Test, as it name connotes, also involves memory. Perhaps not surprising, then, individuals with memory impairment perform worse than people who are cognitively normal. As such, the typical cut scores have a unacceptably high rate of false positives. Unlike other PVT's, there are not alternative (lower) cutoff scores for persons with impaired memory. Instead, the creator of the WMT established a specific formula that must be applied whenever there is a concern regarding dementia. Not only did Dr. Goldstein fail to apply the formula, it was impossible for her to do so because she failed to have Mr. Girardi complete the remaining three subtests or didn't bother to record the results. Either way, Dr. Goldstein's conclusion that Mr. Girardi failed the WMT is invalid.

The WMT is a 5-part test in which two "easy: tests—the Immediate Recognition ("IR") and Delayed Recognition ("DR") tests—measure effort.  An algorithm then creates a consistency parameter ("CNS") based on the initial tests.  The latter three tests—the Multiple Choice ("MC"), Paired Associate Recall ("PA") and Free Recall ("FR") tests—are increasingly difficult tests of verbal memory.  In normal populations, suboptimal effort is suggested when the patient scores below 82.5 percent on any of the initial effort-related measures (IR, DR, or CNS).

---

| Test | Dementia Cutoff Score | Mr. Girardi's Score |
|---|---|---|
| Trial 1 | 41 σ 6.6 (37.7 - 44.3) | 39 |
| Trial 2 | 45 σ 5.7 (42.5 - 47.85) | 42 |
| Retention Trial | 47 σ 4.4 | 44 |

20

"Specificity of these validity cutoffs, however, reaches highly unacceptable rates when either MCI or dementia is present."  Exhibit 51, 262.  For this reason, the Genuine Memory Impairment Profile ("GMIP") was developed to evaluate patients with memory impairment, like Mr. Girardi. Using the GMIP, low effort is indicated where: (i) The patient scores below 82.5 percent on any of the initial effort-related measures, and  (ii) The difference between (a) the average of the first three measures (IR, DR, or CNS) and (b) the average of the latter three measures (MC, PA, and FR) is (c) less than 30.[28]

Dr. Goldstein's report does not reflect any acknowledgment of the GMIP, despite her admission that "*some* patients with moderate to severe dementia do not pass." Goldstein, p. 43. Her report does not, for example, even mention Girardi's scores on the MC, PA, or FR.  *See id.* (not including such scores). Failing to record or administer the latter three sub-tests renders the administration and results of the WMT results invalid.

### d.    Mr. Girardi Either Passed the Reliable Digit Span-Revised or It Was Invalid

Dr. Goldstein claims that Mr. Girardi passed one digit span test but failed the other. But Dr. Goldstein must concede that Mr. Girardi initial struggle with the second digit span test was the result of a hearing problem, not lack of effort or an intentional exaggeration of impairment. Indeed, Dr. Goldstein admits that once Mr. Girardi heard the instructions clearly, he passed. Moreover, there is nothing to indicate that this specific PVT, the Reliable Digit Span-Revised (RDS-R), has been subject to testing on individuals with cognitive impairment in order to determine the appropriate cut-offs.

### (1)    Mr. Girardi Ultimately Passed the RDS-R

While Dr. Goldstein's report is somewhat vague, it's clear that Girardi passed the RDS-R. She notes that "when Mr. Girardi was offered a second opportunity to complete" the test, "it normalized."  Goldstein, p. 44.  This is just technical jargon

---

[28] Mauricio Martins and Isabel Martins, *Memory Malingering: Evaluating WMT Criteria*, Applied Neuropsychology (2010).

21

1  masking the bottom line: Mr. Girardi passed the RDS-R the second time it was

2  administered. Nonetheless, Dr. Goldstein refused to give him credit for the pass.

3        **(2)  Mr. Girardi's Initial Failure Resulted From "Hearing**

4                **Difficulty" And "Not Poor Effort"**

5       As Dr. Goldstein admits, Mr. Girardi's first attempt of the RDS-R "may have

6  been due to a hearing difficulty resulting in not understanding the instruction, *not* poor

7  effort."  Goldstein, p. 44.  Thus, an administration error, rather than lack of effort,

8  contributed to the invalid result. Accordingly, even if it were proper for Dr. Goldstein

9  to exclude Mr. Girardi's second successful completion of the RDS-R as a pass, it was

10  wholly inappropriate to identify the first administration as a failure.

11        **(3)  In Any Case, the RDS-R Has Not Been Adequately**

12                **Validated In Clinical Studies**

13       The original (unrevised) RDS is already problematic. Reliable Digit Span (RDS)

14  is the most commonly used embedded PVT within neuropsychology.  The standard

15  cutoff of ≤6 lacks adequate specificity for individuals with even mild dementia because

16  it falls below the 90% specificity threshold.  Once cognition worsens beyond a mild

17  degree of dementia," "substantially lowered RDS cutoffs (e.g., ≤2 or ≤3) are likely

18  needed to maintain adequate specificity."  The use of RDS with patients with moderate

19  dementia, however, will likely be of little value given that cutoff scores need to be

20  adjusted so substantially.  Ex. 51, Schroeder p. 272.

21       In any event, there appears to be no validation studies using the RDS-R for

22  dementia patients (of any severity). Because it is impossible to know, what if any cutoff

23  score for the RDS-R applies to dementia patient, Mr. Girardi's score cannot be

24  considered an invalid result.

25

26

27

28

**(4)    Dr. Goldstein Tries to Minimize Mr. Girardi's Passing Score of a Nearly Identical Test, the Reliable Digit Span**

Mr. Girardi passed the original RDS test with a score of 8. While the cutoff score for the general population is 6, someone with Mr. Girardi's cognitive impairment requires a cutoff score of ≤3. Mr. Girardi didn't barely pass; he passed comfortably demonstrating full effort.

**e.    Even If Girardi's Score on the CVLT-II Long Form Qualifies As a Failure, His Concomitant Hearing Difficulty and Corresponding Passing Score on the CVLT-II Short Form Undermines the Reliability of the Result**

Dr. Goldstein identifies Mr. Girardi's score on the Long Form CVLT-II as a failure. But that is incorrect for three reasons. First, Mr. Girardi *passed* the nearly identical test (short version of the CVLT-II test). Mr. Girardi's significant hearing and vision problems, as noted throughout the testing, was likely the cause of the failure rather than poor effort. Second, Dr. Goldstein failed to apply the correct cutoffs for dementia showing that Mr. Girardi barely failed. Not only that, Dr. Goldstein tried to distort the significance of the result by falsely claiming that Mr. Girardi scored in the chance range. Finally, a single invalid PVT result is insufficient to establish an invalid presentation during the examination under Criterion B.

Dr. Goldstein concluded that Mr. Girardi scored an 11 out of 16 on the CVLT-II Long Form.  Goldstein, p. 43.  As noted, Dr. Goldstein was not present during the test and does not know  how the verbal instructions were given or whether Mr. Girardi had difficulty hearing the instructions (as he did with other tests). Dr. Goldstein claims the result is in the "chance range." *Id.* Simply false. The chance range is ≤ 8.

While Mr. Girardi's score would technically qualify as an invalid result, Mr. Girardi's score on the CVLT-II Short Form undermines any conclusion that it resulted from an intentional exaggeration of cognitive impairment. On the Forced

23

Choice Delayed Recall CVLT-II short form, Dr. Goldstein found that Mr. Girardi scored a 7 out of 9, which is "average." Goldstein, p. 47.  Curiously, Dr. Goldstein does not include this result in the PVT results section, despite her recognition that "the Forced Choice trial of the CVLT-II (both standard and *short* forms)" constitute "embedded PVT measures."  Goldstein, p. 43 (emphasis added). Instead, Dr. Goldstein buried the result further down in the "Learning and Memory" section and other sections having nothing to do with PVT.  Goldstein, p. 47.

