CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CRAIG A. HARBAUGH (Bar. No. 194309)
(E-Mail: Craig_Harbaugh@fd.org)
J. ALEJANDRO BARRIENTOS
(E-Mail: alejandro_barrientos@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
THOMAS VINCENT GIRARDI

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-cr-00047-JLS-1 |
| Plaintiff, | **THOMAS V. GIRARDI'S POST-HEARING BRIEF; DECLARATION OF CRAIG HARBAUGH; EXHIBIT 263** |
| v. | |
| THOMAS VINCENT GIRARDI, | |
| Defendant. | |

Thomas Vincent Girardi, by and through counsel, Deputy Federal Public Defenders Craig A. Harbaugh, and J. Alejandro Barrientos, hereby files his post-hearing brief, declaration of Craig Harbaugh, and exhibit 263.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 17, 2023     By /s/ Craig A. Harbaugh

CRAIG A. HARBAUGH
J. ALEJANDRO BARRIENTOS
Deputy Federal Public Defenders
Attorneys for THOMAS VINCENT GIRARDI

# **TABLE OF CONTENTS**

ARGUMENT ........................................................................................................... 1

I.   THE GOVERNMENT FAILED TO ESTABLISH THAT GIRARDI IS
     COMPETENT ................................................................................................. 1

     A.   Expert Opinions Offered by the Government Are Unreliable and Do
          Not Establish Competence ..................................................................... 2

     B.   Despite Shouldering the Burden, the Government Failed to Call
          Collateral Witnesses to Support its Case ............................................. 14

II.  THE WEIGHT OF THE EVIDENCE ESTABLISHES THAT GIRARDI IS
     INCOMPETENT TO STAND TRIAL ........................................................... 14

     A.   Dr. Chui's Diagnosis that Girardi Suffers From Moderate Dementia is
          Reliable ................................................................................................. 15

     B.   Dr. Wood Has the Required Expertise and Her Opinion of
          Incompetency Is Reliable ..................................................................... 16

     C.   Uncontroverted Records Establish Girardi's Years-Long Decline ........... 19

CONCLUSION .................................................................................................... 20

i

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Dusky v. United States*,
    362 U.S. 402 (1960) ................................................................................................1

*Medina v. California*,
    505 U.S. 437 (1992) ..............................................................................................20

*United States v. Brockman*,
    604 F. Supp. 3d 612 (S.D. Tex. 2022) ..................................................................3

*United States v. Hoskie*,
    950 F.2d 1388 (9th Cir. 1991) ..............................................................................1

*United States v. Kasim*,
    2008 WL 4822291 (N.D. Ind. Nov. 3, 2008) ........................................................5

*United States v. Quintero*,
    995 F.3d 1044 (9th Cir. 2021) ..............................................................................1

**Federal Statutes**

18 U.S.C. § 4241 ....................................................................................................20

## DEFENDANT'S POST-HEARING BRIEF

### ARGUMENT

## I. THE GOVERNMENT FAILED TO ESTABLISH THAT GIRARDI IS COMPETENT

The government must demonstrate a defendant's competency by a preponderance of the evidence. *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991). It must prove both that the defendant (a) has a rational and factual understanding of the proceeding against him, and (b) has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. *Dusky v. United States*, 362 U.S. 402 (1960). If the government fails to meet its burden on either prong, the defendant must be found incompetent, committed to the custody of the Attorney General, and hospitalized for restoration. *United States v. Quintero*, 995 F.3d 1044, 1060 (9th Cir. 2021).

The government failed to carry its burden. Neither expert proffered by the government is qualified to opine on the competency of an older adult with cognitive impairment. Dr. Goldstein is not qualified to assess older adults; Dr. Darby is not qualified to assess competency at all. Given their lack of expertise and experience, it is unsurprising that their opinions lack scientific reliability. Dr. Darby disregarded overwhelming medical literature confirming the strong relationship between profound atrophy of the hippocampi and cognitive impairment. Dr. Goldstein improperly scored and interpreted Girardi's performance validity tests ("PVTs"), which follow dementia, not malingering. The manner in which she conducted her evaluation and reported her results also demonstrates an obvious bias undermining her credibility. Putting aside Dr. Goldstein's unsupported subjective belief, her objective test results confirm that Girardi's severe cognitive impairment impedes his ability to retain new information. Without it, he can neither appreciate the proceedings, nor assist in his defense. Because the government failed to carry its burden, the Court must find Girardi incompetent.

/ / /

/ / /

1

### A.   Expert Opinions Offered by the Government Are Unreliable and Do Not Establish Competence

***Dr. Darby.*** As Dr. Darby admitted two years ago, he is not qualified to opine on a defendant's competency. ECF No. 110, Ex. 45, 75-80. While the Court permitted him to testify, his testimony offered little reason to believe he is qualified now. He has no training. ECF 145, 295:6-7 ("There is not a fellowship or a field in forensic neurology"). And his only "experience" appears to be working with forensic *psychiatrists*, including his brother. *Id.*, 295:12-17. Dr. Darby never explained what he did over the past two years that renders him qualified now.[1] Similarly, he is unqualified to opine on malingering. He has no training in assessing malingering and could not explain what standard or method he used to assess malingering here, except to say the standard used by Dr. Goldstein was acceptable for neuropsychologists, while also admitting that he did not understand that standard. *Id.*, 296. For example, he didn't know that moderate dementia and malingering are mutually exclusive under that standard (they are). *Id*. He administered a single PVT (coin-in-hand test) and Girardi passed it with a perfect score, which indicates Girardi is not malingering. *Id.*, 284:22-285:12.

Dr. Darby's opinions even within his area of expertise were unsupported and inconsistent with the research. Most notably, he discounted the significance of Girardi's brain atrophy stating, "the link between brain imaging findings and the severity of clinical symptoms is not one to one." Darby Rpt., 26. But he offered no research showing lack of association between hippocampal atrophy and memory performance, or even that the association is weak. He admitted on cross examination he was *not* offering an opinion that Girardi's neuroimaging contradicted Girardi's presentation. Indeed, he conceded Girardi "would currently meet criteria for a diagnosis of mild to moderate dementia" if taken at "face value." ECF No. 145, 252:4-9, Darby Rpt., 27.

