E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
ALI MOGHADDAS (Cal. Bar No. 305654)
Assistant United States Attorney
Corporate & Securities Fraud Strikeforce
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6527/1786
    Facsimile: (213) 894-6269
    E-mail:   scott.paetty/ali.moghaddas@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THOMAS V. GIRARDI, <br><br> Defendant. | No. 23-00047-JLS-1 <br><br> GOVERNMENT'S OPPOSITION TO DEFENDANT THOMAS V. GIRARDI'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 <br><br> Hearing Date: Dec. 6, 2024 <br> Hearing Time: 9:00 a.m. <br> Location:    Courtroom of the <br> Hon. Honorable <br> Josephine L. Staton |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Scott Paetty and Ali Moghaddas, hereby files its opposition to defendant Thomas V. Girardi's motion for judgment of acquittal pursuant to Rule 29.

//

//

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 5, 2024

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

      /s/
SCOTT PAETTY
ALI MOGHADDAS

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                                      PAGE

I.   INTRODUCTION..................................................................1

II.  LEGAL STANDARD................................................................2

III. ARGUMENT......................................................................3

     A.   The Evidence Demonstrated that Defendant Knowingly
          Devised and Participated in a Scheme to Defraud...........3

     B.   The Evidence Was Sufficient to Prove Defendant's
          Intent to Defraud.........................................8

     C.   The Deposits of Settlement Funds into the Girardi
          Keese Client Trust Accounts Were in Furtherance of the
          Scheme...................................................11

IV.  CONCLUSION...................................................15

**TABLE OF AUTHORITIES**

**CASES** PAGE

Hart v. Massanari,
  266 F.3d 1155 (9th Cir. 2001) ............................... 14, 15

Jackson v. Virginia,
  443 U.S. 307 (1979) ........................................... 2, 3

Lustiger v. United States,
  386 F.2d 132 (9th Cir. 1967) ..................................... 7

Neder v. United States,
  527 U.S. 1 (1999) ................................................ 8

Nuh Nhuoc Loi v. Scribner,
  671 F. Supp. 2d 1189 (S.D. Cal. 2009) ........................... 15

Parr v. United States,
  363 U.S. 370 (1960) ....................................... 13, 14, 15

Schmuck v. United States,
  489 U.S. 705 (1989) ......................................... 12, 14

Schreiber Distrib. Co. v. Serv-Well Furniture Co.,
  806 F.2d 1393 (9th Cir. 1986) .................................... 8

Uche-Uwakwe v. Shinseki,
  972 F. Supp. 2d 1159 (C.D. Cal. 2013) ........................... 15

United States v. Alvarez-Valenzuela,
  231 F.3d 1198 (9th Cir. 2000) .................................... 2

United States v. Booth,
  309 F.3d 566 (9th Cir. 2002) .................................... 10

United States v. Chang,
  2020 WL 5702131 (N.D. Cal. Sept. 24, 2020) ...................... 11

United States v. Goland,
  959 F.2d 1449 (9th Cir. 1992) ................................... 11

United States v. Jinian,
  725 F.3d 954 (9th Cir. 2013) .................................... 13

United States v. Kellogg,
  955 F.2d 1244 (9th Cir. 1992) ................................... 13

<s>

United States v. Layfield,
  2024 WL 982437 (9th Cir. Mar. 7, 2024) ........................ 14, 15

United States v. Licciardi,
  30 F.3d 1127 (9th Cir. 1994) ...................................... 13

United States v. Lindsey,
  850 F.3d 1009 (9th Cir. 2017) ...................................... 8

United States v. Lucas,
  963 F.2d 243 (9th Cir. 1992) ....................................... 2

United States v. Nevils,
  598 F.3d 1158 (9th Cir. 2010) ...................................... 2

United States v. Nguyen,
  2024 WL 4164626 (9th Cir. Sept. 12, 2024) ......................... 11

United States v. Peterson,
  538 F.3d 1064 (9th Cir. 2008) ...................................... 8

United States v. Reed,
  575 F.3d 900 (9th Cir. 2009) ....................................... 3