As well established in the scientific community, the failure on a single PVT is never sufficient to satisfy an invalid presentation based upon PVT results. Moreover, the CVLT-II Forced Choice trial is only embedded measure not a stand-alone test. And according to Dr. Goldstein, "use of stand-alone measures is considered 'medically necessary' in clinical examinations." ECF No. 64., at 64.

>             **f.     Contrary to Dr. Goldstein's Contention, Mr. Girardi Never
>                      Scored Below Chance and His Single PVT Failure Does Not
>                      Satisfy Criterion B**

Even if Mr. Girardi failed the CVLT-II is technically invalid, a single PVT can never establish Criterion B unless the examinee scores below chance level. Contrary to Dr. Goldstein's report, Mr. Girardi never scored below chance.

Dr. Goldstein claims that Mr. Girardi tested just above the chance range on the WMT and within the chance range on the CVLT-II. Goldstein, p. 43.  Dr. Goldstein's contention betrays a fundamental misunderstanding of what chance means. Contrary to her position, neither score was at or below chance and thus, do not constitute a single failure that can establish an invalid PVT result.[29] Chance for a two-alternative forced

---

[29] Chance for a two-alternative forced choice test is just what one would expect. "If there are two choices, it would be expected that purely random guessing would result in 50 percent of items correct." Accordingly, "[s]cores deviating from 50 percent in either direction indicate nonchance-level performance." National Academies of Sciences, Engineering, and Medicine. 2015. Psychological Testing in the Service of

24

1   choice test is just what one would expect: "If there are two choices, it would be

2   expected that purely random guessing would result in 50 percent of items correct."[30]

3   Accordingly, "[s]cores deviating from 50 percent in either direction indicate

4   nonchance-level performance."

5       For both the WMT and CVLT-II, Mr. Girardi did not score at chance, much less

6   below it. For the CVLT-II, Mr. Girardi got an 11 out of 16. Of course, chance is 8 (50%

7   of 16). For the WMT, even as Dr. Goldstein concedes, Mr. Girardi was above chance.

8           **g.    Contrary to Dr. Goldstein's "Mixed" Classification, Girardi**

9                   **Passed the Rey 15 Item (RFIT)**

10       Dr. Goldstein identifies Mr. Girardi's results on the Rey 15-Item test as

11  "Mixed." Goldstein, p. 43. Dr. Goldstein claims he obtained 7 out of 15 items, Passed 2

12  rows, and got 5 out of 30 on the Recognition Items. *Id.* But when correctly normed for

13  dementia patients, Mr. Girardi's results were not just mixed; he passed.

14       For the Rey 15-Item Test, researchers have been found that the traditional cutoff

15  must be significantly reduced for dementia patients to satisfy the 90% specificity

16  requirement. The traditional cutoff of ≤11 does not even meet the 90% threshold for

17  nondementia patients.  (concluding that the cutoff only meets 88% specificity excluding

18  dementia patients). Even when the cut-off was lowered for dementia to the specificity is

19  still grossly inadequate (ranging from 26 to 28%). Dropping the cutoff even further

20  (≤8) still failed to meet the requisite specificity, even for mild dementia (85%). The

21  only way to satisfy the 90% specificity threshold was to lower the free recall cutoff to

22  between ≤ 2 and ≤ 1 and lower the combination equation to ≤ 3.  Ex. 50, p. 488.

23       Applying the correct cutoffs, Mr. Girardi's scores clearly passed the RFIT.

24  Granted, such low cutoffs for the RFIT also lower the sensitivity. But this only

25

26  Disability Determination. Washington, DC: The National Academies Press.
    https://doi.org/10.17226/21704

27      [30] National Academies of Sciences, Engineering, and Medicine. 2015.

28  Psychological Testing in the Service of Disability Determination. Washington, DC: The
    National Academies Press. https://doi.org/10.17226/21704.

demonstrates that Ms. Graupman should not have administered the RFIT at the outset.[31]
Given the multitude of other tests available, there was simply no reason to use it.
Dr. Goldstein's decision to employ the RFIT further underscores her lack of expertise
in examining older adults.

> **h.    Dr. Goldstein's Use of the Word Choice Test, Which Has No
> Cutoffs for Mr. Girardi's Age, Much Less His Cognitive
> Impairment, Further Exposes the Unreliability of Her
> Examination**

Ms. Graupman administered the Advanced Clinical Solutions Word Choice Test
(WCT). Goldstein, p. 43. But as Dr. Goldstein notes in her report, the test is not normed
for populations above 70 years old. This immediately begs the question as to why Dr.
Goldstein directed Ms. Graupman to give the test. Was she unaware that the test was
useless for an 84-year-old examinee? Or did she know, but decide to give the test any
way to create the false impression that Mr. Girardi did not pass yet another test. Either
way, Dr. Goldstein's decision to administer the test betrays a total lack of
understanding in how to evaluate older adults.

Age norms aside, the WCT fails to meet the specificity requirements for persons
with dementia. The only study to evaluate the WCT in a mixed sample did not even
identify the appropriate cutoff scores (90% specificity) for individuals with dementia.[32]

---

[31] Indeed, in a recent study, researchers did not even try to identify a cut-off
score for dementia patients because the RFIT "proved to be non-discriminatory."
Fernandes S, Ferreira I, Querido L, Daugherty JC. To adjust or not to adjust: Cut-off
scores in performance validity testing in Portuguese older adults with dementia. Front
Psychol. 2022 Aug 11;13:989432. doi: 10.3389/fpsyg.2022.989432. PMID: 36033073;
PMCID: PMC9406512.

[32] See Ex. 50. Boone, p. 482 (reviewing study results and noting that "specificity
relative to the patients with AD [Alzheimer's disease] was not reported."); see Bain
KM, Soble JR. Validation of the Advanced Clinical Solutions Word Choice Test
(WCT) in a Mixed Clinical Sample: Establishing Classification Accuracy,

26

### i.   Because Mr. Girardi failed, at most, one out of fourteen PVTs, such tests cannot support a finding of malingering.

Evaluating Mr. Girardi's overall performance on PVTs by all experts, further undermines a finding of invalid presentation based on PVTs. To the contrary, Mr. Girardi pass rate failure on a single PVT out of 14 demonstrates more than adequate effort and strongly undermines a finding of malingering.

At the outset, it is important to note that Mr. Girardi passed *all* PVTs administered by *all* experts, except the Long Form CVLT-II, which was administered by Ms. Graupman. Given the numerous problems noted throughout the administration of the testing, the lengthy examination and testing period likely raising the issue of whether fatigue contributed to effort, and the sheer number of the tests administered, calls into question whether the testing itself was fundamentally flawed and should be disregarded.

In any event, when Ms. Graupman's tests are placed in context with all other PVTs, it is clear that Mr. Girardi's PVT performance is not indicative of malingering. The MND criteria emphasize the importance of "consider[ing] the ratio of PVT failures to total PVT scores rather than the absolute number of PVTs administered." For example, "failing two of seven PVT scores would appear to meet criteria for invalid responding, as would failing four of 14 PVT scores; failing two of 14 PVT scores likely would not (i.e., because this would be equivalent to failing one out of seven PVTs)."

As set forth below, at most Mr. Girardi had a single failure out of 14 PVTs:

| Administrator | PVT | Dementia Cut Score | Girardi's Score | Result |
|---|---|---|---|---|
| Dr. Budding | Validity Indicator Profile | | | Passed |
| Dr. Budding | California Verbal | | 15/16 | Passed |

Sensitivity/Specificity, and Cutoff Scores. Assessment. 2019 Oct;26(7):1320-1328. doi: 10.1177/1073191117725172. Epub 2017 Aug 24. PMID: 28836450.