---

[1] While Dr. Darby was permitted to offer one prior competency opinion, his qualifications went unchallenged in that case.

2

Concessions aside, Dr. Darby's opinions are not otherwise credible. He told this Court that neuroimaging "is not what we use to assess the level of cognitive impairment." ECF No. 145, 248:9-14. But just two years ago, he testified in *United States v. Brockman* to the exact opposite, confirming there that he had used neuroimaging to assess the defendant's cognitive impairment., 604 F. Supp. 3d 612, 632 (S.D. Tex. 2022) (Dr. Darby testifying that "'based on [the defendant's] most recent neuroimaging,' he would expect [the defendant] to exhibit impairment 'at the mild range of severity, so in the mild cognitive impairment range.'"). The only apparent difference between then and now is that the neuroimaging supported Dr. Darby's opinion there but undermines it here. This Court should reject Dr. Darby's obvious double standard. And, in any case, Dr. Darby's opinion in *Brockman* proved unreliable. Nine months after he testified and three months after the court accepted his testimony in a published decision, the defendant died due to "endstage dementia and Parkinson's Disease." *See Brockman*, 604 F. Supp. 3d 612 (May 23, 2023 order finding defendant competent); Def.'s Mot. Dismiss, *United States v. Brockman*, 4:21-cr-00009-1 (S.D. Tex.), ECF 289, at 5 (defendant's death certificate).

***Dr. Goldstein.*** For her part, Dr. Goldstein has no expertise in geropsychology, the psychology of older adults. She has no board certification, no formal education, no specialized training, and no research on older adults. She is a generalist who neither focuses on older adults, nor regularly evaluates people with dementia. ECF 145, 8:6-8; 8:23-25. In her 24-year career, she has evaluated just 10 individuals with dementia. *Id.*, 9:2-4. This lack of expertise undermines the reliability of her evaluation. For instance, Dr. Goldstein chose PVTs that were unsuitable for adults of Girardi's age, much less

1  those suspected of having dementia. *Id.*,151:23-25.[2] She also chose substantive

2  neuropsychological tests improper for older adults.[3]

3        These errors were compounded by Dr. Goldstein's decision to use an unqualified

4  technician, Emily Graupman, to administer the tests. Dr. Goldstein had no idea what

5  experience Graupman had in testing older adults. ECF 145, 99:17-24, 150-151:17-25, 1-

6  17. Graupman worked for Dr. Goldstein for less than a year before testing Girardi[4] and

7  before that she had worked at Northwest Suburban Psychology Group, which only

8  works with children and young adults.[5] The only thing Dr. Goldstein knew of

9  Graupman's experience with older adults was that she was not certified to administer the

10  MoCA, a requirement imposed by the test creators. *Id.*, 176:15-20. Without the needed

11  certification, administration errors for the MoCA occur 66% of the time. *Id.*, 176:22-25;

12  177:1. Unsurprisingly, Graupman's administration of the MoCA involved hearing

13  difficulties and resulted in a score of 10—an outlier from all of Girardi's other MoCA

14  scores, including his score on the MoCA administered by Dr. Darby.

15        There were other errors in Dr. Goldstein's test administration, many attributable to

16  Graupman's lack of experience testing with older adults. *See, e.g.,* ECF 145, 219:1-7

17  ("when you use this test with people over 65 older adults, you read the first story two

18  times, . . . [and] her scoring, she'd indicated that that wasn't done.").[6] Other times, the

19  errors resulted from Girardi's hearing difficulties. *See, e.g., id.*, 175:8-18.[7] Because

20

21      [2] Even though Dr. Goldstein knew Girardi was 83 years old, she used two PVTs,
the Victoria Symptom Validity Test and the Word Choice Test, that are not normed for

22  people over 72 and 69, respectfully. ECF 145, 152:17-24; 152:24-25, 153:1-7.

23      [3] According to her report, she administered the Logical Memory Test, which has
different standards for older adults but she used the standard for younger individuals.

24  Ex. 170, p. 42, n. 21. Dr. Goldstein also gave the Viewed Color and Word Test even
though it was not normed for people over 70 years old. ECF 145, 156:16-25;157:1-5.

25      [4] Again, Dr. Goldstein has only evaluated 10 dementia individuals in her 24-year
career and it is unclear how many, if any, were tested during Graupman's short tenure.

26      [5] Dr. Goldstein claimed that Graupman worked on a competency restoration unit,
but didn't know if she had tested any older adults. ECF 145, 151:9-14.

27      [6] The Block Design was "misadministered and misscored." ECF 139, 223:11-13.

28      [7] Girardi was given the Digit Span test twice because he "wasn't hearing the
instructions very well," but Graupman ignored the second normal score and used the
original low score for an unknown reason. ECF 139, 224: 11-13.

Dr. Goldstein was not present for any of Graupman's testing, however, Dr. Goldstein could not explain what happened. And because the government chose not to call Graupman as a witness, the Court has no way of knowing either.

Beyond Dr. Goldstein's admitted lack of expertise in geropsychology, she also testified beyond her expertise in other areas. For example, despite having no training in neuroimaging or volumetric analysis, *Id.*,136:23-25; 137:1-10, she insisted that Neuroquant was "experimental."[8] ECF 145, 135:17-20. Yet she offered no authority for her assertion other than belief. *Id.*, 146:6-9. She also conceded Neuroquant is FDA approved and has been validated by over 100 studies. *Id.*, 146:10-15.[9] She also appeared to be unaware that Neuroquant is better at measuring brain volume than traditional visual inspection. *Id.*, 146:16-19.[10, 11]

In other instances, Dr. Goldstein cited studies as support when they actually undermined her opinions. For example, she tried to discount Girardi's prior mental status

[8] This is not the first time Dr. Goldstein has offered her unsupported opinion regarding neuroimaging: "Dr. Goldstein believed that the use of SPECT was inappropriate for a dementia diagnosis. . . Dr. Goldstein's interpretation of the clinical guidelines for the use of a SPECT scan is misplaced: the guideline in question suggests practical applications of the SPECT scan to help . . . . As such, her dismissal of the use of the objective test . . . must be disregarded." *United States v. Kasim*, No. 2:07 CR 56, 2008 WL 4822291, at *19 (N.D. Ind. Nov. 3, 2008), *supplemented*, No. 2:07 CR 56, 2010 WL 339084 (N.D. Ind. Jan. 21, 2010).