United States v. Richter,
  782 F.3d 498 (9th Cir. 2015) ....................................... 2

United States v. Rocha,
  598 F.3d 1144 (9th Cir. 2010) ...................................... 2

United States v. Rude,
  88 F.3d 1538 (9th Cir. 1996) ....................................... 8

United States v. Woods,
  335 F.3d 993 (9th Cir. 2003) ....................................... 7

**Rules**

Federal Rule of Criminal Procedure 29 .............................. 2

</s>

## I. INTRODUCTION

After a near month-long trial, a jury found defendant Thomas V. Girardi ("defendant") guilty of all four counts of wire fraud. During trial, at the close of the government's case, defendant made a motion for judgment of acquittal, which the Court reserved ruling on. (Dkt. 370 at 132-146.) Now, in a single-paragraph, defendant has incorporated by reference his oral Rule 29 arguments.

As the Court will recall, defendant's oral motion for acquittal raised many of the same arguments that defendant presented to the jury, which were unequivocally rejected at trial. For example, defendant argued that he did not knowingly devise or participate in a scheme to defraud and that, instead, the scheme was devised and implemented solely by co-defendant Kamon. Defendant also previously argued, unsuccessfully, that he could not form the requisite intent to defraud in light of his purported diminished mental faculties. Just as the jury rejected these and other defenses in reaching its guilty verdicts, so too should this Court. The jury's verdicts were consistent with the considerable evidence presented at trial. Specifically, the government presented extensive evidence that defendant's misappropriation of client settlement funds occurred as early as 2010 (well before he experienced any significant mental issues) and continued up through the collapse of Girardi Keese at the end of 2020. Defendant used these stolen funds to, among other things, pay for his personal expenses, including his two private jets and lavish lifestyle, fund his former spouse's entertainment career, and pay past owed clients after previously misappropriating their money as well. Further, the government presented more than sufficient evidence that defendant had the requisite intent

throughout the entirety of his scheme as evidenced by his calculated and explicit lies to clients in his letters, emails, and even voicemails, along with contemporaneous recordings of defendant during the same time period.

This evidence, and even evidence presented during defendant's case, supported the jury's verdicts. Accordingly, and for the reasons set forth below, the jury's verdicts should not be disturbed, and defendant's motion should be denied.

**II.  LEGAL STANDARD**

A motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is governed by the two step process set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also United States v. Nevils, 598 F.3d 1158, 1161, 1164 (9th Cir. 2010) (en banc). First, the court "construe[s] the evidence in the light most favorable to the prosecution." Nevils, 598 F.3d at 1161 (internal quotations omitted). In performing this first step, "[t]he government is entitled to all reasonable inferences that can be drawn from the evidence." United States v. Lucas, 963 F.2d 243, 247 (9th Cir. 1992). Second, the court must evaluate whether the evidence "is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." United States v. Richter, 782 F.3d 498, 501 (9th Cir. 2015) (citations omitted). The Ninth Circuit has explained, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high," United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010), and "any conflicts in the evidence [must] be resolved in favor of the jury's verdict," United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1201-02 (9th Cir. 2000).

In short, the jury's verdict must stand if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Reed, 575 F.3d 900, 923 (9th Cir. 2009) (quotations omitted).

**III. ARGUMENT**

The evidence presented against defendant during the government's case-in-chief is more than sufficient for "any rational trier of fact" to find that "the essential elements" of all of the crimes charged against him were met beyond a reasonable doubt. Jackson, 443 U.S. at 319-20. Defendant's primary arguments as to the alleged insufficiency of the evidence and the evidence presented at trial are discussed in turn below.