27

| | | | | |
|---|---|---|---|---|
| | Learning Test-III Forced Choice | | | |
| Dr. Darby | Coin-in-the-Hand Test | <6 | 10 | Passed |
| Ms. Graupman | Test of Memory Malingering<br>Trial 1<br>Trial 2<br>Retention | <br><br><30<br><32<br>30-35 | <br><br>39<br>42<br>44 | Passed |
| Ms. Graupman | Word Memory Test | GMIP calculation | Incomplete Testing | Administration Error |
| Ms. Graupman | Reliable Digit Span | ≤6 | 8 | Pass |
| Ms. Graupman | Reliable Digit Span-Revised<br>1st Attempt<br><br>2nd Attempt | Unknown | <br><br><br>Hearing Problems Passed | Administration Error/ Passed on Second Administration |
| Ms. Graupman | California Verbal Learning Long Form | <13 Mild Dementia | 11 | Invalid |
| Ms. Graupman | California Verbal Learning Short Form | | 7 | Passed |
| Ms. Graupman | Rey 15 Item | <2 | <7 | Passed |
| Ms. Graupman | Victoria Symptom Validity Test<br>Easy<br>Hard | <br><br><br><14 | <br><br>24/24<br>22/24 | <br><br>Passed<br>Passed |
| Ms. Graupman | Word Choice Test | | 39 | Invalid test for Dementia |
| Dr. Wood | Test of Memory Malingering<br>Trial 1<br>Trial 2<br>Retention | <br><br><30<br><32<br>30-35 | <br><br>39<br>47<br>47 | Passed |
| Dr. Wood | Dot Counting | ≥22[33] | 17 | Passed |
| Dr. Wood | Age Corrected Digit Span | <5 | 10 | Passed |

---

[33] In contrast to all other PVTs, for the Dot Counting Test, a higher score is considered worse performance.

28

| Dr. Wood | CVLT-III Forced Choice | | 16/16 | Passed |
|---|---|---|---|---|

### 2.    Criterion B, Sub-criterion 2: The Purported Compelling Inconsistencies Identified By Dr. Goldstein and Dr. Darby Are Neither Compelling Nor Inconsistent

Dr. Goldstein claims that "Mr. Girardi responded to questions or otherwise presented himself in noncredible ways." Goldstein, p. 66. But applying the MND criteria, none qualify as inconsistencies, certainly not compelling ones. To be sure, mild discrepancies do not suffice to satisfy the MND. Instead, they must "so extreme or improbable that deliberate dissimulation, exaggeration, or feigning is determined to be the most reasonable cause." Ex. 48, p. 745. All of Dr. Goldstein's examples of purported malingering are either consistent with someone who has dementia or wholly irrelevant.

Compelling inconsistencies occur when "the difference in the way a patient presents when being evaluated compared with when they are not aware of being evaluated is such that it is not reasonable to believe the patient is not purposefully controlling the difference." Ex. 48, p. 744.  "[C]ompelling inconsistencies are instances of feigning or exaggeration of neurocognitive, somatic, or psychiatric dysfunction that are directly documented by the examiner, as opposed to being detected by PVTs or SVTs or found in records and documentation." "Compelling inconsistencies are not the typical, milder discrepancies seen in neuropsychological assessment, such as the examinee who reports word-finding problems yet speaks relatively normally during the interview. Rather, these are stark contradictions found either on observation or clinical interview that are so extreme or improbable that deliberate dissimulation, exaggeration, or feigning is determined to be the most reasonable cause. As Sherman makes clear, "compelling inconsistencies are not definitive evidence of malingering but rather of

29

1  feigning or exaggeration" because "[m]alingering requires meeting additional criteria,

2  including . . . consideration of exclusionary criteria."  Ex. 48, p. 745.

3          Dr. Goldstein fails to identify any compelling inconsistencies required to satisfy

4  the MND criteria. Some of the bases raised by Dr. Goldstein are simply nonsensical.

5  For example, Dr. Goldstein writes:

6          At numerous points during the competency-related inquiries, which
        spanned 4/29/23 to 4/30/23, Mr. Girardi said he did not know certain
7          answers because he was not a criminal lawyer. On 4/30/23, he stated, "I'm
        not a criminal lawyer, as I said 15 times." Similarly, after discussing his
8          parents earlier in the day, when discussing family history, Mr. Girardi
        commented about his father (accurately), "As I told you, he invented the
9          radar to land planes on ships."

10         Goldstein, p. 67.

11         It is difficult to know what Dr. Goldstein is getting at. Mr. Girardi said he's not a

12  criminal lawyer because he's not and has never claimed otherwise. That's credible. The

13  fact that Mr. Girardi accurately reported that his father invented radar for landing

14  planes on aircraft carriers is also credible. Perhaps Dr. Goldstein finds it suspicious that

15  Mr. Girardi can recall information from the distant past. It's not. To the contrary,

16  dementia patients routinely recall biographical historical information. The cognitive

17  impairment attacks short-term and episodic memory first.

18         Other times, Dr. Goldstein suggests that because Mr. Girardi can recall bits of

19  recent information, he must be faking it. For example, Dr. Goldstein points out that

20  after Mr. Girardi was informed about the charges at the beginning of the evaluation, he

21  later speculated that "[t]he only thing it could be is if clients are saying they didn't get

22  paid." Goldstein, p. 66. But Mr. Girardi's vague speculation about what the case may

23  be about in no way shows he is pretending not to remember the charges. Given Mr.

24  Girardi's lengthy career as a plaintiff's lawyer, it would have been reasonable for

25  anyone with his background to assume the most likely basis for criminal liability would

26  be the failure to pay clients. Drawing upon crystalized knowledge about what happens

27  in a plaintiff law practice hardly qualifies as actual recollection. Moreover, even if Mr.

28  Girardi retained broad rudimentary facts from an earlier time in the same interview

30

does not demonstrate feigning. People with moderate dementia can retain some basic information within the same meeting.  But as established by Mr. Girardi's repetitive interaction with numerous defense counsel and multiple meetings with Dr. Wood over successive days, it is clear that Mr. Girardi lacks the ability to retain specific information over any lengthy period of time, certainly not beyond a 24-hour period, about the charges against him, including the names of the complaining witnesses, the nature of the underlying cases, the amounts claimed to be withheld, and the resolution of the complaints.  Ex. 69 (Declaration of Counsel).

Dr. Goldstein also points to Mr. Girardi's prior knowledge but current forgetfulness as being evidence of malingering but that is also entirely consistent with dementia. For example, Dr. Goldstein claims that Mr. Girardi's awareness in 2021 about his law practice being closed somehow proves he's lying about lacking current knowledge of the firm. Goldstein, p. 66. Mr. Girardi's lack of recollection *two* years later is entirely consistent with dementia (or for that matter, MCI).

While it is true that Mr. Girardi did not immediately recall his third marriage to Erika Jayne (though later acknowledging his "ex"), this still does not establish a compelling inconsistency. Goldstein, p. 66. Long before charges were filed, Mr. Girardi struggled with his recognition of Jayne. In September 2019, Girardi was unable to recognize a photograph of his then-wife Erika Jayne together. (Ex 10, p. 1.) And Mr. Girardi failed to recount his marriage to Jayne in the evaluations by both Dr. Wood and Dr. Goldstein. Finally, Mr. Girardi openly took phone calls during both evaluations of Dr. Wood and Dr. Darby. No one who is trying to fake a lack of memory of someone would take a phone from the very person they claim to have forgotten, certainly not in front of experts hired by the government.