[9] *Updated Review of the Evidence Supporting the Medical and Legal Use of NeuroQuant® and NeuroGage® in Patients With Traumatic Brain Injury*. Ross DE, Seabaugh J, Seabaugh JM, Barcelona J, Seabaugh D, Wright K, Norwind L, King Z, Graham TJ, Baker J, Lewis T.. Front Hum Neurosci. 2022 Apr 8;16:715807 (noting that "102 published peer-reviewed studies were identified that supported the reliability and validity of NeuroQuant® for measuring brain volume in neuropsychiatric patients and normal control subjects").

[10] *Man versus machine: comparison of radiologists' interpretations and NeuroQuant® volumetric analyses of brain MRIs in patients with traumatic brain injury* Ross DE, Ochs AL, Seabaugh JM, Shrader CR; Alzheimer's Disease Neuroimaging Initiative.. J Neuropsychiatry Clin Neurosci. 2013 Winter;25(1):32-9. doi: 10.1176/appi.neuropsych.11120377. PMID: 23487191; PMCID: PMC7185228.

[11] Similarly, Dr. Goldstein also claimed, without support, that the "[e]tiology [of dementia] is only determined postmortem." ECF 145, 147:4. Again, she had no choice but to admit she was wrong. *Id.*, 147:5-12.

5

examination results, which show a consistent, steady decline.[12, 13] She claimed that his score of 21 on the Mini-Mental Status Exam (MMSE) only showed "mild severity," Ex. 170, p. 53, purporting to rely on studies to justify her claim that "cognitive impairment of mild severity is denoted by MMSE scores between 18 and 23." Ex. 170, p. 53, n. 28 & 29. Not true. For one of the studies, the mean MMSE score was 27 when accounting for age and education. Far from mild, Girardi's score of 21 was far below the bottom quartile (26) when properly adjusted for age and education. Ex. 185, p. 5 (2389).[14]

Dr. Goldstein characterized Girardi's MoCA score of 20 administered by Dr. Frechette as "mildly impaired." Ex. 170, p. 53. Yet again, her cited articles fail to support her conclusion. For the Rossetti study, she noted that "MoCA scores among 2,653 cognitively normal adults aged < 35 to 80 years produced a mean MoCA score of 23.65." Goldstein Rpt., 53. But she overlooked two limitations of the study: (1) "[P]articipants were not formally screened for conditions (other than stroke)," and "the sample may have included individuals with undetected neurologic comorbidities," and (2) "[R]elatively small sample size (n = 79) for the 70- to 80-year-old group is a limitation, as the MoCA is often used in this age group." Ex. 184, p. 4 (1274).[15]

While discounting the significance of other mental status examinations, Dr. Goldstein hid that her own testing supported a dementia diagnosis. She merely listed

---

[12] ECF 139, 228:9-19 (noting Girardi's scores show "roughly a three point decline since [the first mental status examination] in the last couple of years" and "are abnormally low scores, norm[ed] for his age and education").

[13] Dr. Goldstein claimed that mental status examinations are never diagnostic. Ex. 170, p. 52.  But Dr. Goldstein's bible permits their use to diagnose cognitive impairment when neuropsychological testing is "unavailable or infeasible." DSM-5-TR, 679; *id.*, 686 ("A variety of brief office-based or 'bedside' assessments . . . can also supply objective data in settings where such testing is unavailable or infeasible.").

[14] The Tombaugh study cited by Dr. Goldstein undermines her position because this study did not factor in education on the MMSE cut score, despite recognizing "higher education levels may mask mild impairment" and "that all dementia patients with an MMSE score of 24 or greater (ie, false negative) had relatively high levels of education." Ex. 186, p. 7-8 (928-29).

[15] The other study cited by Dr. Goldstein used and educational mean of a high school diploma (12.4), eight years less than Girardi's level of education. And the authors "did not address whether education influenced the optimal MoCA cut score" even though "it is well known that level of education influences performance on cognitive screening measures such as the . . . MoCA." Ex. 183, p. 5.

6

Girardi's scores for the SLUMS and the DRS-2 tests in her report but failed to state their significance. On cross examination, she admitted that both scores pointed towards dementia.  ECF 145, 174:12-15 (SLUMS score below the cutoff for dementia); *Id.*, 174:22-24 (DRS-2 in the mild dementia range).

Dr. Goldstein also miscalculated Girardi's pre-morbid intellectual functioning, which is critical in determining the severity of an individual's cognitive decline. Relying exclusively on a single test, Dr. Goldstein concluded that Girardi's premorbid functioning was "average." Ex. 170, p. 44. But according to the DSM-5-TR[16]—Dr. Goldstein's "bible," ECF 145, 30:23-25—she should have considered Girardi's education and occupation. ECF 139, 208:17-24. Had she accounted for his advanced law degree and professional success, ECF 139. 210:2-3, she would have found his premorbid functioning was at least "high average." *Id.*, 209:20-23.

Most critically, despite having virtually no experience with older adults, Dr. Goldstein insisted neuropsychologists should never consider even the possibility of cognitive impairment before the evaluation. But Dr. Goldstein's method runs afoul of the scientific community, including an expert she cites. Because of her misguided approach, Dr. Goldstein administered improper PVTs and applied improper cutoff scores in evaluating Girardi. But for these errors, she would have necessarily concluded that Girardi passed all but one PVT and that his cognitive test results were valid.