### A. The Evidence Demonstrated that Defendant Knowingly Devised and Participated in a Scheme to Defraud

Without addressing any of the evidence presented at trial, defendant baldly claims that "[n]o rational juror could find beyond a reasonable doubt that Mr. Girardi knowingly participated in [a] scheme, let alone that he devised a scheme himself[.]" (Dkt. 370 at 132.) However, the evidence presented at trial proved just that. Each client-victim testified that they understood defendant Girardi was their attorney, and it was defendant Girardi who was providing them information, which ultimately turned out to be lies. For example, Joseph Ruigomez testified that defendant told him that his portion of his settlement was worth only $5 million and an annuity when, in fact, the total settlement was for $53 million. (Dkt. 364 at 23 ("Q: . . . [W]ho told you that you would receive $5 million? A:

3

Tom."); Trial Ex. 3.)  It was defendant who falsely told Judy Selberg that her money was delayed because of tax issues.  (Dkt. 364 at 241-42; Trial Ex. 226.)  And it was defendant who told Josephina Hernandez that he was waiting on court orders before he could pay her, which was also unequivocally false.  (See, e.g., Trial Ex. 333, 337, 339.)  It was defendant who owed these and other client-victims a fiduciary duty and a duty of loyalty.  As the jury was instructed, "a lawyer was required to provide his clients with true and accurate information" and "could not withhold material information from or mislead his clients."  (Dkt. 393 at 23-27.)[1]  But that is precisely how defendant operated his scheme -- he withheld material information and told lies instead.  Time and again, defendant authorized co-defendant Kamon and others at Girardi Keese to pay lulling payments to client-victims -- payments that came from sources other than the client-victim's own funds -- even though there was no further

---

[1] Defendant also re-raises his challenge to the Court's instruction on a lawyer's ethical duties and the attorney-client trust account requirements.  (Dkt. 370 at 137.)  However, challenges to jury instructions are typically raised in a motion for a new trial pursuant to Rule 33.  See United States v. Chang, No. 16-CR-00047-EJD-1, 2020 WL 5702131, at *15 (N.D. Cal. Sept. 24, 2020).  In any event, as articulated in the parties' proposed jury instruction submission (Dkt. 310), the Ninth Circuit has routinely affirmed such instructions.  See, e.g., United States v. Goland, 959 F.2d 1449, 1454 (9th Cir. 1992); United States v. Nguyen, No. 23-582, 2024 WL 4164626, at *2 (9th Cir. Sept. 12, 2024) (affirming a near identical instruction explaining a pharmacist's duties under California law).  At all times during the scheme, defendant was a licensed attorney in good standing with the California Bar and subject to all duties attendant thereto, and all four client-victims signed retainer agreements with Girardi Keese, which as defendant consistently alleged was a sole proprietorship that was owned, managed, and controlled exclusively by defendant.  (See Dkt. 369 at 223; Trial Ex. 1, 201, 340, 403; Dkt. 299 at 5-6.)

impediment to paying the client-victims the entirety of their balances.  And time and again, defendant Girardi would tell his clients lies so that he could perpetuate his scheme without scrutiny.  (See, e.g., Trial Ex. 14 (you "will received 6½% interests [*sic*]"), 15 ("The funds are locked up for a six-month period"), 30 ("we worked magic so far in getting these huge interest rates and getting the first two years tax free"), 35 ("I think it is more prudent to pay Joseph on a monthly basis.  That was an agreement I had with the court when we settled the case"), 42 ("As you know, Justice Panelli watches over this case"), etc.)  The jury observed firsthand that despite defendant's promises that client funds were protected and sitting safely in his client trust accounts, the funds were actually being spent -- sometimes before the settlements were even deposited.  (See, e.g., Trial Ex. 458 (showing approximately $1.5 million advanced from Client 4 settlement's settlement over a month before any settlement funds were even received).)

    Moreover, though defendant continues his belabored attempts to pin the fraud scheme entirely on co-defendant Kamon, overwhelming evidence presented at trial demonstrates that defendant operated his Ponzi scheme for decades, and long before Kamon even started at Girardi Keese.  For example, Kathy Marlatt testified that even before Kamon was employed at the law firm, she was asked to "create a system that would allow for negative balances in the trust account[.]" (Dkt. 367 at 202.)  Marlatt also testified that, long before Kamon joined the firm, Girardi Keese would advance itself portions of