Similarly, Dr. Goldstein cites Mr. Girardi's failure to recall parts of his medical history, including a 2017 car accident and coronary artery disease as somehow noncredible. Goldstein, p. 66. While Dr. Goldstein fails to offer any explanation, it appears she assumes that because these events are so significant that Mr. Girardi

31

must've remembered them but is lying about it. Putting aside that Mr. Girardi was found unconscious after the 2017 accident and had no memory of the crash or even his name, Mr. Girardi's inability to recall significant past events is entirely consistent with dementia.

Dr. Goldstein claims that because Mr. Girardi reported having previously given various legal presentations "until I came here" this allegedly "reflects memory for the time period and his activities." Tellingly, while Dr. Goldstein goes into great detail discussing *her* knowledge of the presentations Mr. Girardi participated in late 2020, she fails to point to anything demonstrating *his* memory of these recent events. Mr. Girardi's general recollection of his past involvement in presentations over a lengthy legal career is not inconsistent with dementia but entirely expected.[34]

Dr. Goldstein claims that Mr. Girardi recognized various people during the examination and that this shows malingering. Goldstein, p. 67. Nonsense. While Dr. Goldstein claims that Mr. Girardi recognized herself, Ms. Graupman, and the defense investigator, she offers zero proof for this assumption. Dr. Goldstein does not claim at any time that Mr. Girardi addressed any of the three by name or even role. Mr. Girardi's generic inquiry of the investigator ("What are you doing here?") and his acquiescence to further testing from Ms. Graupman ("No, I like you") also fails to establish recognition. Goldstein, p. 67. Mr. Girard's polite and friendly manner is entirely consistent with someone suffering from dementia. Indeed, dementia patients often attempt to cover for their lack of memory, especially memory of people, that they

---

[34] Dr. Goldstein also cites Mr. Girardi's recognition of COVID and its impact on the legal practice as somehow inconsistent with dementia. Mr. Girardi's ability to recall the most severe pandemic in United States history, upending all facets of daily life and resulting in more than 1 million deaths, is neither surprising nor suggestive of malingering. *See COVID-19 Surpasses 1918 Flu as Deadliest Pandemic in U.S. History*, available online at https://www.nationalgeographic. com/ history/article/covid-19-is-now-the-deadliest-pandemic-in-us-history.

32

*feign* recognition. Years earlier, Mr. Girardi would attempt to mask his inability to recall individuals by referring to them in general terms and not by name.

While Mr. Girardi does jumble some past and current history when speaking to Dr. Goldstein this still does not establish compelling inconsistencies. For example, Mr. Girardi is mistaken about many of the details of American history. Goldstein, p. 67. *See*, *e.g.* (President Roosevelt was the immediate predecessor to President Biden, United States still active in the Vietnam War). Dr. Goldstein identifies no instance either within the examination or without where Mr. Girardi provides the correct or even alternative information.

Dr. Goldstein insists that given Mr. Girardi's involvement with representation of his prior clients at the heart of both federal criminal cases, Mr. Girardi's inability to recall their names must be evidence of malingering. But Dr. Goldstein exaggerates Mr. Girardi's participation in this cases. As the discovery reflects, other attorneys from the firm more directly worked with clients while Mr. Girardi's role was limited to glad-handing the clients or finalizing settlements. Even so, Mr. Girardi's inability to recall their names now is entirely consistent with his dementia diagnosis. To bolster her position, Dr. Goldstein contends that "remote memory degradation would occur at a late stage in a dementing process and would not occur in combination with intact memory for recent events." Once again, Dr. Goldstein reaches far beyond her field of expertise, touching upon medical rather than psychological issues.

Putting aside her lack of expertise, Dr. Goldstein's position is factually and scientifically unsupported. Dr. Goldstein fails to point to any instance where Mr. Girardi's memory for recent events is intact. Vague recollection of broad concepts hardly evinces intact memory. And while Dr. Goldstein insists that "[t]he gradient of memory loss in cognitive decline simply doesn't work this way," Dr. Goldstein presupposes that there is only one way for cognitive decline to occur. She's wrong.

33

"[D]ementia progresses very differently, both between and within individuals. This implies an average trajectory is not informative to individual persons . . . ."[35]

Finally, Dr. Goldstein latches on to Mr. Girardi's parting statement, "Take care of me," as somehow reflecting malingering. Goldstein, p. 67. Dr. Goldstein did not seek clarification of what Mr. Girardi may have meant but automatically attributed a nefarious motive. But given Mr. Girardi's defiance that he has no cognitive impairment to all medical and mental health professionals it is more probable that he was hoping she would not find him cognitively impaired. Indeed, Mr. Girardi specifically asked Dr. Lavid not make such a finding because of the impact on his professional reputation. Other than bald speculation, Dr. Goldstein has no reason to believe that Mr. Girardi harbored the same motive here.

### 3.    Criterion B, Sub-criterion 3: Though Dr. Goldstein Fails to Acknowledge Its Significance, Mr. Girardi Passed Her Symptom Validity Test

Dr. Goldstein glosses over the fact that Girardi passed the MMPI-2, the only Symptom Validity Test (SVT) that she administered. "SVTs are scales that are designed to assess the validity of self-reported symptoms." SVTs relevant to malingering detection identify scores that are indicative of exaggeration of cognitive, somatic (*e.g.*, neurological, medical), or psychological symptoms. Most are designed to identify symptoms that are not credible by virtue of being overly exaggerated, too negative, or too implausible to be believable." Similar to the limitations on PVTs, "an invalid SVT score must be based on SVTs that (a) have an acceptable false-positive rate, (b) provide non-redundant information, and (c) have validated cutoffs using clinical (i.e., known-group) studies."  Ex. 48, p. 740.

Dr. Goldstein notes the results of the MMPI-2 but not much else.  Tellingly, the Government successfully fought to allow Dr. Goldstein to administer the MMPI-2

---

[35] Ex. 67.

1  arguing the MMPI-2 is important test to demonstrate malingering. See ECF No. 46, at

2  7 ("[T]he true reason or defendant's objection to the use of personality testing,

3  including the MMPI-2, may be . . . the test's ability to identify malingering. However,

4  these validity measures are precisely why this Court should allow Dr. Goldstein to

5  administer personality testing"). Now that Mr. Girardi's MMPI-2 results do not support

6  its malingering position, the government and Dr. Goldstein are conspicuously silent.

7  **C.    Criterion C: Rather than Marked Discrepancies, There Are**

8  **Marked Consistencies Between Mr. Girardi's Examination**

9  **Results and His Presentation in the Real World**

10      The government's experts attempt, but ultimately fail to demonstrate marked

11  discrepancies between Mr. Girardi's presentation during the examination and his

12  presentation in daily life. In doing so, they ignore or distort accounts from

13  knowledgeable collateral witnesses and disregard medical and facility records. Far from

14  marked discrepancies, there are significant consistencies between Mr. Girardi's

15  examination results and his real-world presentation.

16      Marked discrepancies must be apparent between "self-report or through tests or

17  scales" and other kinds of evidence. Acceptable types of evidence include:

18  "(i) natural history and pathogenesis of the condition in question, (ii) records and other

19  media, and (iii) reliable collateral informant report." Regarding the last category of

20  evidence, "a reliable collateral informant report is defined as one who does not have a

21  vested interest in the outcome of the evaluation." Ex. 48, Sherman, 764.[36]

22      As an initial matter, examiners must consider not only the individual's

23  presentation but their self-report of symptoms. In contrast to a suspected malingerer,

24  _____

25  [36] The MND criteria provides a number of examples of marked discrepancies,
including "[a]n examinee obtains severely impaired memory scores after a motor

26  vehicle collision, but emergency, hospital, and family doctor records indicate no loss of
consciousness or cognitive problems at the scene or subsequently" and "[a]n examinee

27  is unable to perform simple math problems in testing but performs well as an

28  accountant according to an employer."