Even though she was keenly aware of prior dementia diagnoses from reviewing Girardi's medical records, Dr. Goldstein insisted that this material "didn't inform [her] understanding of where Girardi was from a cognitive standpoint, nor should it." ECF 145, 82:21-23. According to Dr. Goldstein, Dr. Bradley Axelrod teaches "you should not make an a priori decision about whether someone has dementia." *Id.*, 82:7-13. But Dr. Axelrod says the exact opposite: "One critical point of consideration is the *prior probability* of whether or not a patient may have a neurodegenerative disease, which

---

[16] Diagnostic and Statistical Manual 5 Technical Revision was current at the time of the evaluations and remains the current version in effect.

should be established as early as feasible." ECF 99.1, Reply Brief, Ex. 47, p. 35 (emphasis added).[17]

Dr. Ryan Schroeder, an expert endorsed by both the defense and prosecution,[18] and one of the preeminent experts on PVTs and dementia, explained the methodological flaw in Dr. Goldstein's approach. ECF 141, 8-11. According to Dr. Schroeder, "it's absolutely necessary" to conduct a risk assessment for dementia before conducting neuropsychological testing "given the high false positive rates when applied to dementia samples." *Id.*, 25:4-10.[19] Unless neuropsychologists follow this correct approach, they will mistakenly label a dementia patient as a malingerer, just as Dr. Goldstein did here. *Id.*, 26:16-22 ("[W]e have to give the appropriate test for somebody who might have dementia or else we're going to penalize them. And then we might come to the conclusion that they're malingering, and so it would be a circular conclusion that see, "they don't have dementia. They're malingering," despite the fact that dementia causes very high false positive rate.").[20]

Based upon a review of the demographic factors,[21] and the medical record summaries relied upon by Dr. Goldstein, Dr. Schroeder "determined that there was a

---

[17] ("Oftentimes, relevant information can be extracted from the referral question or source and patient demographics, with additive information provided by a review of available medical records, collateral reports, and good clinical interviewing. Knowing the relative prevalence of the individual neurodegenerative syndromes and that the base rates of dementia are higher in older adults and increase as a function of age, findings from a neuropsychological evaluation can be used to adjust the posttest probability of disease up or down.").

[18] The government authoritatively cited Dr. Schroeder's research on PVT testing in its briefing. ECF 94.1, p. 32, Ex. 27.

[19] To be sure, neuropsychologists are "not forming a diagnosis of dementia . . .beforehand." ECF 141, 27-28. Instead, the expert is looking at "empirically-based findings to indicate is it *possible* that the person could have dementia." *Id.*

[20] Dr. Goldstein's preferred expert fully concurs. DE 47, p. ("[U]sing established cutoff scores in individuals *suspected* of neurodegenerative disease increases the risk of misinterpreting genuine cognitive impairment as invalid performance. . ."[T]he degree of cognitive impairment occurring as part of the disease process in dementia may interfere with the ability to pass PVTs even though the individuals may be putting forth their best effort.")

[21] Even Dr. Goldstein could not ignore that based solely on Girardi's age, there was in a one in five chance he had dementia. ECF 145. 83:20-23.

8

1   reasonable possibility that [Girardi] could potentially have dementia." ECF 141, 32:14-
2   15.[22] Dr. Schroeder's opinion (which the government expressly does not dispute) is that
3   when applying the dementia norms, Girardi passed all of Dr. Goldstein's PVTs except
4   one. But this single failure cannot establish malingering. 24:3-7; Ex. 148, p. 742 ("a
5   single PVT, when multiple PVTs are administered, is insufficient to meet the
6   psychometric criterion for invalid test data, unless that score is in the significantly
7   below-chance range").[23]

8       The conflict between the experts is largely academic, as Dr. Goldstein failed to
9   follow her own purported methodology. Though Dr. Goldstein insisted that she never
10  entertains the possibility of cognitive impairment in advance, she admitted that she
11  "suspected" Girardi had MCI before conducting neuropsychological testing. ECF 145,
12  83:1; *also id.*, 32:21-22. Then, despite determining that he has MCI, Ex. 170, p. 65, she
13  then refused to apply MCI cutoffs and instead used traditional cutoffs.  ECF 141, 55:15-
14  22 ("If he has MCI, we need to be applying MCI cutoffs.").

15      Dr. Goldstein's decision to reject the results of Girardi's cognitive testing was
16  based *exclusively* on her erroneous conclusion that Girardi failed most of PVTs. DE 170,
17  p. 44 ("[G]iven the variable performance validity findings Girardi produced, including
18  the majority failed or mixed passed/failed performances, and qualitatively atypical
19  performances, the cognitive test data he produced must be considered invalid for
20  interpretation.").[24] Perhaps realizing that her PVT scoring would be exposed as
21  unreliable, Dr. Goldstein claimed that she also based her malingering opinion on

22

23      [22] Dr. Schroeder found that the material establishing the probability of dementia
24  was more fulsome than most cases he has seen. ECF 141, 32:23-25("they were a
    substantial number of records, more so than I typically have for my own clinical
    evaluations").
25      [23] Girardi's hearing problems generally, Ex. 170, 19, and simultaneous passing of
26  the short form version of the same test, *id.*, 47, casts into doubt whether even this test
    properly qualifies as a failure.
27      [24] Dr. Goldstein also claimed that Girardi had "qualitative atypical performance"
    within the tests themselves, purportedly indicative of poor effort.  Ex. 170, p. 44. But
28  Dr. Goldstein once again conceded that her reliance upon these supposed atypical
    results lacked any scientific support. ECF 145, 96-97.

1   supposed "compelling inconsistencies." ECF 145, 183:10-13.[25] She then identified three

2   general categories of "compelling inconsistencies" but all fully align with dementia:

3   (1) recognition of individuals;[26] (2) ability to "track" conversations;[27] (3) inability to

4   recall historical facts.[28] None are sufficient, individually or collectively, to establish

5   "compelling inconsistencies" required for a malingering determination.

6          Beyond misidentifying compelling inconsistencies, Dr. Goldstein misapplied the

7   malingering criteria by confusing the four criteria and most notably muddling

8   compelling inconsistencies with marked discrepancies. ECF 145, 183:10-13 ("Marked

9   discrepancies, compelling inconsistencies, which we didn't get much of a chance to talk

10  about"). But each criterion must be satisfied independently to make a malingering

11  determination.[29] Because Dr. Goldstein failed to establish Criterion B (Invalid

---

[25] To be sure, Dr. Goldstein did identify these observations as part of her overall malingering determination. But her report is very explicit that she rejected the substantive testing based solely on his supposed failure of the PVTs. The distinction is critical because PVTs are objective psychometric evidence that is superior to clinical judgment. ECF 145, 14:9-10 (discussing research results that consistently find that "formal validity assessment results in higher accuracy rates than clinical judgment.").