settlement proceeds before the funds were even received by the firm. (See id. at 203; see also Dkt. 368 at 45 ("Q: [Y]ou have seen dozens of other examples of the firm advancing itself funds far before the money is actually received? A: Yes.").)  Moreover, the jury heard evidence that defendant was on notice of client demands for their money, but he continued to delay payments and manufacture more and more lies to obfuscate the truth.  (See, e.g., Trial Ex. 226 ("Maybe you do not know but this settlement is fully taxable by the IRS").) And he did this even after his own junior attorney wrote memo after memo disputing his lies.  (See, e.g., Trial Ex. 235, 200 ("There are ZERO tax issues. There are ZERO liens.  There is no reason to withhold the client's funds any longer.").)  Indeed, the jury heard testimony from Alexa Galloway who spent months attempting to get defendant to pay a past-owed client, and when she confronted defendant "[h]e would get progressively more upset with [her] and say your role in this case is done.  I will handle it.  Handle your other cases."  (Dkt. 365 at 29; see also Dkt. 368 at 154 ("I asked [defendant], why are you so upset? . . . He said, you just don't understand.  There's a lot of bills to pay here.  I need that check, period.  And he took the check from me.").)  Far from a "victim" in a scheme orchestrated by Kamon, defendant was the mastermind behind this multi-million dollar fraud that left many of his former clients without the benefit of their full settlements.

Defendant also incredibly claims that "the Government has not proved that Mr. Girardi obtained [the client-victims'] money by means

6

of false statements or omitted representation that he had a duty to disclose," (Dkt. 370 at 133), but that is precisely what the evidence at trial demonstrated. Defendant lied to the Ruigomez family about a phantom 6½% interest bearing account (see, e.g., Trial Ex. 14, 15, 30, 39), former retired California Supreme Court Justice Edward Panelli supposedly "watching over the matter" (see Trial Ex. 35, 42, 44, 53, 57, 98), and so much more. He also lied to client-victim Selberg about alleged tax issues (Trial Ex. 226) -- a lie he also told client-victim Saldana (Trial Ex. 429, 452), among others. And the jury in this case also heard from each client-victim that they trusted defendant and believed the lies he told them. (See, e.g., Dkt. 364 at 23, 43 ("Because I trusted Tom."); id. at 220 ("He said he would, so I believed him."); Dkt. 368 at 88 ("Q: [D]id you still believe that the defendant was holding your money in trust? A: Yes, I did.").)[2] In any event, and despite overwhelming examples of defendant's false statements and omitted facts, the Ninth Circuit has squarely held that "the government is not required to prove any particular false statement was made." United States v. Woods, 335 F.3d 993, 998 (9th Cir. 2003). The relevant inquiry is whether the

---

[2] Defendant also claims that the government "has not proved that the four matters at issue in this case are part of one single scheme." (Dkt. 370 at 133.) Notwithstanding his claims, the scheme charged in the indictment and presented at trial was simple and consistent throughout all charged clients: each client signed a retainer agreement for legal services wherein Girardi Keese was entitled to fees and costs and the remainder of the funds was supposed to be paid to the clients. Notwithstanding this explicit agreement, under defendant's control and with his authorization, client settlement funds were almost immediately misappropriated and used to pay other clients and personal expenses unrelated to the clients at issue. Each client-victim had their money misappropriated in similar ways by similar means, i.e., defendant would pay them lulling payments (usually after they threatened action), and defendant would make lulling statements to buy himself more time.

scheme as a whole "was reasonably calculated to deceive." Id. Relatedly, statements need not be "literally false" to be misleading. Woods, 335 F.3d at 998 (internal quotation marks and citation omitted). "[D]eceitful statements of half truths ... is actual fraud"; true statements may also deceive if made under circumstances that "convey [a] false and deceptive appearance." Id. (internal quotation marks and citation omitted); see also Lustiger v. United States, 386 F.2d 132, 136 (9th Cir. 1967) ("While the statements in the advertising materials may not have been literally false, taken as a whole they were fraudulently misleading and deceptive.").[3]

In sum, the government presented sufficient evidence that a rational juror could conclude that defendant knowingly devised and participated in a scheme to defraud.