35

Exhibit B - 039

Mr. Girardi has consistently and adamantly denied any cognitive impairment. When
pressed by every physician, medical staff, mental health professional, and skilled
nursing caregivers, Mr. Girardi has insisted his memory is intact.

   1.   **Evidentiary Category 1: Contrary to the Government's
        Position, Independent Records Confirm Mr. Girardi's
        Progression from MCI in Late 2020 to Moderate Dementia
        Today**

        The government's experts identify two categories of records to demonstrate
Mr. Girardi allegedly malingering and lack of dementia. First, they attempt to discount
the prior medical records, specifically the neuroimaging as failing to support cognitive
impairment. Second, they fixate on Mr. Girardi's presentation in video and audio
recordings from late 2020/early 2021 as establishing normal functioning. A closer
review of the records demonstrates they're wrong.

        a.   **The Government Experts Improperly Disregard the Medical
             Records Consistent with Moderate Dementia**

        Medical records establish a steady decline. ███████████████

█████████████████████████████████████

███   Each time, Mr. Girardi had little or no memory of the event and was unable to
take himself to the hospital. ████████████████████

████████████████████████████████████

███████████████   In making that decision, medical professionals were required to
attest to Mr. Girardi's cognitive impairment and lack of ability to care for himself. ███

█████████████████████████████████

███████████████████████████   The same screening process
occurred when Mr. Girardi was accepted into the memory ward facility at ██████
To accept the government's absurd position requires the Court to conclude that
Mr. Girardi, despite his protestations, was actually playing four-dimensional chess with

36

1  all medical professionals over the past six years to convince them that he was suffering
2  from dementia.

3      **b.  Dr. Darby Fails to Address, Much Less Dispute, Numerous**
4          **Studies Showing a Strong Correlation Between**
5          **Hippocampal Atrophy and Dementia**

6      Dr. Helena Chui assessed the presence and etiology of Mr. Girardi's dementia
7  using, *inter alia*, neuroimaging from 2017, 2021, and 2023, which show progressive
8  and extreme atrophy of Mr. Girardi's hippocampus, which is essential to encoding
9  episodic memories and semantic information. In response, the government correctly
10 concedes that "[Mr. Girardi's] brain scans undisputedly show significant atrophy in his
11 temporal lobes." Gov. Opp., at 39. But the government and its experts obfuscate the
12 importance of this concession, making vague claims that "the link between brain
13 imaging findings and the severity of clinical symptoms is not one to one." *Id*., *quoting*
14 Darby Rep., at 26.[37] This broad assertion may be technically true in the abstract but
15 utterly meaningless in this case. There is a tremendous body of scientific literature
16 showing a connection between atrophy of the hippocampus and dementia. Because Mr.
17 Girardi's hippocampal atrophy is incredibly severe—bottom percentile for all
18 hippocampal volume for any adult his age—it strongly supports Mr. Girardi's
19 progressive decline from mild cognitive impairment to moderate dementia.[38]

20     Dr. Chui's interpretation of the neuroimaging draws upon not only her extensive
21 experience reviewing brain scans as the Keck USC Medical Center Chair of Neurology
22 but the tremendous body of scientific literature, including her own studies. Among the
23 over 200 peer-reviewed articles Dr. Chui has published, she oversaw studies

25     [37] Dr. Goldstein, who is not a neurologist, takes a more extreme position on
26 neuroimaging than Dr. Darby. Unlike him, she claims that neuroimaging cannot be
   used to assess the severity of Mr. Girardi's cognitive impairment. ECF No. 64, at 59.
27     [38] Dr. Goldstein incorrectly states that Mr. Girardi's hippocampal volume is
28 currently in the second percentile. ECF No. 64, at 58.

37

specifically addressing hippocampal atrophy and cognitive function. Nearly twenty years ago, in 2005, she published an article describing a sample where "[h]ippocampal volume from [an] MRI was significantly related to the Memory and the Demential Rating Scale scores." Ex. 52, Zarow et al. (2005), at 900. A follow-up study from 2012 similarly found that the average hippocampal volume for subjects with Hippocampal Sclerosis was 52 percent smaller than the average volume in those with normal hipocampi. Ex. 53, Zarow *et al.* (2012), at 441. More recently, Dr. Chui wrote, "[c]linical practice relies heavily on structural magnetic resonance imaging (MRI) for the diagnosis of AD and vascular cognitive impairment." Ex. 54, Zheng et al. (2006), at 205.

Dr. Chui's reliance on neuroimaging and volumetric analysis of Mr. Girardi's hippocampus is supported by numerous studies conducted by other scientists, including the following:

- "The degree of hippocampal or parahippocampal atrophy has been related to the severity of memory impairment." Ex. 55, Maestú et al. (2003), at 208;

- "[A] strong association exists between the severity of atrophy and cognitive decline along the aging continuum . . . ." Ex. 56 Desikan *et al.* (2013), at 2;

- "Our rates of hippocampal volume loss were 3.42% in participants who are developing AD and 0.85% in participants who did not develop AD." Ex. 57, Rana et al. (2017), at 36;

- "Hippocampal volume measured in MRI has shown to be predictive of dementia in patients with mild cognitive impairment . . . ." Ex. 58, Achterberg et al. (2019), at 58;

- "We found a strong association between dementia and atrophy of medial temporal lobe structures, namely the hippocampus,

38

amygdala and parahippocampus, even after accounting for

neuropathologies." Ex. 59, Woodworth et al. (2022), at 9-11.

Dr. Darby does not even mention, much less attempt to distinguish the numerous studies that undermine his empty pronouncement.

   **c.**  **Dr. Goldstein's Attack on the Sophisticated Software Used to Quantify Brain Atrophy Is Both Baseless And Beyond Her Expertise**

Dr. Goldstein takes a different tack, criticizing NeuroQuant, the software used to assess the volume of Mr. Girardi's hippocampus. According to her, NeuroQuant is "experimental" and "not intended for clinical diagnosis." Goldstein, p. 58. But Dr. Goldstein is both wrong and unqualified opine on such questions.

More than 15 years ago, the FDA approved NeuroQuant for "automatic labeling, visualization and volumetric quantification of segmentable brain structures from a set of MR images." Ex. 60, 2006 FDA Approval of NueroQuant. In 2017, the FDA further approved NeuroQuant for comparing volumetric measurements of an individual's brain structures to reference percentile data. Thus, a full four years before Dr. Chui's review of the neuroimaging in this case, the FDA specifically authorized the use of NeuroQuant to compare Mr. Girardi's hippocampal volume to that of other 84-year-old men. Ex. 61, 2017 FDA Approval of NueroQuant.

Beyond FDA approval, scientific studies have specifically addressed the use of NeuroQuant. A 2009 study used NeuroQuant "to examine [Medial Temporal Lobe] volume in MCI patients," and ultimately "identified an association between [Medial Temporal Lobe] volume and clinical decline within a 6-month interval." Ex. 62, Kovacevic et al. (2009), at 143. Two years later, in 2011, a study used NeuroQuant and found that "the presence of medial temporal lobe atrophy, when considered alone or in combination with other factors, was associated with the most rapid rate of conversion [from MCI to Alzheimer's dementia], with median survival times of approximately 15 months." Ex. 63, Heister et al. (2011), at 1624. A 2013 article similarly explained

39

that "[t]he presence of atrophy in medial temporal structures, which can be visually rated or more precisely quantified using FDA-approved automated medical device image analysis software (e.g., NeuroQuant ®, CorTechs Labs, Inc., CA, USA), is associated with a high risk of imminent decline to dementia." Ex. 64, McEvoy & Brewer (2012), at 345.[39]

Ignoring all this, Dr. Goldstein cites a single article, Luo *et al*. (2015), to make the misleading claim that "the overlap in hippocampal volume between [persons with normal function, MCI, and Alzheimer's dementia] is considerable, making the likelihood of misdiagnosis high." ECF No. 64, at 58. This amounts to little more than misdirection when put in the full context of this case. As demonstrated by a scatterplot from Luo *et al*. (2015), there is minimal overlap between populations with normal cognitive function and populations with Alzheimer's dementia at the bottom percentile for hippocampal volume, which is where Mr. Girardi currently falls:



**Figure 7.** Normative reference percentile curves showed that the average of each of the data sets shift from close to 50% percentile curve (for normal population) to 5% percentile curve (for LMCI) and about 1% percentile curve (for AD). This is consistent with current understanding of hippocampus atrophy and Alzheimer's disease.