[26] ECF 139, 266:16-17 ("It's possible that [people with dementia] may have a feeling of familiarity. . . "; 266:25, 267:1-2 ("he's not good at discriminating stimuli, and he has a lot . . .higher than typical sense of things being [ ]familiar."). In any event, Dr. Goldstein's observations were based upon pure assumptions because she never sought clarification from Girardi whether he recognized anyone. *See* ECF 145, 112-115.

[27] ECF 139, 264:12-15 ("it's typical for language and . . . immediate memory to be spared in dementia. So I have many cases where they can track a conversation."); *see also id.*, 81:1-8 ("attention and language would be relatively spared . . . they could track the conversation. The damage to the hippocampus would render it difficult for them to remember that conversation.

[28] ECF 139, 37;10-12 ("confabulation will affect one's own biographical recall of what one has experienced and will also affect factual knowledge, semantic memories"); 58:11-15 (noting MRI "showing significant atrophy of both anterior temporal lobes" which are responsible for semantic information."); *see also* Day 2 265-66 (noting Girardi's difficulty in formal testing of semantic facts).

[29] Defense Exhibit 148, p. 741 ("Malingering of Neurocognitive Dysfunction - In addition to meeting Criteria A, C, and D, the individual meets Criterion B1a, B1b, or B1c for feigned or exaggerated cognitive dysfunction, that is, one or more of the following: (a) A compelling inconsistency pertaining to cognitive deficits or symptoms; (b) Invalid cognitive performance as demonstrated by performance validity tests; or (c) Invalid cognitive symptoms as demonstrated by symptom validity tests.")

Presentation), there is no need to reach Criterion C or D.[30] In sum, Dr. Goldstein's malingering determination is unfounded.

Once her erroneous determination regarding effort is corrected, Dr. Goldstein's own testing confirms Girardi's severe memory impairment.[31] She found that Girardi had 14 scores, all assessing long-term memory, in the impaired range. Many of these scores fell in the "moderately impaired" range, and some fell in the "severely impaired" range.[32] While Dr. Goldstein claimed Girardi had 7 unimpaired memory scores, closer scrutiny reveals that was not true. One test cited was an embedded PVT, rather than a memory test.[33] Indeed, Dr. Goldstein disregarded her *own* classification of the test as a PVT. ECF 145, 104:24-25:105:1-2 ("Oh, I apologize. 'The embedded measures considered here include the Forced Choice short trial of the CVT two both standard and short forms.' I apologize."); *id.*,178:24-179:3. Four of the tests addressed only immediate or short-term memory. *Id.*, 182:6-12.[34] While the last two tests do address long-term memory,[35] Girardi had so many false positive answers that his score was inaccurate. *Id.*, 180:14-16.[36]

Girardi passed all but one PVT, meaning his effort is adequate. ECF 141, 37:1-6. According to Dr. Goldstein then, "[i]f effort is assumed adequate," and it must be, her opinion regarding Girardi's memory impairment holds true:

---

[30] In any event, Dr. Goldstein failed to establish the remaining criteria, as previously addressed. *See* ECF 99.1 pp. 35-50.

[31] Dr. Goldstein also found impairment in executive functioning as it relates to memory retrieval. Ex. 170, p, 48.

[32] Despite inherent variability between testing administrations, Girardi performed consistently not only within Dr. Goldstein's testing but also when compared to identical tests administered by Dr. Wood. ECF 138, 218-20 (comparison of results), *Id.*, 218:4-5 (noting the results were "quite similar").

[33] Forced Choice Delayed Recall CVLT-II short form.

[34] The four tests were: Immediate encoding/recall of a 16-word list, Learning slope of a 16-word list, Immediate encoding/recall of UDS3 Craft Story, Immediate encoding/recall of WMS-IV geometric figures

[35] Recognition recall of a 16-word list, Recognition recall of a 9-word list

[36] Consistent with Dr. Goldstein, Dr. Wood observed Girardi's proneness for false positives on the same recognition test. *Compare* Dr. Goldstein (13 hits, 18 false positives) *with* Dr. Wood (14 hits, 15 false positives).

11

> [V]erbal and nonverbal learning and memory performances reflect the capacity for relatively intact (albeit reduced) initial encoding capacities. Girardi's capacity to consolidate . . . information into long-term memory (i.e., his ability to accurately retain that information over time) is impaired, resulting in both a loss of a significant amount of information as well as trouble discriminating between information learned at different points in time.
> Ex. 170, p. 47.[37]

During her testimony, Dr. Goldstein admitted making several errors.[38] These errors may be due to a lack of expertise with older adults, carelessness, or both. It is also plausible, however, these errors are not errors at all, but instead evidence of Dr. Goldstein's bias for the prosecution. Regardless of the true reason for her errors, Dr. Goldstein lacks credibility and her opinions should be rejected.

Dr. Goldstein's bias is most apparent in her interviews of collateral witnesses. Buried in her notes, Dr. Goldstein evinced a deliberate attempt to not only shade the facts but shape them to the government's narrative. For witnesses convinced of Girardi's dementia, Dr. Goldstein challenged them with seemingly contrary information to alter their opinion. When Richard Marmaro told Dr. Goldstein about multiple interactions with Girardi which caused concern, including the "shocking" incident at the courthouse, Dr. Goldstein told him that "the State Bar & USAO[39] [are] calling b.s. re dementia."

---

[37] Dr. Goldstein testified for the first time at the competency hearing that Girardi's scores were invalid because there was an "A-B-A" pattern of inconsistent performance across the three neuropsychological test administrations. Tr. 184: 18-23. After claiming "numerous" anomalies, Dr. Goldstein identified three: (1) Boston Naming: (2) Block Design (3) Wechsler Adult Intelligence Scale Intelligence Quotient (WAIS IQ). But Dr. Goldstein failed to bring her raw data so she could not justify her claims. Following that testimony, Dr. Wood found Dr. Goldstein's materials dispelled her claims. For the Boston Naming test, Girardi scored consistently across the administrations, as Dr. Goldstein's and Dr. Wood's results were "quite similar." Day 2, p. 222:14-18. While Dr. Goldstein's Block Design test was lower, it was "misadministered and misscored." Day 2, Tr 223:11-13. Similarly, though Girardi's overall IQ score was lower for Dr. Goldstein, it was brought down by two subtests, the incorrectly administered Block Design and Digit Span, where Girardi was given the test twice because he "wasn't hearing the instructions very well." Though Girardi had a "normal" score the second time it was administered, Dr. Goldstein inexplicably used the original low score. Tr. 224: 11-13. Contrary to Dr. Goldstein's bald assertions, "the patterns really weren't very different across the three examiners." Tr. 224:23-24.