**B.  The Evidence Was Sufficient to Prove Defendant's Intent to Defraud**

Defendant next argues that the government failed to present evidence of defendant's intent. Specially, he argues that "[n]o rational juror could find based on the evidence beyond a reasonable

---

[3] Defendant's arguments regarding materiality likewise fail. Materiality "is an objective test, which looks at the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end." United States v. Peterson, 538 F.3d 1064, 1072 (9th Cir. 2008) (cleaned up). "To be material a statement need only have the propensity or capacity to influence or affect [the relevant] decision." United States v. Lindsey, 850 F.3d 1009, 1013-14 (9th Cir. 2017) (internal quotation marks and citation omitted). Thus, "the government does not have to prove actual reliance upon the defendant's misrepresentations" in order to satisfy materiality." Id. (quoting Neder v. United States, 527 U.S. 1, 25 (1999)). After all, wire fraud does not require a showing "that the scheme was successful or that the intended victim suffered a loss or that the defendants secured a gain." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1400 (9th Cir. 1986); see also United States v. Rude, 88 F.3d 1538, 1547 (9th Cir. 1996), as amended on denial of reh'g (Sept. 10, 1996) ("[T]he mail and wire fraud statutes do not proscribe only successful schemes.").

8

doubt that Mr. Girardi, especially during the 2019 and 2020 time period, was capable of understanding complex and changing information[.]"  (Dkt. 370 at 144.)  However, at trial the government presented extensive evidence that defendant had the requisite criminal intent for all counts, especially his conduct alleged in 2019 and 2020.  The government presented numerous letters that defendant dictated during this time period to the client-victims in which he had no apparent issue in appreciating the facts of the particular case and, notably, building upon the previous lies he had told them.  For example, the jury heard testimony from Erika Saldana who primarily dealt with defendant in 2019 and 2020.  Nearly all of Ms. Saldana's interactions with defendant were by telephone, whereafter she would write an email to him and others summarizing their conversation.  In an email exchange from September 2020, Ms. Saldana itemized each lie defendant told her over the preceding months, which continued to evolve, demonstrating defendant's acute awareness of the facts of that case and the previous lies he had told her.  (See Trial Ex. 438 ("At first you said . . . then we were told . . .  then we had to wait . . . and by now everything has been approved and completed and this week you mentioned the judge not wanting to sign off on the release of our money due to favoritism . . ."); see also 455 ("but every time we speak there [is] a new excuse, a new story and I don't know what is really going on at this point. . . This is unfair and you are taking advantage of my family.").)  The jury also heard contemporaneous voicemails defendant left for many of these victims in which he gave further lies and excuses for delays in payment.  (See, e.g., Trial Ex. 337 ("I know you're so frustrated, and mad, and everything, and I don't blame you, I am too.  There

9

[are] certain orders that we have to get signed by the court. The courts are closed."), 339 ("The courts are closed, as you know, and it isn't my fault").)

Moreover, the government presented evidence that for years, defendant continued to avoid giving clients and lenders requested documentation, further demonstrating his intent to avoid detection. For example, the jury heard testimony from Joseph Ruigomez and his mother, Kathleen Ruigomez, where they recounted how frequently they requested their settlement materials from defendant, and how he actively avoided giving it to them. (Dkt. 364 at 30 ("Q: [D]id you ever receive a copy of your settlement agreement from the defendant? A: No. Q: And did you continue to ask the defendant and others at Girardi Keese for this paperwork? A: Yes, consistently."); Trial Ex. 31 ("When we requested [it] in the past, your office said more time [was] needed. We still haven't received any case documents."), 36 ("We requested these documents in the past . . ."), 54 ("[Tom] said this is complicated because it is a general settlement agreement with all the victims"), 59 ("I have been trying to get information concerning my PG&E settlement and the settlement proceeds for a considerable period of time.").) The jury also heard from Alan Zimmerman, a former creditor of Girardi Keese, who testified that defendant would not allow his auditor to look at the firm's books and records -- a fact he found concerning. (Dkt. 367 at 163-64.) Testimony from attorney Jeffrey Issacs also echoed this theme that defendant stonewalled litigants who tried to gain access to the Girardi Keese accounting records. (See Dkt. 373 at 81-82 ("We filed motions to compel . . . [and] [e]ventually got orders requiring that the Girardi Keese law firm produce those records. When they did not,

we filed a motion to have the Girardi Keese law firm, Mr. Girardi, and Mr. Callahan held in civil contempt for violating court orders.").