Mr. Girardi's approximate location on each scatter plot based on his current age (84) and normative percentile for hippocampal volume (1st percentile).

Ex. 66, Luo *et al*. (2015), at 6.

---

[39] The maker of NeuroQuant states that it provides "[v]olumetric analysis for the assessment of a broad range of neurological conditions, from dementia-related atrophy to MS and brain trauma." Ex. 65, Celebrating 10 Years of FDA Clearance.

40

Studies aside, Dr. Goldstein, who is a psychologist, is unqualified to contest Dr. Chui's use of NeuroQuant or its volumetric measurements demonstrating the extreme atrophy of Mr. Girardi's hippocampus. Even the government's neurologist does not join Dr. Goldstein's unfounded criticisms on these points. *Compare* Goldstein, at 57-59, *with* Darby, at 25-26. The Court should reject Dr. Goldstein's views, as have other courts when Dr. Goldstein has overstepped her professional limitations. *See United States v. Kasim*, No. 2:07 CR 56, 2008 WL 4822291, at *8 (N.D. Ind. Nov. 3, 2008) ("To the extent that there is a conflict between the opinions of Dr. Kohn and Dr. Goldstein, the opinion of Dr. Kohn is accepted. Dr. Kohn is a medical doctor, the SPECT scan is a test within his medical expertise . . . .").

The Court should reject the Government's attempts to downplay the extreme atrophy of Mr. Girardi's hippocampus from 2017 to 2023. Even the Government's own neurologist concedes his atrophy is "abnormal" and "associated" with multiple neurodegenerative disorders, including the disorder that Dr. Chui identifies as the most likely cause of Mr. Girardi's dementia. The Court should similarly dismiss vague claims by government experts, *e.g.*, "the link between brain imaging findings and the severity of clinical symptoms is not one to one," which attempt to handwave the incredible degree of atrophy that Mr. Girardi has actually suffered.

**2.** **Evidentiary Category 2: The Government's cited Video and Audio Recordings of Mr. Girardi in 2019-2020 Are Consistent With His Then-Mild Cognitive Impairment And Do Not Suggest Malingering Today**

Rather than acknowledge the incongruency between its position and the medical records, the Government points to video and audio recordings of Mr. Girardi from 2019 and 2020. Gov. Opp., at 24-25. The Government's reliance on such media, as well as other reports from the same time period, reflects a fundamental misunderstanding of how Mild Cognitive Impairment progresses to Dementia. The government's neuropsychologist admits Mr. Girardi had Mild Cognitive Impairment as early as late

41

2020, relying on some of the same media that the Government cites in its brief. And "[i]ndividuals with MCI generally maintain their functional capacity for activities of daily living." Goldstein, at 57. Thus, it is no surprise that Mr. Girardi was able to participate in media events more than three years ago.

### 3. Evidentiary Category 3: As Documented By Numerous Collateral Witnesses, Mr. Girardi's Cognitive Decline Is Consistent With the Natural Progression of Dementia

The Government does not and cannot dispute that 84-year-old Thomas Girardi suffers from cognitive impairment, but then argues that his cognitive decline was both too fast, and at the same time too slow. Their position is based largely on excerpts of hearsay statements of lay witnesses, many of whom strongly dislike Mr. Girardi and have an interest in him being found competent. A number of the statements relied on by the Government were taken by their chosen expert, Dr. Diana Goldstein, who by the time she took the statements had already decided that Mr. Girardi was "malingering." The Government in arguing Mr. Girardi is competent fails to mention information obtained from a number of witnesses who knew Mr. Girardi well, and over a long period of time prior to his cognitive decline. Among the statements they did choose to include, the Government omits important information about Mr. Girardi's memory lapses. A closer more complete review of the statements provided --- including many not even mentioned --- demonstrates unequivocally that Mr. Girardi suffers from a substantial and debilitating cognitive impairment that has progressed over time, and his memory and his ability to encode and maintain new information is significantly impaired. This impairment has progressed as dementia does, progressively over time, with good days and bad.

The parties agree that it is the people who knew Mr. Girardi over a long period of time, and those had frequent interactions with him, who are in a position to describe his daily functioning and the progression of his disease. But the Government, fails to submit information obtained from those individuals who observe him every day at the

42

1    locked memory care ward in which he resides, or information from family members

2    who have known him his entire life, and friends who have known him for many years,

3    but instead cite to individuals, like A███ Z█████, who have not seen Mr. Girardi

4    since the summer of 2019, someone with whom Mr. Girardi had only had business

5    dealings, and whom if believed, is owed a substantial sum of money by Mr. Girardi and

6    dislikes him intensely. (Gov't Exh. 21)

7        Similarly, the Government failed to provide information from interviews of

8    people who knew Mr. Girardi both before and after his cognitive decline and can speak

9    to the differences in Mr. Girardi's behavior, but instead they provide excerpts from a

10   statement of Arin Scapa, a former paralegal in the United States Attorneys' Office, and

11   then a lawyer who started working at the Girardi Keese law firm on July 1, 2019, and

12   left less than18 months later on December 6, 2020. (Gov't Opposition p. 23)

13   The Government states that Ms. Scapa worked closely with Mr. Girardi, and yet

14   nowhere in her statement is there any evidence she ever worked on a case with him or

15   had any dealings with him beyond lunches and check-ins.

16       The only other law firm employee who is mentioned by the Government is Kim

17   Cory. The Government's pleading asserts:

18       Additionally, defendant's longtime secretary, Kim Cory, who also worked

19       closely with defendant until GK closed, confirmed that defendant oversaw

20       hundreds of cases and that despite occasional forgetfulness, defendant still

21       handled his busy schedule, and she never questioned his mental fitness as a

22       lawyer or the head of the firm.

23       What Ms. Cory actually described to Dr. Lavid and case agents was an

24   individual who was losing his memory and on a decline.

25       Over the past year and a half… I noticed the digression in his memory and
     his focus… there was one incident… in September of 2019. He showed
26   me a picture of him and Erika that was probably taken at the beginning of
     their relationship. Tom asked me who the person was with him in the
27   photo. When I casually said, 'That's Erika. You're being silly.' He then
     replied, 'I knew that. I was just kidding'… He would ask me for files… A
28   few days later he would forget that I had given it to him. Forgetting from a

43

1   few days turned in to minutes later… He would forget about the cases that
2   we have settled and would ask for status updates… He would dictate a
    letter that would indicate the case was still active… He would repeatedly
3   dictate the same letter to the same person… My daughter had worked at
    the law firm for the past 6 years, and he would forget who she was…
4   Sometimes, he would say he has come into some money and that he would
    pay me to come in to work… It has been very heart wrenching to see how
5   Tom has deteriorated slowly during these couple of years. (Goldstein Rpt.
    p. 61)

6   In a subsequent interview by FBI agents Ms. Cory confirmed what she had
7   told Dr. Lavid and indicated her belief that Mr. Girardi may have been suffering
8   from "some kind of mental problem." (Goldstein p. 61-62)

9       Interviews conducted by the Government and their expert, Dr. Diana Goldstein,
10  of people who knew Mr. Girardi well, and over a long period time, do consistently
11  describe an individual whose cognitive facilities were on the decline for a period of
12  more than six years. These interviews are not mentioned by the Government in its
13  pleading.