[38] 56, Tr. Day 1, pp. 104 ("I apologize"), 105 ("I apologize), 154 ("I apologize" "I apologize"), 158 ("I apologize"), 171 ("I apologize" "I apologize"), 194 ("I apologize").

[39] This is a telling omission given that Dr. Goldstein knew Marmaro's son is an AUSA in this district. DE 233, p. 2 ("my son/AUSA was having his first trial").

ECF 145, 17:19-24.  Marmaro remained undeterred: " I was 100% certain he'd lost it." ECF 233, p. 4. His certainty of Girardi's dementia conveniently didn't make into Dr. Goldstein's report. The only part of his response included the report was Marmaro's caveat that he wouldn't "swear on [his] kid's lives." Ex. 170, p. 62, ¶iv, p. 91, ¶5.

Dr. Goldstein followed the same pattern with other witnesses who insisted her father has dementia. She confronted Girardi's daughter, Jennifer Crane, about the State Bar's allegations of feigning, but Ms. Crane remained steadfast that Girardi has dementia. Ex. 170, p. 89. When interviewing the memory ward care manager, Margarita Munoz, Dr. Goldstein pointedly asked if she thought Girardi was faking it; she did not. ECF 141, 244:14-15.[40] During the interview of Girardi's business associate, Rick Kraemer, Dr. Goldstein asked Kraemer "[if] ever been a part of you that doesn't believe he is cognitively impaired? Kraemer responded, "No, I don't think so." Ex. 232, at 3. Kraemer remained adamant that Girardi was "no longer there." Dr. Goldstein became even more confrontational, going beyond raising the prospect of feigning to challenging him with specific conduct, including Girardi's CLE moderator role and his deposition testimony. *Id*. at 7. Although Dr. Goldstein reported Kraemer's response ("maybe he's hoodwinking us all"), she neglected to include her reference to the deposition which prompted it. Ex. 170, p. 93 ¶ 6.

For witnesses who supposedly supported Dr. Goldstein's opinion of malingering, however, Dr. Goldstein omitted critical facts affecting their candor and potential bias. For example, in describing Kimberly Archie, Dr. Goldstein only noted that she was a

---

[40] Dr. Goldstein also claimed in her report that Munoz said "His lawyers told me not to speak to anyone if I was asked, but I don't mind talking to you." Ex. 170, p. 96. Despite copious notetaking, Dr. Goldstein's claim is nowhere to be found in her interview notes. ECF 145, 209:4-12. In any event, Munoz testified that she told Dr. Goldstein that it was her executive director told her that she could not speak to Dr. Goldstein, *Id.*, 244:6-10.

13

business consultant for the Girardi firm. Ex. 170, p. 63, vi. Dr. Goldstein knew but failed to mention that Archie had been a close friend of one of Girardi's alleged victims.[41]

### B. Despite Shouldering the Burden, the Government Failed to Call Collateral Witnesses to Support its Case

Despite shouldering the burden, the government relied exclusively on its experts. It affirmatively chose not to call any collateral witnesses and relied on Dr. Goldstein's biased accounts of the few witnesses who she interviewed. And it did so even though the Court stressed the need to directly evaluate the credibility of witnesses rather than adopt an expert's summary. ECF 145, 143:19-22 ("I have to rely on their credibility as well, so I'm not sure if it's helpful for me to just look at the interviews.").

Instead of presenting evidence, the government made two unfounded claims: (1) Girardi was running his law firm in 2020 and (2) he was faking his decline at Sunrise. It called no witness to support such claims, but only presented emails and memoranda purportedly written by Girardi.[42] Amber Ringler and Rick Kraemer confirmed that firm attorneys and staff questioned Girardi's capacity. Yet the government offered no rebuttal. Nor did it call anyone to dispute Margarita Munoz's recounting of Girardi's decline. It instead clung to his classification at Level One care which had been downgraded to Level Two in August 2023.

## II. THE WEIGHT OF THE EVIDENCE ESTABLISHES THAT GIRARDI IS INCOMPETENT TO STAND TRIAL

Based solely on the government's evidence, there is insufficient evidence to establish Girardi's competency to stand trial. The defense's presentation only further confirms Girardi is incompetent.

---

[41] In discussing her interview with Arin Scapa, she withheld any reference to Scapa's previous employment in the USAO's fraud section, the same section prosecuting Girardi. ECF 145, 195:24-25; 196:1-3. She also excluded Scapa's characterization of the firm as a "boys club" and Girardi's sexual harassment, instead noting only "inappropriate comments." *Id.*, 193:20-25; 194:1-10 (telling her "loved" her like a "wild dog").

[42] Emails and memoranda cited by the government are strikingly unsophisticated for an individual who was named one of the top lawyers in the country.