Finally, the jury saw evidence that tens of millions of dollars were used, often from the client trust account, to fund inappropriate expenditures such as defendant's private jets, jewelry and country clubs, luxury car payments, EJ Global expenses, and nearly $30 million in payments to defendant himself.  Of course, such misuse of funds is highly probative of defendant's specific intent to defraud.  See United States v. Booth, 309 F.3d 566, 575 (9th Cir. 2002) ("There was evidence that the two [defendants] received money, represented to be refundable, from their clients that was purportedly for securing leases, but they promptly spent the money on themselves instead.").

Accordingly, the evidence was sufficient to prove defendant's intent to defraud.

### C. The Deposits of Settlement Funds into the Girardi Keese Client Trust Accounts Were in Furtherance of the Scheme

Last, defendant challenges the sufficiency of the evidence for his wire fraud convictions on the grounds that defendant's lies and material omissions were made only after the settlement funds had already been received by Girardi Keese.  (Dkt. 370 at 134-35.)  Not so.  As discussed above, defendant's lies to client-victims sometimes occurred before his receipt of their settlement funds, and his misappropriation of their money often occurred days or weeks before the firm even received their settlement deposits.  For example, in the Ruigomez case, defendant began to lie and mislead them on the day of their final mediation -- well before Girardi Keese received any of their settlement funds.  Specifically, he lied to the Ruigomez family

11

about the true value of their settlement, discounting it from $53 million to $5 million plus an annuity. (See supra at 3.)  Clearly the Ruigomez family would have never allowed defendant to receive the funds had they known the truth.

Defendant also minimizes his decades' long misappropriation of the trust accounts, which was only possible through his receipt of new client funds to pay past owed clients.  As demonstrated during trial, the Girardi Keese trust account deposits helped facilitate defendant's fraud in at least two ways.  First, defendant's ability to embezzle funds depended on his "continued harmonious relations" and "good reputation" with both his employees and clients.  See Schmuck v. United States, 489 U.S. 705, 711-12 (1989).  By depositing settlement checks in the trust account, defendant created the illusion that he was complying with his professional obligations and running a legitimate law firm -- when, in fact, he was fraudulently embezzling these funds.  That false sense of security gave defendant more time to steal his existing clients' money and find new clients.  What is more, defendant also used some of the funds that he deposited in the trust account to make lulling payments, which served the same purpose.  Thus, the trust account deposits were "incident to an essential part of the scheme or a step in [the] plot." Id. at 711 (cleaned up).

Additionally, defendant's trust account deposits helped conceal his fraudulent scheme from detection, i.e., numerous, high value deposits allowed the accounts to avoid being overdrawn.  Like a Ponzi scheme, once new money was deposited, old client-victims could be paid.  It was only toward the end of the scheme, in approximately 2019-2020, when settlement deposits slowed down and his scheme began

1  to unravel.  By causing checks to be deposited into his trust
2  accounts -- and not into other accounts -- defendant was able to
3  continue the fraud scheme.  Thus, deposits into the Girardi Keese
4  trust accounts were integral to defendant's efforts to further the
5  scheme and "conceal his transactions entirely from detection."  See
6  United States v. Jinian, 725 F.3d 954, 964 (9th Cir. 2013).