14      Jennifer Crane, Thomas Girardi's daughter from whom he was estranged for a
15  long period of time, not only paints a very different picture of her father's functioning,
16  but also casts doubt on the Government's assertion that Mr. Girardi was living
17  independently and on his own up until he was placed in an assisted facility following a
18  fall he had at his residence. While Ms. Crane initially doubted the veracity of Mr.
19  Girardi's dementia, all doubts were put aside when she saw him for the first time in
20  2021. Mr. Girardi's housekeeper was with Mr. Girardi during the day and brought him
21  dinner in the evening, and a friend stayed with him every night. Ms. Crane and her
22  husband started the project of building a house for Mr. Girardi behind their home
23  because of her concerns about his inability to live alone.

24      Ms. Crane described her father rapidly forgetting what he was told, repeating
25  questions and conversations they had had over and over, observations that were similar
26  to what others described. She said her father would scroll through his phone and call
27  the last number on it. The Government conceding Mr. Girard's impaired functioning
28  asserts that ensuring Mr. Girardi is able to take notes during court proceedings is one of

44

a number of steps that could be taken to render him able to assist properly in defense of his case. (Govt. Response p. 38 citing Dr. Goldstein at 70.) Regarding her father's ability to take notes, Ms. Crane recounted, "It was all a bunch of gibberish." (Goldstein Rpt. p. 88)

Rich Marmaro is a friend, golf and travel companion of Mr. Girardi's for 20 years. In March of 2020, Mr. Marmaro who is also a lawyer, ran into Mr. Girardi at the federal courthouse just prior to the COVID shutdown. He noticed Mr. Girardi talking to some security guards and one of them asked Mr. Marmaro "Do you know this man? He seems to be confused." Mr. Girardi had apparently come into the federal courthouse instead of the Superior Court across the street and told the security guard he was looking for "Department 32," a reference to a state court courtroom. Mr. Marmaro was concerned because Mr. Girardi was familiar with and had practiced for years in both courts and would not have confused them. Following this encounter in the summer of 2020, Mr. Girardi forgot a plan to visit Mr. Marmaro's house. When they finally saw each other, Mr. Girardi did not remember basic information about his friend including that he was retired and where he was golfing, a club both he and Mr. Girardi belonged to, and at which they had golfed together for years. Mr. Marmaro also thought his friend looked awful. (Goldstein Rpt. p. 91)

Rick Kraemer who has known Mr. Girardi for 25 years spent considerable time with him after Mr. Girardi and his wife separated. He visits him once a month at the ██████ memory care unit. Mr. Kraemer first noticed a decline in 2017 after the automobile accident. Mr. Kraemer observed first-hand some of the ways Mr. Giarardi would try to mask his failing memory. He would often say things like "hey buddy" or "how's the chic" when it was clear he could not remember the person's name. He similarly described that Mr. Girardi often repeated the same stories but that over time they seemed to lack details. He also described two incidents he had heard about when Mr. Girardi wandered away from a doctor's office. According to Mr. Kraemer, Mr. Girardi is proud man and when he witnessed Mr. Girardi's credit card being denied

45

while at the eye doctor, Mr. Girardi made up a story about his card having been lost and it must have been canceled which did not make sense. Mr. Kraemer stated, "I used to think he was brilliant in many ways… He no longer has the breadth or depth. He's been reduced from 10 to 1 cylinder—the car runs, but not very well." Mr. Kraemer then spontaneously told Dr. Goldstein, "I think he'd have trouble testifying in a criminal hearing." (Goldstein Rpt. p. 92)

A statement made by Kimberly Archie, who by all accounts loathes Mr. Girardi, is telling. She told Dr. Goldstein, that following his automobile accident in 2017, she came to believe Mr. Girardi had a brain injury and she remembered thinking, "and they are letting him run this 50 million dollar company." (Goldstein Rpt. p. ) "he didn't have the same attention to detail or the same short-term memory… I didn't think he was any less sharp, but I noticed he'd say, 'Hey baby,' to people instead of their names, people he should have known, it's like 'cheating'… but I never saw him use the wrong name, or not recognize someone. Ms. Archie, noticed he did not have the same attention to detail or the same short-term memory. (Goldstein Rpt. p. 63) This was six years ago and before living through all of the apparent stressors associated with investigations, bankruptcy, a divorce and COVID.

Finally, the unbiased collateral informant reports demonstrate that Mr. Girardi's testing and daily function were entirely consistent. Almost all of the collateral witnesses Dr. Goldstein relies upon have information that predates Mr. Girardi's current presentation by years. Their accounts support the slow and steady decline of dementia over the years. That being said, these reports have little or no bearing on Mr. Girardi's current functioning.

The only witness who can reliably speak to Mr. Girardi's day-to-day functioning now is his care manager, ███████ Munoz. While Dr. Goldstein interviewed Munoz, critical information provided to Dr. Goldstein never made its way into her report. Most significantly, Ms. Munoz when asked if Mr. Girardi could be feigning, said "we believe

46

he has dementia." (Goldstein Rpt. p. 96) Dr. Goldstein didn't bother to mention this critical account in her report.

Munoz also provided significant detail supporting her belief that he was suffering from dementia. According to Ms. Munoz, Mr. Girardi spends his days working at a desk or a table, by himself, outside or in the dining room. He says he's working on cases. He appears to be on his cellphone a lot, but she has no idea with whom he is talking. Ms. Munoz said that Mr. Girardi has short-term memory problems. The example she gave Mr. Girardi coming to the office on the day he wants a haircut and asking if the barber is there that day. She will tell him the barber is not there, and then he will return five or six times and ask the exact same question.

Even worse, Dr. Goldstein distorted what Munoz said in order to cast aspersions on Mr. Girardi's defense counsel. Specifically, Dr. Goldstein claimed that Munoz stated that defense counsel attempted to prevent her from speaking to others about Mr. Girardi. See ECF No. 64, at 96 ("M███ noted that . . . . 'His lawyers told me not to speak to anyone if I was asked . . . .'"). But the coordinator has confirmed that she did not make any such statement, but instead told Dr. Goldstein that the "ED," i.e., the executive director of the facility, told her to limit discussions about Mr. Girardi. See Ex. A, Mem. re: Munoz Interview.

Munoz's account of Mr. Girardi's daily activities was fully consistent with his presentation with Dr. Goldstein. According to Dr. Goldstein, "Mr. Girardi brought one or two large folders of papers with him each day, explaining they were his 30 open legal cases at the law firm, which he said was open (and had never closed)." According to Munoz, Mr. Girardi could be seen on daily basis with his stacks of "paperwork" so he could "work" on "cases." Munoz's account was further corroborated by ███ records which document Girardi "spend[ing] most of his time in his room napping or at his desk 'working on legal cases.'" (Ex. 32, p. 1.); *se also* (Ex. 33.) ("With encouragement, he occasionally joins for lunch/dinner in the dining room or out on the

47

1  patio but prefers to sit alone to 'work' . . . ." (Id.) On some days, he will take his
2  "paperwork" to lunch.

3      In sum, numerous collateral witnesses corroborate Mr. Girardi's steady cognitive
4  decline and decrease in independent functioning one would expect with dementia.

5      **D.    Criterion D: The Government Experts Cannot Reasonably Rule**
6          **Out Moderate Dementia, Which Precludes a Malingering**
7          **Determination.**

8      The objective evidence points to Mr. Girardi suffering from moderate dementia.
9  Because Dr. Goldstein cannot reasonably rule out moderate dementia, the government
10 cannot establish a malingering determination.[40] Further, Mr. Girardi's moderate
11 dementia precludes him from being competent. As fully detailed in the defense expert
12 reports and initial briefing, Mr. Girardi lacks the factual and rational understanding to
13 assist in his defense. Accordingly, he is incompetent to stand trial.