**A.      Dr. Chui's Diagnosis that Girardi Suffers From Moderate Dementia is Reliable**

Dr. Chui's vast expertise in gerontology and neurology, especially her understanding of the role of neuroimaging in assessing neurodegenerative disorders, is unparalleled. ECF 139, 12:8-10. Her research focuses on "clinical imaging and pathological correlations of dementia." *Id*., 12:11-12. She has treated approximately 4,000 patients in her decades as a neurologist. *Id*., 12:20-13:1. And she has authored multiple studies specifically addressing hippocampal volume and memory. *See, e.g.*, ECF 110, Exs. 52-54. One study involved a 15-year program where she assessed subjects' memory performance every year, measured hippocampal volume every two years, and counted hippocampal nerve cells at autopsy. ECF 139, 21:8-18.[43]

Drawing on her extensive experience, Dr. Chui confirmed that the progression of Girardi's decline, as well as his symptoms, were consistent with dementia caused by limbic-predominant age-related TDP-43 encephalopathy. And she further explained how the neuroimaging and volumetric analysis of Girardi's brain provides objective evidence of dementia. In 2021, Girardi's hippocampal volume was in the 2nd percentile. Ex. 239. From 2021 to 2023, the volume decreased from to 3.89 $cm^3$ to 2.98 $cm^3$—representing a decline of approximately 25% in only two years. Exs. 239, 241. Research has shown such a rapid rate of hippocampal atrophy is highly correlated with dementias. One study, cited in the defense's pre-hearing briefing and never addressed by the government's experts, found that patients who developed Alzheimer's dementia had an annual rate of hippocampal atrophy of 3.43%. ECF No. 110, Ex. 57, 287. ("The AD patients lose 3.42% (SD 1.59%) volume per year compared with 0.85% (SD 0.85%) volume for controls."). As already noted, Girardi's rate of brain atrophy far exceeds such numbers. Moreover, his decline placed him in the bottom percentile for hippocampal volume in 2023. Ex. 241.Throughout her career, Dr. Chui has seen approximately 25 subjects in the

---

[43] This study showed a correlation of .7 between hippocampal volume and memory performance, which is a "strong" correlation. *Id*., 27:2-9.

clinical setting with similar levels of brain atrophy and another 30 such subjects in a research setting. ECF 139, 56:22-57:3. She could not recall a single person with brain atrophy comparable to Girardi who was cognitively normal. *Id.*, 56:12-16, 58:12-16. She confirmed that persons with such atrophy typically have "[s]evere impairment of declarative memory." *Id.*, 58:17-19.

### B.    Dr. Wood Has the Required Expertise and Her Opinion of Incompetency Is Reliable

Dr. Wood is a board-certified expert in forensic geropsychology. In her career, Dr. Wood has forensically evaluated approximately 500 older adults. ECF 139, 187:8-9. She has conducted 65 to 75 competency evaluations, *id.,* 179:10-12, 182:3-5, with 40 to 50 of those evaluations involving older adults. *Id.* She is so well respected as a forensic geropsychologist that the California State Bar initially contacted her to serve as an independent expert to conduct a competency evaluation of Girardi. *Id.*,190:2-16.

Due to her extensive forensic work, Dr. Wood is primed to look for malingering. *Id.*, 244:7-9. Even though the base rate of malingering among dementia patients is just 5%, *id*, 244:24-25;245:1, she assesses everyone for malingering. *Id*, 244:14-20. She endorses the Sherman & Slick criteria for malingering and applies them in every case. Based on the medical records, video and audio evidence, psychometric results, and her clinical judgment, Dr. Wood found Girardi was not malingering. *Id.*, 246:22-24. Even after reviewing the same materials as Dr. Goldstein (and then some),[44] Dr. Wood's conclusion did not change. *Id.*, 267:3-7.[45]

Dr. Wood found that the progression of Girardi's decline was normal, rather than accelerated as the government experts maintained. Like Dr. Goldstein, she found that

---

[44] On cross-examination, Dr. Wood was presented with additional information, such as an interview of Girardi's ex-wife, Erika Jayne. It did not alter her opinion.

[45] Nevertheless, the Government insists Dr. Wood failed to adequately consider this evidence. Not so. The fact that Dr. Wood did not ascribe the same weight as Dr. Goldstein does not mean she did not consider it. Moreover, because of Dr Wood's experience with older adults, she recognizes behaviors and limitations of older adults that neuropsychologists without her expertise (Dr. Goldstein) may misunderstand or ascribe to malingering when they are common for elderly people.

Girardi showed "mild word-finding problems" and "repetition" consistent with "either MCI or early dementia" in videos from 2020; "that's about right in terms of how he was presenting and how he performed in that mental status test." *Id.*, 261:19-25. While Girardi's decline may seem rapid to someone with Dr. Goldstein's limited experience, Dr. Wood explained that it was entirely expected given the departure of Girardi's wife and the subsequent "failure of informal supports." *Id.*, 263:14-25.

Applying the DSM 5-TR criteria for Major Neurocognitive Disorder, Dr. Wood found that Girardi's memory was substantially impaired based on tests results over 2 standard deviations below the mean. *Id.*, 214:9-15; *see also* DSM, p. 685 ("For major NCD, performance is typically 2 or more standard deviations below appropriate norms (3rd percentile or below).[46]

Based on Girardi's severe memory impairment, Dr. Wood concluded that he is incompetent because he is unable to assist in his defense. She found the impact of his impairment two-fold. First, he has diminished episodic memory, making "it very difficult for him to learn and retain information and . . . retain it over time." *Id.*, 273:3-5. Second, his lack of insight (anosognosia) prevents him from making rational choices. In combination, he cannot assist with an investigation, decide whether to plead guilty or go to trial, decide whether to testify, handle testifying, or even follow trial proceedings.

The lay witnesses who testified corroborated Girardi's dementia. Three witnesses (Kraemer, Marmaro, and Munoz), who were interviewed by Dr. Goldstein, offered consistent accounts of Girardi's decline. A fourth witness, Isabel Mancilla, also testified consistent with her prior interviews.[47] Amber Ringler, who was not interviewed by any

---

[46] Consistent with Dr. Schroeder, Dr. Wood reviewed Girardi's medical records and other materials before her evaluation to "have a sense of the rule-out to differential diagnosis before going into the testing for test selection and for other reasons." ECF 139, 254:19-25. But she made clear that she "would definitely correct [the test cutoffs] if my final diagnosis was different than my initial presumption." *Id.*, 255:12-14, 17-18.

[47] Compellingly, Mancilla provided the virtually identical information to officers of the Pasadena Police Department in January 2021. Her was captured on body camera footage. However, the Court previously ruled that the defense could only introduce body camera footage involving Girardi. But for the Court's ruling, the defense would have introduced the complete video recording of Mancilla's interview.