7  　　　Finally, as previously submitted, defendant's reliance on Parr
8  v. United States, 363 U.S. 370 (1960), is misplaced.  Far from
9  absolving him of liability, these and other deposits into the firm's
10 trust accounts -- regardless of whether they were "legally compelled"
11 -- were integral to his fraudulent scheme.  The Ninth Circuit has
12 repeatedly held that "a conviction for mail fraud may be upheld where
13 'legally compelled' mailings were part of the scheme."  United States
14 v. Licciardi, 30 F.3d 1127, 1133 (9th Cir. 1994); United States v.
15 Kellogg, 955 F.2d 1244, 1247-48 (9th Cir. 1992).  In Kellogg, for
16 instance, the defendant was convicted of mail fraud and aiding the
17 preparation of false tax returns.  955 F.2d at 1246.  He challenged
18 his conviction for mail fraud on the basis that he was legally
19 required to mail his tax returns.  Id. at 1247.  The Ninth Circuit
20 rejected that argument and explained that the holding of Parr was
21 narrow:

> The [Supreme] Court carefully limited its holding to the
> "particular circumstances of the case," relying on the
> facts that the school district was required to collect
> taxes, that the taxes assessed were not "padded," and that
> the assessment letters "contained no false pretense or
> misrepresentation."

Id. at 1248 (alteration adopted) (quoting Parr, 363 U.S. at 391-92).

13

1    In other words, the holding of Parr applies only when the
2 relevant mailings or wirings were not "part[s] of the execution of
3 the fraud." Id. (alteration in original) (quoting Parr, 363 U.S. at
4 390). This was not the case here since, as stated above, defendant
5 used the trust account deposits to facilitate and help further
6 perpetrate the fraud, including by even "advancing" himself proceeds
7 of the settlements before they were even received. Thus, these
8 deposits were "incident to an essential part of the scheme, or a step
9 in the plot." See Schmuck, 498 U.S. at 711 (cleaned up); see also
10 Dkt. 352 at 3-4.
11   Moreover, in a near identical case involving a lawyer convicted
12 of fraud related to misuse of client trust accounts, the Ninth
13 Circuit recently rejected the same argument based on Parr that
14 defendant makes here. See United States v. Layfield, 2024 WL 982437
15 (9th Cir. Mar. 7, 2024). Wires into Layfield's client trust account
16 resulted from services that Layfield "falsely represented he would
17 perform in accordance with his fiduciary duty to protect and hold his
18 clients' funds in trust." Id. at *4. Thus, Layfield's
19 misrepresentations "led to the firm's services to client's which in
20 turn led to the receipt of settlement funds that were then deposited
21 into the trust account." Id. Because Layfield's fraud scheme
22 "triggered the applicability of the local law that required the
23 wires, Parr [could] not immunize Layfield." Id. (cleaned up).
24   Defendant argues that this Court should ignore the Ninth
25 Circuit's decision in Layfield because it was unpublished and
26 therefore nonbinding. (See Dkt. 354 (citing Hart v. Massanari, 266
27 F.3d 1155, 1158 (9th Cir. 2001) (Kozinski, J.) (discussing 9th Cir.
28 R. 36-3 prohibition on citing unpublished cases)).) However,

14

1  defendant ignores that Rule 36-3 was subsequently amended, after
2  Hart, clarifying that unpublished decisions issued on or after
3  January 1, 2007 may be cited "as persuasive authority pursuant to
4  Ninth Circuit Rule 36-3(b)." Uche-Uwakwe v. Shinseki, 972 F. Supp.
5  2d 1159, 1189 n.14 (C.D. Cal. 2013); Nuh Nhuoc Loi v. Scribner, 671
6  F. Supp. 2d 1189, 1201 n.10 (S.D. Cal. 2009) ("Although still not
7  binding precedent, unpublished decisions [postdating 2006] have
8  persuasive value and indicate how the Ninth Circuit applies binding
9  authority."). Thus, there is no reason for this Court to ignore
10 Layfield's reasoning and result. Defendant's ancillary attempt to
11 distinguish this case from Layfield likewise fails. Like the wires
12 in Layfield, the wires into defendant's trust accounts were the
13 result of the services that defendant had falsely represented he
14 would perform in accordance with his fiduciary duty to protect and
15 hold their funds in trust. Therefore, as in Layfield, because
16 defendant's "fraudulent scheme ... triggered the applicability of the
17 local law that required the [wires]," Parr cannot immunize him. Id.,
18 2024 WL 982437 at *2.

**IV.  CONCLUSION**

For the forgoing reasons, the government respectfully requests that the Court deny defendant's motion for judgment of acquittal in its entirety.

15