14     A neuropsychologist must be able to exclude significant developmental, medical,
15 or psychiatric conditions as the cause of the invalid results in Criterion B (compelling
16 inconsistencies or PVT/SVT scores). The MND notes that "neurological conditions
17 with cognitive impairments sufficient to preclude independence in basic activities of
18 daily living would be exclusions." Specific exclusions include "moderate to severe
19 dementia."[41, 42]

20
21     [40] Neither can Dr. Darby, but Dr. Darby is not even qualified to make a
22 malingering determination.

23     [41] "Malingering can co-occur in conditions associated with cognitive deficits
    including mild intellectual disability, mild dementia, or mild cognitive impairment."

24     [42] Dean, A. C., Victor, T. L., Boone, K. B., Philpott, L. M., & Hess, R. A. (2009).
25 Dementia and effort test performance. The Clinical Neuropsychologist, 23(1), 133–152.
   doi: 10.1080/13854040701819050; McGuire, C., Crawford, S., & Evans, J. J. (2018).
26 Effort testing in dementia assessment: A systematic review. Archives of Clinical
27 Neuropsychology. 114–132, doi: 10.1093/arclin/acy012; Singhal, A., Green, P.,
28 Ashaye, K., Shankar, K., & Gill, D. (2009). High specificity of the Medical Symptom

48

Dr. Darby is willing to concede that Mr. Girardi may have dementia.[43] And even he notes that "at face value," Mr. Girardi meets the diagnosis of moderate dementia. While Dr. Goldstein admits that video recording evidence confirms Mr. Girardi had mild cognitive impairment starting three years ago, she nevertheless insists that this necessarily progressive condition has remained static until today. The reason for their hesitancy is apparent: a finding that Mr. Girardi suffers from moderate dementia would effectively vitiate their contention that he is malingering. Moderate dementia and malingering are mutually exclusive. The Government experts reach their conclusion only by disregarding the governing scientific standards. When reliably applied, these standards make clear that Mr. Girardi currently suffers from moderate dementia.

Mild cognitive impairment (MCI) is a cognitive state between normal cognition and dementia, with essentially preserved functional abilities. By contrast, "[d]ementia is typically diagnosed when acquired cognitive impairment has become severe enough to compromise social and/or occupational functioning."[44] The older someone is, the greater likelihood that they will have dementia. A staggering 1 in 5 adults ages 85 to 89 have dementia.[45] Mr. Girardi is 84-years-old turning 85 on June 3rd, 2024. And as

_____

Validity Test in patients with very severe memory impairment. Archives of Clinical Neuropsychology, 24(8), 721–728. doi: 10.1093/arclin/acp074.

[43] "It is possible he (Girardi) still has MCI or could have progressed to a mild dementia stage now." (Darby Report p. 26)

[44] Hugo J, Ganguli M. *Dementia and cognitive impairment: epidemiology, diagnosis, and treatment*. Clin Geriatr Med. 2014 Aug;30(3):421-42. doi: 10.1016/j.cger.2014.04.001. Epub 2014 Jun 12. PMID: 25037289; PMCID: PMC4104432.

[45] Vicki A. Freedman, Jennifer C. Cornman, and Judith D. Kasper, *National Health and Aging Trends Study Chart Book: Key Trends, Measures and Detailed Tables, 2021*. Available online at https://micda.isr.umich.edu/wp-content/uploads/2022/03/NHATS-Companion-Chartbook-to-Trends-Dashboards-2020.pdf (finding approximately 3% of adults ages 70 to 74 had dementia in 2019, compared with 22% of adults ages 85 to 89 and 33% of adults ages 90 and older).

49

already explained, hippocampal atrophy is also associated with increased risk of dementia.

A diagnosis of dementia or MCI is based upon a particular set of criteria depending on the type of evaluation. For a neurologist, the governing standard is the Clinical Dementia Rating scale (CDR). The CDR process entails the following:

- Structured interview with both patient and informant
- Performance is rated in six domains: memory, orientation, judgment and problem solving, community activities, home and hobbies, and personal care
- A 5-point scale: 0 = no impairment, 0.5 = questionable, 1 = mild, 2 = moderate, and 3 = severe dementia
- The six domains are often summed to create a 0 – 18 "sum of the boxes" score.

For neuropsychologists, the standard for determining MCI and dementia is found in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR) DSM-5-TR. Although previously designated as MCI and Dementia disorders, the new corresponding classifications are Mild Neurocognitive Disorder (correlated to MCI) and Major Neurocognitive Disorder (related to dementia).[46]

---

[46] The DSM-5-TR criteria for Major Neurocognitive Disorder are listed below:

A. Evidence of a significant decline from a previous level of performance in one or more cognitive domains.

    1. Concern of the individual, a knowledgeable informant, or clinician that there has been a significant decline in cognitive functioning.

    2. Substantial impairment in cognitive performance, preferably documented by standardized neuropsychological testing.

B. The cognitive deficits interfere with independence and everyday living (at a minimum requiring assistance with complex instrumental

50

1    Even if Mr. Girardi met the first three criteria for MND, Dr. Goldstein could still

2    not reach a malingering determination because it was not possible for her to rule out

3    moderate dementia as the cause.

4                                        <u>**CONCLUSION**</u>

5        For the stated reasons, the Government has failed to meet its burden of showing

6    by a preponderance of the evidence that Mr. Girardi is competent to stand trial.

7

8                                        Respectfully submitted,

9
                                         CUAUHTEMOC ORTEGA
10                                       Federal Public Defender

11

12   DATED: August 9, 2023          By */s/ Craig A. Harbaugh*
                                     _____
13                                   CRAIG A. HARBAUGH
                                     GEORGINA WAKEFIELD
14                                   J. ALEJANDRO BARRIENTOS
                                     Deputy Federal Public Defenders
15                                   Attorneys for THOMAS VINCENT GIRARDI

16

17

18

19

20

21

22

23

24   _____

25   activities of daily living, such as paying bills for managing
     medications).

26   C. The cognitive deficits do not occur exclusively in the context of
     delirium.

27

28   D. The cognitive deficits are not better explained by another mental
     disorder.

                                          51

1

**PROOF OF SERVICE**

2        I, **Christelle Solinap**, declare that I am a resident or employed in Los Angeles

3    County, California; that my business address is the Office of the Federal Public

4    Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No.

5    (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the

6    action entitled above; that I am employed by the Federal Public Defender for the

7    Central District of California, who is a member of the Bar of the State of California,

8    and at whose direction I served a copy of the attached **REPLY IN SUPPORT OF**

9    **MOTION FOR ORDER OF INCOMPETENCY** on the following individual(s) by:

10

| [X] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [ ] Faxing same via facsimile machine addressed as follows: |
|---|---|---|---|

14        [X] Via e-mail:

15  **Ali Moghaddas**                   **Scott Paetty**

**Assistant United States Attorney**      **Assistant United States Attorney**

16  **scott.paetty@usdoj.gov**           **ali.moghaddas@usdoj.gov**

17  **312 N. Spring Street, 12th Floor**     **312 N. Spring Street, 11th Floor**

**Los Angeles, California 90012**        **Los Angeles, California 90012**

18

19        This proof of service is executed at Los Angeles, California, on **August 9, 2023**.

20        I declare under penalty of perjury that the foregoing is true and correct to the best

21    of my knowledge.

22

23                         /s/ Christelle Solinap   .

24                         **LEGAL ASSISTANT**

25

26

27

28