17

expert, provided a comprehensive account of Girardi's pre-morbid functioning and later decline. Through "almost daily" interactions over 20 years, Ringler observed that Girardi could follow conversations, had no difficulty recognizing people ("sharp as a tack"), and was always well groomed ("best dressed"). ECF 141, 152:23-25. But Ringler noticed a change around 2015. The first thing that "really startled" her was Girardi lost his ability to recognize people.[48] Also, Girardi repeated stories during a single conversation, often "within a matter of minutes" and with no awareness he had done so.[49] *Id*., 159:5-8, 25.[50] Beginning in the 2015-16 timeframe, multiple attorneys and law firm staff approached Ringler voicing concerns about Girardi's dementia. Before the pandemic, she became so concerned about Girardi she asked his physician to perform an MRI on his brain. *Id*., 163:18-21, 164:3-4.

Ringler witnessed Girardi's further deterioration during the pandemic. After Girardi's wife left in November 2020, Ringler felt compelled to stay at Girardi's home a few nights a week because he "was not in his right mind."[51] *Id*., 165:23. She continued to observe his inability to recognize people. She also noticed an inability to retain basic information. For example, she was present when Girardi met with bankruptcy attorneys. Right after they left, Girardi asked her, "Who are those guys?" *Id*., 168:7-9, 11-3. From December 2020 until Girardi's hospitalization in July 2021, Ringler observed his daily routine of "working" on cases with his "papers all over the table." *Id*., 171:4-12.

---

[48] ECF 141, 157-158 ("Sean McCaan [ ] worked with Tom and they had had a major falling out, [I] was at an event . . . and we walked out to the lobby area and Tom had a conversation with Sean. And then left and said[, 'W]ho was that[?]' And I said[, 'T]hat was Sean McCaan[.'] . . . [S]ome of his other attorneys were like[,'W]hat happened [?]. . .[W]hen did they make up[?]' He had no idea who he was talking to.").

[49] ECF 141, 159:14-22 ("Sitting at dinner let's say there's 4 or 5 of us and he tells a story about when . . . he was friends with John Wayne's son and how they were all hanging out one. . . . And then we'd laugh and talk and say a few other things and then oh so I was at my friend's house. I was friends with John Wayne's son and we were all hanging out . . . and we're all like you just said that.")

[50] Ringler also observed Girardi while traveling, where he would carry the same set of 20 to 30 printed emails and repeatedly read them during the flight.

[51] Contrary to the government's claims, Girardi did not live independently. Besides Ringler, John Kilfoyle stayed with him for a significant time. ECF 141, 205:24-25, 206:2-10,

18

Ringler last saw Girardi when he was admitted to the Belmont facility. Girardi acted as if the two were entering a hotel lobby. *Id.*, 169-70.  Girardi continued calling Ringler, often leaving messages asking for his former driver because he needed to go to the office. *Id.*, 170.  Ringler was unequivocal Girardi was not feigning, observing his decline well before any charges: "I know him. He's not faking." *Id.*, 171:16, 18-19.

## C.   Uncontroverted Records Establish Girardi's Years-Long Decline

The defense also presented extensive uncontroverted contemporaneous records confirming Girardi's decline. In January 2021, Girardi reported a burglary at his residence. Officers from the Pasadena Police Department responded multiple times to investigate. Although they were focused on the burglary, the officers noticed Girardi's cognitive impairment. Ex. 248, p. 8.[52] Similarly, the day after Christmas 2020, Girardi woke up screaming he could not hear and Ringler rushed him to urgent care. There, Girardi reported being "unable to hear" and denied having recent injuries or procedures. After inspection, medical staff found hearing aids stuck in both ear canals. Ex. 259. Girardi did not just forget that he inserted hearing aids; he forgot he even had them. ECF 141, 169:11-12. The defense also submitted records from the Sunrise living facility. Beginning in August 2023, Girardi has been upgraded to Care Level 2.[53] Ex. 263. Girardi now "[r]equires supervision" because although he's "[a]ble to maintain façade of being oriented[,] memory deficits are seen over time." *Id.* at 14. Most notably, he now "[r]equires stand-by assistance for all showering/bathing needs." *Id.* at 1

/ / /

/ / /

/ / /

---

[52] *Id.* ("Girardi began to walk back towards this bedroom he opened a closet door instead thinking it was the bedroom door. He then moved to the next bedroom, which was not the correct one either. Mancilla motioned me to the following bedroom, which was the correct one. I stepped into the bedroom with her and she quietly told me that Girardi had early onset dementia and could not recall many details.").

[53] Throughout the hearing, the government insisted that Girardi was at Care Level 1 (the lowest). The late produced records refute this claim.

1

**CONCLUSION**

2        The government failed to make a *prima facie* showing of Girardi's competence,

3   much less overcome the compelling evidence offered by the defense that he's not.  The

4   government's proffer consisted of just two experts, neither of whom are qualified to

5   opine regarding the competency of someone with dementia.  Instead, Drs. Goldstein and

6   Darby offered their speculation that Girardi, despite suffering from MCI or mild

7   dementia, has the present wherewithal to not only feign moderate dementia but do it so

8   convincingly that he duped everyone around him.  In contrast, the defense presented

9   renowned experts within their respective fields to establish with hard data that Girardi

10  suffers from dementia and is unable to rationally participate in his defense. The defense

11  corroborated these opinions with people who observed Girardi's impairment firsthand.

12       Even if the case falls in that 'narrow class of cases where the evidence is in

13  equipoise,' *Medina v. California*, 505 U.S. 437, 449 (1992), the Court is still be required

14  to find Girardi incompetent. In that case, Girardi will not remain at his assisted living

15  facility. Instead, as mandated by statute, he will be involuntarily committed to a medical

16  prison for at least four months (and potentially longer). 18 U.S.C. § 4241(d). If he is

17  truly the consummate actor the government pegs him to be, the prison mental health

18  professionals charged with assessing him on a daily basis will no doubt uncover it.

19

20                                            Respectfully submitted,

21                                            CUAUHTEMOC ORTEGA

22                                            Federal Public Defender

23  DATED: November 17, 2023        By */s/ Craig A. Harbaugh*

24                                            CRAIG A. HARBAUGH
                                              J. ALEJANDRO BARRIENTOS
25                                            Deputy Federal Public Defenders
                                              Attorneys for THOMAS VINCENT GIRARDI
26

27

28